UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SOLUS ALTERNATIVE ASSET MANAGEMENT LP,

                    Plaintiff,

      -against-

GSO CAPITAL PARTNERS, L.P., HOVNANIAN ENTERPRISES, INC., K. HOVNANIAN ENTERPRISES, INC., K. HOVNANIAN AT SUNRISE TRAIL III, LLC, ARA K. HOVNANIAN, and LARRY SORSBY,

                    Defendants.
------------------------------------------------------------------------X

No. 18 Civ. 232 (LTS) (BCM)

**DECLARATION OF RYAN MOLLETT**

Pursuant to 28 U.S.C. § 1746, RYAN MOLLETT, declares as follows:

      1.     I am a Senior Managing Director of defendant GSO Capital Partners LP ("GSO"), where I have been employed since 2011.  GSO is one of the world's largest credit-oriented alternative asset managers with approximately $99 billion in total assets under management.  GSO specializes in providing financing for distressed companies that do not have ready access to financing in traditional capital markets.  GSO has provided over $47 billion in capital in privately originated transactions to enable companies to remain viable while also capturing opportunities for the firm's investors.  Such financing packages often utilize non-investment grade disciplines such as leveraged loans, high yield bonds, distressed debt, mezzanine lending, and rescue financing.

      2.     I respectfully submit this declaration in opposition to the motion of plaintiff Solus Alternative Asset Management LP ("Solus") for a preliminary injunction in the above-captioned action, which seeks to enjoin a proposed exchange offer announced on

December 28, 2017 (the "Exchange")[1] by defendant K. Hovnanian Enterprises, Inc. ("HOV" or the "Company"). This declaration is based on my personal knowledge and experience, as well as information and documents that I have reviewed as described herein.

3. At GSO, I am a Portfolio Manager focused on distressed and special situation investing. I am a senior member of GSO's Global Distressed Investment Team and a Joint Portfolio Manager of GSO's Capital Solutions Funds, Credit Alpha Funds, and the Special Situations Funds. I also sit on the Investment Committee for these funds. I also serve as a Portfolio Manager of GSO Community Development Capital Group LP, a fund formed to provide land acquisition and development capital in partnership with residential homebuilders.

**Evolution of GSO's Refinancing Idea for HOV**

4. GSO has followed HOV closely from an investment perspective for years. Indeed, GSO has provided financing to the company on occasion. For example, in July 2012, GSO offered critical financing to HOV in the form of a "land bank" deal.

5. HOV has a complex capital structure and, absent a successful closing of the Exchange and the various financings associated with it, has approximately $369 million of unsecured debt maturing in January and November of 2019, consisting of senior 7% notes maturing in January 2019 (the "7% Notes"), and 8% notes due in November 2019 (the "8% Notes"). In addition, to the extent that the 7% Notes are not refinanced or repaid prior to October 15, 2018, HOV has a $75 million term loan that will become due and payable on that date. Accordingly, HOV needs to find a way to refinance or otherwise retire the 7% and 8%

---

[1] On December 28, 2017, the Company filed an 8-K regarding the Exchange, which publicly disclosed the exchange offering and terms that were conveyed to noteholders in a Confidential Offering Memorandum. Both the 8-K and Confidential Offering Memorandum were attached as exhibits to the Declaration of Jonathan Pickhardt in support of Solus' motion for preliminary injunction. (Pickhardt Decl. Exs. 10 and 11.)

Notes in 2018 in order to avoid cross-defaulting its capital structure and suffering the disastrous consequences associated with such an outcome.

6. In December 2016, iHeartCommunications, Inc. ("iHeart") and its parent iHeartMedia, Inc. were engaged in restructuring their debt, a process that is still ongoing. iHeart arranged for its wholly owned subsidiary, Clear Channel Holdings, Inc. ("Clear Channel") to purchase $57.1 million of its 5.5% senior notes due December 15, 2016. At maturity, iHeart repaid all amounts outstanding on the 5.5% notes except for amounts due on the notes held by Clear Channel. Based on publicly available information about the transaction, I believe iHeart undertook this transaction in order to: (i) avoid a springing lien in favor of certain creditors that would have been triggered if all of the notes had been retired; and (ii) eliminate credit default swaps on iHeart in order to permit its debt holders to negotiate with iHeart based only on their debt holdings without regard to CDS positions.

7. In late December 2016, an International Swaps and Derivatives Association ("ISDA") determinations committee ("DC")[2] ruled that iHeart's decision not to repay the principal balance due on the notes held by Clear Channel constituted a "Failure to Pay" Credit Event. (A copy of an ISDA press release regarding iHeart is attached as Exhibit A1, and a copy of the DC's decision regarding iHeart is attached as Exhibit A2.) As a consequence, buyers of CDS referencing iHeart were entitled to collect on their contracts and, to my knowledge, no new CDS contracts have been written on iHeart. The iHeart transaction and Credit Event received substantial attention and were widely known in the market.

---

[2] Relevant background on credit default swaps ("CDS") is provided at paragraphs 32 to 39 of this Declaration. *See* paragraphs 36 to 39 for a brief description regarding the process by which a DC determines whether a Credit Event has occurred that requires payment on CDS contracts.

3

8. In late February 2017, while traveling to the J.P. Morgan High Yield Conference where HOV was making a presentation, I started to think about a high-level framework for a financing package that would solve HOV's near-term unsecured debt maturities in a way that would provide HOV with sufficient runway to grow its business and not be under the near constant pressure of maturing debt obligations, like so many other companies that issue high-yield debt and wind up amending and extending that debt into an unclimbable "wall" of sequentially maturing debt.

9. The high-level framework based on an iHeart-type structure under consideration at GSO was essentially as follows: HOV would offer its unsecured noteholders a package of new debt that, on a blended basis, provided them with a total above-par return, while also providing HOV with a portion of new debt at reasonable costs with a longer-term maturity to give it maximum flexibility in the future. Part of the framework also included a way to trigger the CDS that was written on HOV in order to incentivize those with hedged positions to participate in such an exchange. A transaction that triggers CDS allows potential participants in an exchange to make an investment decision on the merits of the exchange without regard to their CDS position. The concept was also intended to provide investment returns sufficient to offset potential losses incurred on the sponsorship of low-cost financing provided to HOV.

10. When I saw HOV's Chief Financial Officer, Larry Sorsby, at the J.P. Morgan Conference, I mentioned to him that I was thinking about a way to help HOV refinance the 7% and 8% Notes, but I did not elaborate on the framework since it was still at the level of a conceptual idea that needed to be developed.

11. As the high-level framework was evolving into a more refined investment idea, [REDACTED]

4

███████████████████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████████
█████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
████████████████████████████ █████████████
███████████████████████████████████████
█████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
█████████████████████████████████████
████

12.     This investment thesis underwent a rigorous process of testing and refinement internally as per the normal GSO Investment Committee protocol. That process included ████████████████████████████████
████████████████████████████████████
████████████████████████████████████

---

[3] The risk associated with CDS is asymmetric. Buyers of CDS (such as GSO with reference to HOV CDS) stand to lose only the amount of the premiums paid, while CDS sellers potentially stand to pay the entire notional amount of the CDS.

3318722_6

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

13.     In early to mid-July 2017, GSO was ■■■■■■■■■■■■■■■■ ■■ while refining its investment strategy.  To GSO's surprise, the Company announced the launch of a large secured bond offering designed to refinance various secured debt instruments that were part of its capital structure.  As the offering evolved, certain covenants for the new secured bonds limited HOV's ability to refinance the 7% and 8% Notes by: (a) requiring any debt incurred to refinance such debt to mature after the new secured bonds; and (b) restricting HOV from using any of its cash to repurchase the 7% or 8% Notes in order to facilitate a refinancing of such debt.[4]  This was problematic because HOV previously had used cash to repurchase bonds when their trading price fell below par to help meet upcoming maturities by reducing the amount necessary to be refinanced or repaid.  Even with these onerous covenants, the indicated price in the market for the new secured bonds was higher than the combined pricing on the debt that it was intended to refinance.

14.     I spoke with Mr. Sorsby and Ara Hovnanian prior to issuance of the new secured bonds and expressed my surprise that HOV would consummate a transaction that increased HOV's cost of capital and restricted its ability to refinance its upcoming unsecured

---

[4] On July 27, 2017 the Company filed an 8-K announcing the completion of this offering. (Pickhardt Decl. Ex. 8.)

6

3318722_6

debt. I suggested to Messrs. Sorsby and Hovnanian that if HOV was intent on moving forward with the new secured bond offering, HOV should at least have some flexibility to continue to repurchase its own debt, and noted that I could not support a refinancing package with a complete restriction on doing so.

15. During our discussions, Messrs. Sorsby and Hovnanian followed up on my discussion with Mr. Sorsby from the J.P. Morgan Conference in February and asked if I was any closer to discussing my idea to help refinance the 7% and 8% Notes. I responded that GSO might at some point consider offering a financing package to the Company, but that I was not able to, even in general terms, discuss the broad strokes of what such a package might involve.

16. The Company's secured bond offering ultimately closed in the form of two notes, priced at 10% and 10.5% with maturity dates of 2022 and 2024, respectively (the "New Secured Notes"). The New Secured Notes allowed HOV to repurchase up to $50 million of HOV unsecured debt, but continued to require that any debt issued to refinance the 7% and 8% Notes have a maturity date beyond the 2024 maturity of the 10.5% Notes.

17. It is common for an investor to use an intermediary to approach a debt or equity issuer for the purpose of exploring a potential investment idea in order to ensure that the investor does not come into possession of material non-public information before it is ready to do so. Typically, the intermediary is a law firm or an investment bank that represents the investor in connection with the investment idea and has experience with the structure. This type of approach is considered standard practice at GSO, where it is regularly used. In July 2017, ███████████████████████████████████████████████ In order to be responsive to the requests from Messrs. Sorsby and Hovnanian to discuss the framework that

GSO was developing, at the end of July, I contacted Mr. Sorsby to propose that he meet with GSO's outside counsel, Kristopher Hansen at Stroock & Stroock & Lavan LLP ("Stroock").

18. On August 1, 2017, Mr. Hansen, Mr. Sorsby and I had a call where I introduced Mr. Hansen to Mr. Sorsby and then I dropped off of the call. Mr. Hansen was not authorized to discuss or propose specific terms of a potential refinancing for HOV, economic or otherwise. Mr. Hansen was instructed and knew not to inform me of any developments regarding his communications with the Company, including even if such communications were ongoing until such time as he believed that the Company was interested enough in the financing concept to warrant GSO entering into a non-disclosure agreement with the Company. While GSO continued to work with Stroock in connection with analyzing various aspects of the financing framework, I was not updated on the substance of anything discussed between Mr. Hansen and Mr. Sorsby on the August 1, 2017 call, nor was I aware of whether, or to what extent, the Company was interested in exploring the concept of a refinancing transaction with GSO along the lines I had considered until Mr. Hansen contacted me on October 19, 2017. The same restriction applied to all other GSO personnel with involvement in investment decisions with respect to HOV.

19. On October 19, 2017, I was contacted by Mr. Hansen, who told me that HOV was interested in exploring the refinancing framework that I had developed. GSO signed a non-disclosure agreement with HOV on October 20, 2017, and [REDACTED] [REDACTED] On the same day, I and others from GSO, along with members of our financial advisor, PJT Partners, met with Mr. Sorsby and members of his team. Mr. Hansen and counsel for HOV were also present at the meeting. I presented GSO's potential transaction structure at the meeting.

8

20. Thereafter, GSO and HOV engaged in numerous rounds of negotiations, both directly and through counsel, to ultimately arrive at the terms contained in the Exchange. During our negotiations, it was clear to me that HOV was also evaluating alternative financing proposals from other parties, but HOV did not disclose the terms of any such proposals, the identity of any party making such proposals, or the status of any negotiations with respect to the same. The Company used this competitive process to extract more favorable terms. In particular, during the course of the negotiations, the blended cost of capital resulting from the bifurcated bond structure improved to the Company's advantage and the Company secured a new revolving credit facility from GSO to HOV for up to $125 million and GSO's commitment to purchase $25 million of the 10.5% Notes, which were not part of GSO's original proposal. In exchange for the various forms of financing it offered HOV, GSO received the right to be paid a fee in limited circumstances where the Company chose to obtain financing from another party. In fact, the Company is free at any point to enter into a financing transaction with another party. GSO is in no way forcing the Company to proceed with the Exchange and its related financing.

21. The comprehensive financing package offered by the Exchange is a great result for HOV and all of its stakeholders. In developing the proposal that formed the basis of the Exchange, it was important to GSO to help HOV for the long term. GSO's interest in helping HOV for the long term post-Exchange makes sense given that GSO is the Company's largest debtholder by a wide margin, and among its five largest equity holders. In addition to providing multiple long-term loans, another method of accomplishing its goal was for GSO to structure the exchange of the 8% Notes into two new notes, as opposed to a single new note. Using a note with a higher interest rate and a shorter maturity (2025), along with a separate note

with a lower interest rate and a longer maturity (2040), creates tangible benefits for HOV and also provides a recovery for existing holders of the 8% Notes that is above par.

22. HOV gets the obvious benefit of having a low interest rate on a component of its debt for a long duration, something that every corporate issuer would prefer. In addition, if HOV executes on its business plan and the credit markets remain robust, HOV should be able to access the capital markets in the future and refinance the higher rate / shorter maturity bond into a lower cost of capital. When combined with the existing lower rate / longer maturity bond, HOV would be able to dramatically reduce its overall cost of capital, something that would enhance the value of HOV's equity and its ability to refinance or repay all of its other debt obligations. In addition, the lower coupon / longer maturity debt may trade in the secondary market at a below-par price. If so, and if HOV believes it to be a prudent use of excess cash, HOV could choose to repurchase a portion of the lower coupon debt and selectively reduce its leverage.

23. These same options would not be available to HOV in the event that the 8% Notes were exchanged into a new single note, even if that note was issued at an interest rate equal to the blended rate of the two new notes offered in the Exchange. One of the benefits of having a bifurcated structure is that when the higher coupon note becomes callable, the Company will be able to refinance at a favorable market rate. In addition, the bifurcated structure allows HOV to selectively reduce its leverage through repurchases of its debt in the market, which would undoubtedly be done at a higher price with a single series of notes, than the price HOV would pay to repurchase the lower coupon bond in the two-note structure. Clearly, having a two-note structure for the exchange of the 8% Notes provides real and lasting benefits for HOV and all of its stakeholders.

24. In fact, even those 8% noteholders who choose not to participate in the Exchange – like Solus – will continue to receive the benefit of their bargain by either being repaid at par, plus any applicable premium, or by receiving interest through maturity and being repaid at maturity. The Exchange is designed to stabilize HOV and let the Company focus on growing its business. The only parties that potentially "lose" from the closing of the Exchange are highly sophisticated investors who chose to sell HOV CDS. It is my view as a long-term investor in HOV that the issuance of an injunction against the Exchange would bring great harm to HOV for the benefit of a select few speculators in HOV CDS.

**Solus Threatens Blackstone**

25. On November 22, 2017, Quinn Emanuel, Solus' counsel, delivered a letter to senior management at The Blackstone Group LP ("Blackstone"), of which GSO is the credit division. (A copy of the November 22, 2017 letter from Quinn Emanuel to Blackstone is attached hereto as Exhibit B.) This letter was sent more than a month before any public announcement by GSO or HOV concerning the deal still under negotiation. Nevertheless, Solus claimed it was "widely reported" that GSO was engaged in negotiations with HOV. (*Id*. at 1.) In addition to claiming that GSO's conduct violated securities laws and the Martin Act, violations of which, it notes, are "subject to prosecution by the New York Attorney General's Office," the letter concludes by advising Blackstone that "[i]f GSO continues on its present course, Solus will ensure that GSO's actions are fully publicized to the marketplace so that all of GSO's counterparties are aware of its business practices, and will pursue recoveries against GSO to the fullest extent of the law." (*Id*. at 3.)

**GSO's Positions in HOV**

26. Contrary to claims made in the Complaint, GSO did not purchase CDS protection and find itself in a bad trade that it had to reverse at all costs. (*See* Complaint ¶¶ 3-4.) As detailed above, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. In fact, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. ▬▬▬▬▬▬▬▬ Attached hereto as Exhibit C is a chart reflecting ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

27. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

28. Attached hereto as Exhibit D is a chart reflecting the change in HOV's share price from September 15, 2017 to date. Also attached hereto as Exhibit E is a chart reflecting the change in pricing of HOV's 7% and 8% Notes relative to HOV CDS prices during the same time frame.

**There Is and Will Be No CDS Market Disruption**

29. The Exchange is not the first refinancing transaction to result in this type of CDS trigger. As noted above, an ISDA DC ruled in December 2016 that iHeart's failure to

3318722_6

redeem at maturity $57.1 million in notes held by its subsidiary constituted a Failure-to-Pay Credit Event. (*See* Exs. A1 and A2.) And in September 2013, an ISDA DC ruled that a Credit Event had occurred triggering payments on CDS after Codere Finance (Luxembourg), S.A., a gaming company operating in Europe and Latin America, made a payment under a revolving credit facility two days after it was due. (A copy of the Codere DC decision is attached as Exhibit F.) The market for CDS has continued to function following these well-publicized events.

30. The pricing of indices of CDS for high yield credits including HOV has not been substantially affected by either the rumors concerning the Exchange or the actual December 28, 2017 disclosure of the Exchange. The Markit CDX North America High Yield Index (the "HY Index"), published by IHS Markit (the leading provider of pricing information for CDS), is an index of CDS referencing 100 non-investment grade entities domiciled in North America, including HOV. On November 8, 2017 the CDX HY 29 price was 107.8051.[5] The following day, when the price of CDS referencing HOV spiked, the CDX HY 29 price remained virtually unchanged at 107.4871. (*Id.*) Similarly, there was no significant movement in index pricing between November 14 and November 15 when the financial press started to speculate about a transaction resulting in a Credit Event for HOV. On November 14, the CDX HY 29 price was 107.0908, and on November 15 it was 107.0605. (*Id.*) Nor did the index pricing show any significant reduction surrounding the announcement of the Exchange. On December 27,

---

[5] *See* GSO011086. Counsel for GSO has obtained a license to use CDX pricing data from Markit, which license requires the following disclaimer: "Data originating from Markit North America, Inc. ("Markit Data") is provided solely on an 'as is' basis. Neither Markit, its affiliates or its suppliers makes any warranty, express or implied (including without limitation any warranties for fitness for particular purpose, merchantability or title), with respect to the Markit Data, nor shall such entities have any responsibility or liability (directly or indirectly) in connection with the accuracy, completeness or timeliness of the Markit data."

2017, the CDX HY 29 price was 108.3297, 108.1859 on December 28, and 108.268 on December 29, 2017.  (*Id.*)  On January 10, 2018, the index price was 108.5085, and upon the filing of Solus' Complaint and motion for preliminary injunction, it was 108.7126.  (*Id.*)

31. If the CDS market believed that the Exchange was a real "existential threat" to the CDS market, other component credits of the CDX HY 29 index would have experienced CDS price increases and the index pricing would have been expected to decline substantially.  Instead, the index has remained virtually constant throughout this period, just as it remained relatively constant following the iHeart transaction in 2016.

*****

**Background on Credit Default Swaps**

32. A CDS is a contract that transfers the credit risk of a particular company, known as the "Reference Entity," between two parties.  A buyer of CDS protection pays a premium in exchange for a fixed duration of credit protection in the event that the Reference Entity experiences a defined "Credit Event."  Events that could constitute Credit Events may include, among others, failure to pay debt obligations, bankruptcy or debt restructuring.  The CDS buyer is also obligated to make quarterly payments to the seller during the protection period.

33. A participant in the market for CDS does not necessarily own any debt obligations issued by the Reference Entity, so there can be more in outstanding CDS than there are underlying debt obligations.

34. Non-dealer firms, such as GSO or Solus, that wish to buy or sell CDS referencing a particular company do not enter into such contracts directly with each other.  Rather, sellers of CDS referencing HOV could enter into contracts with dealers such as Goldman Sachs or Barclays.  Buyers of CDS referencing HOV could enter into separate contracts with the

dealer firms.  The contracts to buy and sell CDS protections are based on a "Master Agreement" promulgated by the International Swaps and Derivatives Association ("ISDA").

35. CDS trades are cleared through a clearing house, such as International Exchange, Inc.'s ICE Clear Credit platform.  This means that ICE functions as the central counterparty for all dealers.  That is, after each contract to buy or sell CDS is entered into ICE, the clearinghouse, among other things, nets the dealer positions against each other, processes payments on the contracts, and makes margin calls when required.  There is never a direct contractual relationship, direct communications or payments, between non-dealer parties buying and selling CDS referencing the same company – the dealers and ICE stand between them.

36. If a party believes that a Credit Event has occurred, it could submit a request to ISDA to have the matter considered by the relevant regional DC, here the Credit Derivatives DC of the Americas.  (ISDA Credit Derivatives Committees Rules (January 20, 2016 Version), attached as Exhibit G at § 2.1.)  The DC is composed of 15 ISDA member firms – 10 sell-side firms and 5 buy side-firms – and must reach a decision based on a 80% supermajority vote.  (*Id*. at § 3.1(c), § 6; *see also* Ex. A1.)  If the DC is unable to reach a decision by supermajority, DC procedures provide that a panel of industry experts may be convened to decide the matter.

37. There are different types of Credit Events, each with different criteria.  In reaching a determination of the issues presented to it, a DC looks to definitions promulgated by ISDA that govern CDS.  As an example that may be relevant here, a Failure-to-Pay Credit Event must involve a missed coupon payment of $1 million or more.  (2014 ISDA Credit Derivatives Definitions, §§ 4.5, 4.9(d), Ex. H at 40-41, 44.)

38. If the DC determines there has been a Credit Event, it triggers an obligation by all sellers of CDS on that particular Reference Entity to pay money – they must either buy a specified amount of purchasers' holdings in so-called Reference Obligations at par (known as "physical" settlement), or pay purchasers the difference between the par value and the market price of a specified debt obligation in cash ("cash" settlement).

39. Accordingly, after a Credit Event, the DC has an auction procedure to facilitate settlement of CDS by payment of an objectively determinable amount of money.  Once a DC finds a Credit Event has occurred, it sets a date for an auction to establish a final price for cash settlement of all CDS, typically based on the "cheapest-to-deliver" obligation, meaning the least expensive bond in the Reference Entity's capital structure.  (See Exhibit G, including § 3.2 ("Auction Resolutions and Potential Auction Resolutions").)  Unless and until all of those separate events occur, it is not possible to determine with certainty the amount of (or need for) any payouts due to buyers of CDS referencing a particular company.  Indeed, prior to the auction there is no obligation of CDS sellers or buyers to pay on the CDS.  However, once the DC rules that a Credit Event has occurred and the auction process determines the price of the cheapest-to-deliver obligation, it is possible to determine the exact amount to be paid by a CDS seller and received by a CDS buyer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on January 19, 2018

By: _____
Ryan Mollett