# EXHIBIT A1



NEWS RELEASE
For Immediate Release

# ISDA Americas Credit Derivatives Determinations Committee: iHeart Communications, Inc. Failure to Pay Credit Event

**NEW YORK, December 21, 2016** – The International Swaps and Derivatives Association, Inc. (ISDA) today announced that its Americas Credit Derivatives Determinations Committee resolved that a failure to pay credit event occurred in respect of iHeart Communications, Inc.

The Committee also resolved to hold an auction in respect of outstanding CDS transactions. ISDA will publish further information, including the timing of the auction, on its website, www.isda.org/credit, in due course.

**For Press Queries, Please Contact:**
Lauren Dobbs, ISDA New York, +1 212 901 6019, ldobbs@isda.org
Nick Sawyer, ISDA London, +44 203 808 9740, nsawyer@isda.org
Michael Milner-Watt, ISDA London, +44 203 808 9727, mmilner-watt@isda.org
Amanda Leung, ISDA Hong Kong, +852 2200 5911, aleung@isda.org

**About the Determinations Committees**
The ISDA Credit Derivatives Determinations Committees (DCs) each comprise 10 sell-side and five buy-side voting firms, alongside three consultative firms and central counterparty observer members. Their role is to apply the terms of market-standard credit derivatives contracts to specific cases, and make factual determinations on Credit Events, Successor Reference Entities and other issues, based on information provided to the DCs by credit default swap (CDS) market participants. The DCs are also responsible for determining whether a CDS Auction should be held following a Credit Event. The determinations are governed by the Determinations Committee Rules. ISDA acts as a non-voting secretary to each DC, and endeavors to co-ordinate this process in a transparent and operationally efficient manner.

**About ISDA**
Since 1985, ISDA has worked to make the global derivatives markets safer and more efficient. Today, ISDA has over 850 member institutions from 66 countries. These members comprise a broad range of derivatives market participants, including corporations, investment managers, government and supranational entities, insurance companies, energy and commodities firms, and international and regional banks. In addition to market participants, members also include key components of the derivatives market infrastructure, such as exchanges, clearing houses and repositories, as well as law firms, accounting firms and other service providers. Information about ISDA and its activities is available on the Association's web site: www.isda.org.

ISDA® is a registered trademark of the International Swaps and Derivatives Association, Inc.

You are receiving this email as notification of an ISDA Press Release distribution. If you no longer wish to receive these emails please contact press@isda.org.

# EXHIBIT A2

Determinations Committee Decision

| Date: | December 27, 2016 |
|---|---|
| Determinations Committee: | Americas |
| Meeting Date: | December 27, 2016 |

| **DC Issue 2016121601:** | **Has a Failure to Pay Credit Event occurred with respect to iHeart Communications, Inc.?** | |
|---|---|---|
| Question for vote | Do you agree to publish the attached statement? (See Annex) | |
| Vote result: | Yes | |
| Votes: | 15 'Yes' votes and 0 'No' votes | |
| | AllianceBernstein L.P. | Yes |
| | Bank of America N.A. | Yes |
| | Barclays Bank plc | Yes |
| | BNP Paribas | Yes |
| | Citadel LLC | Yes |
| | Citibank, N.A. | Yes |
| | Credit Suisse International | Yes |
| | Cyrus Capital Partners, L.P. | Yes |
| | Deutsche Bank AG | Yes |
| | Elliott Management Corporation | Yes |
| | Goldman Sachs International | Yes |
| | JPMorgan Chase Bank, N.A. | Yes |
| | Mizuho Securities Co., Ltd. | Yes |
| | Morgan Stanley & Co. International plc | Yes |
| | Pacific Investment Management Co., LLC | Yes |

Annex

**Americas DC Meeting Statement December 21, 2016**

**Summary**

The DC met on December 21, 2016 to consider whether a Failure to Pay Credit Event had occurred with respect to iHeart Communications, Inc. (f/k/a Clear Channel Communications, Inc.) (the **Reference Entity**) as a result of the failure by the Reference Entity to make a USD 57.1 million payment with respect to certain 5.50% Senior Notes due 2016 (the **2016 Legacy Notes**).

On December 23, 2016, the DC Resolved that the Coverage Election for the DC Question should include both Updated 2003 Transactions and 2014 Transactions.

The DC Resolved that with respect to both 2014 Transactions and Updated 2003 Transactions:

(a)     a Failure to Pay Credit Event occurred on December 20, 2016 with respect to the Reference Entity;

(b)     the Credit Event Resolution Request Date was (i) December 20, 2016 for 2014 Transactions and Updated 2003 Transactions with a Scheduled Termination Date of December 20, 2016 and (ii) December 21, 2016 for Updated 2003 Transactions with a Scheduled Termination Date after December 20, 2016; and

(c)     a Restructuring Credit Event did not occur with respect to the Reference Entity.

Each capitalized term used but not defined in this Meeting Statement has the meaning given to it in the Credit Derivatives Determinations Committees Rules (January 20, 2016 version) (including in the 2014 Definitions and the Updated 2003 Definitions, each as defined therein) (the **DC Rules**).

**Background**

The 2016 Legacy Notes were issued pursuant to a supplemental indenture dated December 16, 2004 between the Reference Entity and The Bank of New York Mellon Corporation (f/k/a The Bank of New York) (the **Trustee**) (the **Supplemental Indenture**, and together with the Senior Indenture dated October 1, 1997 between the Reference Entity and the Trustee (the **Senior Indenture**), the **Indenture**). By their terms, the 2016 Legacy Notes "mature and the principal thereof shall be due and payable, together with all accrued and unpaid interest thereon, on December 15, 2016".[1]  There is no grace period under the terms of the 2016 Legacy Notes for a failure to pay principal.[2]

As described in a Form 8-K filed with the Securities and Exchange Commission on December 13, 2016 (the **Form 8-K**),[3] a special committee of independent directors of the Reference Entity decided not to repay at maturity USD 57.1 million of the 2016 Legacy Notes held by Clear Channel Holdings, Inc. (**CCH**), a Reference Entity affiliate (the 2016 Legacy Notes held by CCH, the **Relevant 2016 Legacy Notes**).

---

[1] Supplemental Indenture at Section 1.01 (available at:
https://www.sec.gov/Archives/edgar/data/739708/000095013404019500/d21022exv10w1.txt).
[2] Senior Indenture at 501(2) (available at: https://www.sec.gov/Archives/edgar/data/739708/0000739708-97-000022.txt).
[3] Available at: https://www.sec.gov/Archives/edgar/data/739708/000119312516791577/d310088d8k.htm

2

On December 20, 2016, the Trustee issued a notice (the **Trustee Notice**) to all holders of the 2016 Legacy Notes stating that "CCH agreed to waive any rights to collect payment on, and consent to non-payment on, [the Relevant 2016 Legacy Notes], at the same time as principal is paid to all other holders of the [2016 Legacy Notes] pursuant to Section 301 of the [Senior Indenture] or otherwise (provided, however, that CCH did not waive its underlying right to be repaid on [the Relevant 2016 Legacy Notes]) […]".

**Failure to Pay**

Section 4.5 of the 2014 Definitions provides that a "Failure to Pay" Credit Event means "after the expiration of any applicable Grace Period (after the satisfaction of any conditions precedent to the commencement of such Grace Period), the failure by the Reference Entity to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations, in accordance with the terms of such Obligations at the time of such failure."

The Updated 2003 Definitions contain the same substantive definition.[4]

Taking the elements of this definition in turn:

(a)     "*after the expiration of any applicable Grace Period*"

Because no contractual grace period applies to the Relevant 2016 Legacy Notes (as noted above), the DC determined that a grace period of 3 Grace Period Business Days should be deemed to apply pursuant to Section 1.46(c) of the 2014 Definitions and Section 1.12(a)(iii) of the Updated 2003 Definitions.  The DC noted that Section 1.46(c) of the 2014 Definitions and Section 1.12(a)(iii) of the Updated 2003 Definitions are identical and specifically provide that "unless 'Grace Period Extension' is specified as applicable in the related Confirmation, such deemed Grace Period shall expire no later than the Scheduled Termination Date".[5]

The definition of "Grace Period Business Day" in both the 2014 Definitions and the Updated 2003 Definitions provides, generally speaking, that the "Business Day" convention specified for the relevant Obligation governs.  Given the definition of "Business Day" in the Indenture and the requirement in the Supplemental Indenture that funds be paid in New York, the DC determined that with respect to the Relevant 2016 Legacy Notes, a "Grace Period Business Day" should be read to mean a "New York Business Day" for both 2014 Transactions and Updated 2003 Transactions.

Given the above, the DC determined that:

(i)     for 2014 Transactions, the deemed Grace Period expired, and the relevant payment failure occurred prior to midnight (Greenwich Mean Time)[6], on December 20, 2016;

---

[4] Section 4.5 of the 2014 Definitions refers to "the Reference Entity"; the corresponding section of the Updated 2003 Definitions refers to "a Reference Entity".  The DC does not view this difference as material to the analysis.

[5] "Grace Period Extension" is not applicable to Transactions specifying the North American Corporate / Standard North American Corporate Transaction Type.

[6] See Section 1.50 of the 2014 Definitions.

3

(ii) for Updated 2003 Transactions with a Scheduled Termination Date of December 20, 2016, the deemed Grace Period expired and the relevant payment failure occurred on December 20, 2016[7]; and

(iii) for Updated 2003 Transactions with a Scheduled Termination Date after December 20, 2016, the deemed Grace Period expired at midnight (Eastern Standard Time) on December 20, 2016, and therefore the relevant payment failure occurred on December 21, 2016.

Based on Publicly Available Information submitted to the DC and on the basis that the DC did not receive any Publicly Available Information indicating that the relevant payment failure had been remedied, the DC determined that for both 2014 Transactions and Updated 2003 Transactions, the relevant payment failure had occurred and was continuing after the deemed Grace Period for the Relevant 2016 Legacy Notes had expired.

(b) "*failure by the Reference Entity to make, when and where due, any payments*"

As noted in the "Background" section above, the Indenture states that the Relevant 2016 Legacy Notes mature on December 15, 2016 and that all principal and accrued but unpaid interest becomes "due and payable" on such date.

The Indenture requires that any change in a payment date or the maturity date of the 2016 Legacy Notes be effectuated by a supplemental indenture.[8] No supplemental indenture or similar amendment agreement was made publicly available to the DC in connection with the DC Credit Event Question, and therefore the DC determined that the Indenture provisions discussed above continue to control the date on which principal on the 2016 Legacy Notes became "due and payable".

Furthermore, the DC noted that according to the Trustee Notice, CCH has in fact asserted that it is owed an amount of principal in respect of the Relevant 2016 Legacy Notes and is reserving the right to claim such amount in the future, notwithstanding the fact that CCH has agreed not to pursue remedies for non-payment at this time. Similarly, the Form 8-K indicates that the Reference Entity continues to view its payment obligations on the Relevant 2016 Legacy Notes as "outstanding". The DC viewed this as further support for the notion that December 15, 2016 was the date on which the relevant payment of principal was "due and payable" and that such date had not been modified or deferred by agreement between the Reference Entity and any noteholder.

(c) "*in an aggregate amount of not less than the Payment Requirement*"

For purposes of the Standard North American Corporate Transaction Type, the Payment Requirement is USD 1 million. The DC determined that the submitted Publicly Available Information described a failure to pay in excess of this amount.

---

[7] See Section 1.12(a)(iii) of the Updated 2003 Definitions (stating that the deemed Grace Period can expire no later than the Scheduled Termination Date).

[8] See Section 902(1) of the Senior Indenture.

(d)     "*under one or more Obligations, in accordance with the terms of such Obligations at the time of such failure*"

The DC determined that the Relevant 2016 Legacy Notes constitute borrowed money obligations of the Reference Entity and therefore constitute "Obligations" for purposes of the Failure to Pay Definition under both the 2014 Definitions and the Updated 2003 Definitions.

As noted above, based on the submitted Publicly Available Information, the DC did not view the payment terms of the Relevant 2016 Legacy Notes to be amended in any way. Therefore the terms of the Relevant 2016 Legacy Notes "at the time of such failure" remain as set out in the Indenture, and the payment of principal on the Relevant 2016 Legacy Notes was due on December 15, 2016.

Having considered the above, the DC Resolved that a Failure to Pay Credit Event had occurred with respect to the Reference Entity in relation to both 2014 Transactions and Updated 2003 Transactions.

**Credit Event Resolution Request Date**

The term "Credit Event Resolution Request Date" means "with respect to a DC Credit Event Question, the date as publicly announced by the DC Secretary that the relevant Credit Derivatives Determinations Committee Resolves to be the date on which the DC Credit Event Question was **effective** and on which the relevant Credit Derivatives Determinations Committee was in possession of Publicly Available Information with respect to such DC Credit Event Question" (emphasis added).[9]

The term "DC Credit Event Question" is in turn defined to mean "a notice to the DC Secretary requesting that a Credit Derivatives Determinations Committee be convened to Resolve whether an event that constitutes a Credit Event for purposes of the Credit Derivative Transaction **has occurred**" (emphasis added).[10]

The DC was of the view that a DC Credit Event Question must relate to an event that "has occurred" in order for such DC Credit Event Question to be "effective" for purposes of the "Credit Event Resolution Request Date" definition. The DC further determined, as noted above, that the earliest date on which the Failure to Pay could have occurred was (a) December 20, 2016 for 2014 Transactions and Updated 2003 Transactions with a Scheduled Termination Date of December 20, 2016 and (b) December 21, 2016 for Updated 2003 Transactions with a Scheduled Termination Date after December 20, 2016.

As a result, the DC determined that the Credit Event Resolution Request Date was (a) December 20, 2016 for 2014 Transactions and Updated 2003 Transactions with a Scheduled Termination Date of December 20, 2016 and (b) December 21, 2016 for Updated 2003 Transactions with a Scheduled Termination Date after December 20, 2016.

**Restructuring**

A "Restructuring" Credit Event is defined in pertinent part to include the "deferral of a date [...] for the payment of principal" with respect to an Obligation, if such deferral occurs "in a form that binds all

---

[9] Section 1.30 of the 2014 Definitions. The corresponding definition in the Updated 2003 Definitions is substantially similar with respect to the quoted text. See Section 1.24 of the Updated 2003 Definitions.
[10] Section 1.26 of the 2014 Definitions. The corresponding definition in the Updated 2003 Definitions is substantially similar with respect to the quoted text. See Section 1.24 of the Updated 2003 Definitions.

holders of such Obligation, is agreed between the Reference Entity or a Governmental Authority and a sufficient number of holders of such Obligation to bind all holders of the Obligation or is announced (or otherwise decreed) by the Reference Entity or a Governmental Authority in a form that binds all holders of such Obligation (including, in each case, in respect of Bonds only, by way of an exchange), and such event is not expressly provided for under the terms of such Obligation in effect as of the later of the Credit Event Backstop Date and the date as of which such Obligation is issued or incurred."[11]

As noted above, the DC determined that the submitted Publicly Available Information did not contain any evidence of a deferral of principal payment obligations.  To the contrary, the DC noted that the Form 8-K and the Trustee Notice indicate that both the Reference Entity and relevant holder (CCH) view the principal amount of the Relevant 2016 Legacy Notes to have become due and payable as of December 15, 2016, and that the Trustee Notice states that CCH is reserving its rights with respect to the unpaid portion of the Relevant 2016 Legacy Notes.

Further, the DC did not identify any Publicly Available Information that would support the notion that all holders of the 2016 Legacy Notes were bound by CCH's decision to forebear on the exercise of remedies.

For the above reasons, the DC Resolved that no Restructuring Credit Event had occurred in relation to either 2014 Transactions or Updated 2003 Transactions.

---

[11] Section 4.7(a) of the 2014 Definitions.  The corresponding definition in the Updated 2003 Definitions is substantially similar with respect to the quoted text.  See Section 4.7(a) of the Updated 2003 Definitions.

# EXHIBIT B

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7115**

WRITER'S EMAIL ADDRESS
**jonpickhardt@quinnemanuel.com**

November 22, 2017

<u>VIA EMAIL</u>

Marshall Sprung
Global Head of Compliance
The Blackstone Group L.P.
345 Park Avenue
New York, New York 10154

Re:  *Hovnanian Enterprises Inc. ("Hovnanian") Credit Default Swaps*

Dear Marshall:

We write on behalf of Solus Alternative Asset Management ("Solus") concerning recent and ongoing efforts by Blackstone's wholly-owned subsidiary GSO Capital Partners ("GSO") to manufacture a Credit Event[1] under outstanding credit default swap ("CDS") contracts referencing debt issued by Hovnanian Enterprises, Inc. ("Hovnanian"), and manipulate the Final Price established under that Credit Event in a manner that will misappropriate hundreds of millions of dollars from sellers of protection on Hovnanian debt, largely redirecting those funds to GSO.

We understand that GSO is currently the largest buyer of CDS protection referencing Hovnanian debt ("HOV CDS").  This outsized bet will pay only if there is a Credit Event under the HOV CDS contracts and the Final Price determined at auction (the "Credit Event Auction") is low.  In recent days, it has been widely reported that GSO is engaged in negotiations with Hovnanian to refinance approximately $400 million of Hovnanian's currently outstanding unsecured debt at financing costs that are radically below current market levels in exchange for Hovnanian's agreement to manufacture an artificial Credit Event under outstanding HOV CDS contracts.  These reports indicate that the refinancing proposed by GSO involves the issuance of a new bond (the "Rigged Bond") in an amount sufficient to retire $369 million in currently outstanding 7% and 8% Senior Unsecured Notes, due in January 15, 2019, and November 1, 2019, respectively.  The Rigged Bond will carry artificial terms highly favorable to Hovnanian;

---

[1]  Capitalized terms used but not defined herein shall have the meaning set forth in the 2014 ISDA Credit Derivatives Definitions.

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | PERTH

if sold on the open market for fair value, we expect the Rigged Bond would price well below par on day one.  However, we also believe that GSO is planning to purchase the Rigged Bond *for par* in exchange for Hovnanian's agreement to manufacture an artificial Credit Event under the HOV CDS, for example by failing to pay principal or interest on a small amount of Hovnanian debt held by either GSO or Hovnanian's affiliates, in effect bribing Hovnanian to create a fraudulent Credit Event.  This Credit Event is intended to trigger the obligation of protection sellers, like Solus, to make protection payments to protection buyers, like GSO, in amounts determined by the Final Price.

The purpose of GSO's scheme is both transparent and cynical.  As noted above, GSO has accumulated a large open position in HOV CDS contracts, betting that Hovnanian will default on its debt.  Yet to date, there is no indication that a true Credit Event for Hovnanian debt is imminent, so GSO must continue making fixed payments under the CDS contracts.  Now, seeking to manufacture profit on those positions, GSO has taken it upon itself to artificially foment a Credit Event through its collusion with Hovnanian, described in the prior paragraph.  Making matters worse, GSO also intends to use the Rigged Bond—created solely for this improper purpose—to drive down the Final Price by delivery into the Credit Event Auction.  Because the Rigged Bond is being structured with the specific intent to create an artificially low price for Hovnanian's cheapest-to-deliver debt, the Rigged Bond will inflate the amount owed by protection sellers—which will benefit GSO, as the largest protection buyer in the market, to the tune of hundreds of millions of dollars, as well as misstating the true value of the debt to the market.  Thus, GSO's scheme will have the effect of creating a false and artificial Final Price in the Credit Event Auction, at the direct expense of credit protection sellers under the HOV CDS contracts, who will underwrite GSO's windfall.  On top of this manipulation, GSO has recently made significant purchases of Hovnanian equity—it now holds 2.36% of the company's total outstanding equity—thereby setting itself up to reap a further windfall in the event that news of GSO's provision of rigged off-market financing to Hovnanian increases the company's stock price.

This scheme to manipulate the market for HOV CDS violates the federal securities laws. Section 10(b) of the  Exchange Act and Rule 10b-5 thereunder "prohibit[] not only material misstatements but also manipulative acts."  *ATSI Commun., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99-100 (2d Cir. 2007).  Rule 10b-5 specifically outlaws "any device, scheme, or artifice to defraud," as well as "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase  or sale of any security." Rule 10b-5(a) and (c).  GSO's scheme is a perfect storm of manipulative acts that depend on a series of artificial transactions that will send, and already have sent, inaccurate signals of market activity.   GSO's significant short position, together with its intent to fraudulently induce a technical Credit Event by Hovnanian, has already driven the prices for HOV CDS to artificially inflated highs.  The terms of GSO's threatened new bond issuance will likewise deflate the Final Price determined in the Credit Event Auction for HOV CDS, inflating recoveries received by credit protection buyers to artificial levels.   The combination of a fraudulently induced Credit Event by Hovnanian—itself a fraud on the market, reflecting not true financial distress or inability to pay by Hovnanian, but rather cynical market manipulation—and artificially reduced recovery assumptions on Hovnanian debt will drastically increase the payout

2

that GSO would obtain on its CDS position.  Fundamentally, "[t]he gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999).  Moreover, GSO's actions are the economic equivalent of "short selling 'willfully combined with something more to create a false impression of how market participants value a security' that may constitute a manipulative act." *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 460 (S.D.N.Y. 2015) (quoting *ATSI*, 493 F.3d at 101).

GSO's scheme does not just run afoul of SEC rules and regulations.  We believe its manipulative conduct will also create false pricing in CDS indices that include Hovnanian, including the CDX high yield index, which trades at a daily volume in excess of $4.5 billion.  These indices are the jurisdiction of the CFTC, which similarly prohibits manipulative conduct where  "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013).  Each of those factors is met here.  GSO's scheme likewise violates the Martin Act, which violations are subject to prosecution by the New York Attorney General's Office.  *See* N.Y. Gen. Bus. L. §§ 339-b, 352-c (prohibiting manipulation of security prices through "fictitious transactions or devices").

Of course, GSO will also face liability to market participants harmed by its manipulative scheme, including Solus.  Protection sellers under the HOV CDS contracts and purchasers of the CDX index may sue GSO for violations of Section 10(b) of the  Exchange Act and Sections 6(c) and 9(a) of the Commodity Exchange Act, as well as for common law fraud and unjust enrichment, among other causes of action.  Solus is not privy to all of the facts of GSO's manipulative conduct at this time, and additional claims are likely to be identified once further facts are known.  In addition, any fraudulently induced Credit Event, and any Final Price determined by the Rigged Bond, will be subject to challenge under the terms of the ISDA Master Agreements and rules and definitions governing the ISDA auction process.  For example, there is no precedent for an ISDA Determinations Committee finding that a bond created to rig a Credit Event Auction is a Deliverable Obligation under either the 2003 or 2014 Credit Derivative Definitions.  Undoubtedly, any attempt to characterize the Rigged Bond as a Deliverable Obligation will be challenged with the Determinations Committee.

Please be advised that Solus will pursue any and all remedies available to it for this fraudulent and manipulative conduct.  If GSO continues on its present course, Solus will ensure that GSO's actions are fully publicized to the marketplace so that all of GSO's counterparties are aware of its business practices, and will pursue recoveries against GSO to the fullest extent of the law.

Very truly yours,

Jonathan E. Pickhardt

# EXHIBIT C

# REDACTED

# EXHIBIT D

# HOV Share Price



# EXHIBIT E

# Recent Pricing of HOV Securities



*Note: Data sourced from Trace and Markit.*

# EXHIBIT F

Determinations Committee Decision

**RESOLUTION THAT FAILURE TO PAY CREDIT EVENT OCCURED**

| Date: | 18 September 2013 |
|---|---|
| Determinations Committee: | EMEA (Europe) |
| Meeting Date: | 18 September 2013 |

| **DC Issue 2013091601:** | **Has a Failure to Pay Credit Event occurred with respect to Codere Finance (Luxembourg) S.A.?** |
|---|---|
| 1st Question for vote: | Has a Failure to Pay Credit Event occurred with respect to Codere Finance (Luxembourg) S.A.? |
| Vote result: | Yes |
| Votes: | 15 "Yes" votes - Bank of America Merrill Lynch |
| | Barclays |
| | Citibank |
| | Credit Suisse |
| | Deutsche Bank |
| | Goldman Sachs |
| | JPMorgan Chase Bank |
| | Morgan Stanley |
| | UBS |
| | BNP Paribas |
| | Citadel |
| | D.E. Shaw |
| | BlueMountain Capital |
| | PIMCO |
| | Elliott Management Corporation |

| | |
|---|---|
| | 0 "No" votes |
| 2nd Question for vote: | Is the date of the Failure to Pay Credit Event with respect to Codere Finance (Luxembourg) S.A .  15 September 2013? |
| Vote result: | Yes |
| Votes: | 15 "Yes" votes – Bank of America Merrill Lynch<br><br>Barclays<br><br>Citibank<br><br>Credit Suisse<br><br>Deutsche Bank<br><br>Goldman Sachs<br><br>JPMorgan Chase Bank<br><br>Morgan Stanley<br><br>UBS<br><br>BNP Paribas<br><br>Citadel<br><br>D.E. Shaw<br><br>BlueMountain Capital<br><br>PIMCO<br><br>Elliott Management Corporation<br><br><br>0  "No" votes |
| 3rd Question for vote: | Is the date on which the DC Secretary first effectively received both a request to convene the Committee and Publicly Available Information that satisfies the requirements of Section 2.1(b) of the 2003 Definitions for the Credit Event with respect to Codere Finance (Luxembourg) S.A. 17 September 2013?  (This question is asked to determine the Event Determination Date.) |
| Vote result: | Yes |
| Votes: | 15 "Yes" votes - Bank of America Merrill Lynch<br><br>Barclays<br><br>Citibank |

| | |
|---|---|
| | Credit Suisse |
| | Deutsche Bank |
| | Goldman Sachs |
| | JPMorgan Chase Bank |
| | Morgan Stanley |
| | UBS |
| | BNP Paribas |
| | Citadel |
| | D.E. Shaw |
| | BlueMountain Capital |
| | PIMCO |
| | Elliott Management Corporation |
| | 0  "No" votes |
| 4th Question for Vote: | Should ISDA hold one or more auctions to settle Relevant Transactions with respect to which a Failure to Pay Credit Event Resolution has occurred in accordance with the terms set out in the form of Credit Derivatives Auction Settlement Terms with respect to Codere Finance (Luxembourg) S.A. |
| Vote result: | Yes |
| Votes: | 15 "Yes" votes - Bank of America Merrill Lynch |
| | Barclays |
| | Citibank |
| | Credit Suisse |
| | Deutsche Bank |
| | Goldman Sachs |
| | JPMorgan Chase Bank |
| | Morgan Stanley |
| | UBS |

|  | BNP Paribas |
|---|---|
|  | Citadel |
|  | D.E. Shaw |
|  | BlueMountain Capital |
|  | PIMCO |
|  | Elliott Management Corporation |
|  | 0  "No" votes |
| 5th Question for vote: | Do you agree to publish the following statement?<br><br>"**18 September, 2013:** The DC considered the Reference Entity's press release regarding its failure to make an interest payment and voted on the DC question.  The DC agreed that a Failure to Pay Credit Event occurred, under Section 4.5 of the 2003 Credit Definitions, on 15 September 2013, and agreed to hold one or more Auctions to settle Relevant Transactions with respect to which the Failure to Pay Credit Event occurred." |
| Vote result: | Yes |
| Votes: | 15 "Yes" votes - Bank of America Merrill Lynch |
|  | Barclays |
|  | Citibank |
|  | Credit Suisse |
|  | Deutsche Bank |
|  | Goldman Sachs |
|  | JPMorgan Chase Bank |
|  | Morgan Stanley |
|  | UBS |
|  | BNP Paribas |
|  | Citadel |
|  | D.E. Shaw |
|  | BlueMountain Capital |

| | PIMCO |
| | |
| | Elliott Management Corporation |
| | |
| | 0  "No" votes |

# EXHIBIT G

**REDACTED**

# EXHIBIT H

**REDACTED**