UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

SOLUS ALTERNATIVE ASSET
MANAGEMENT LP,

          Plaintiff,

      -v-                                  No.  18 CV 232-LTS-BCM

GSO CAPITAL PARTNERS L.P.,
HOVNANIAN ENTERPRISES, INC., K.
HOVNANIAN ENTERPRISES, INC., K
HOVNANIAN AT SUNRISE TRAIL III,
LLC, ARA K. HOVNANIAN, and J. LARRY
SORSBY,

          Defendants.

-------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

          Plaintiff Solus Alternative Asset Management LP ("Plaintiff" or "Solus") brings

the current action against GSO Capital Partners L.P. ("GSO"), Hovnanian Enterprises, Inc., K.

Hovnanian Enterprises Inc. K Hovnanian at Sunrise Trail III LLC ("Sunrise" and collectively

"Hovnanian"), Ara K. Hovnanian, and J. Larry Sorsby (collectively "Defendants"), asserting

claims for violations of Sections 10(b) and 14(e) of the Securities Exchange Act of 1934, 15

U.S.C. §§ 78j(b) and 78n(e), 17 C.F.R. § 240.10b-5, and tortious interference with prospective

economic advantage.  (Compl., Docket Entry No. 1.)  Plaintiff moves pursuant to Federal Rule of

Civil Procedure 65 for a preliminary injunction prohibiting Defendants from consummating any

transaction that includes a commitment by Hovnanian to default on certain debt, and from

proceeding with a solicitation of the exchange of certain Hovnanian debt securities and certain

related consents to amendments of restrictions in current indentures on other series of Hovnanian

debt securities that was announced on December 28, 2017, without correcting alleged

misrepresentations and omissions in the relevant disclosure materials.  (Order to Show Cause, Docket Entry No. 3.)  This action was commenced, and Plaintiff's application for an order to show cause was granted, on January 11, 2018.  The exchange offer is scheduled to expire at 11:59 p.m. on January 29, 2018. (Form 8-K dated December 28, 2017, Docket Entry No. 7-10, at 7.)  The Court held a full-day evidentiary hearing on Plaintiff's motion on January 25, 2018, and has considered thoroughly the evidence presented, as well as the parties' oral arguments and written submissions.  For the following reasons, Plaintiff's preliminary injunction motion is denied.  This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rules of Civil Procedure 52(a)(2) and 65.  To the extent any statement labeled as a finding of fact is a conclusion of law it shall be deemed a conclusion of law, and vice versa.

The Court has subject matter jurisdiction of this matter under 28 U.S.C. sections 1331 and 1367.

## FINDINGS OF FACT

The transaction at the center of this litigation is one in which GSO has agreed to refinance certain Hovnanian debt through, inter alia, the exchange of certain outstanding Hovnanian bonds for new bonds, some of which bear a substantially below market interest rate and unusually long term.  The transaction includes the purchase of some of the currently outstanding bonds by a Hovnanian affiliate.  Hovnanian has covenanted, as part of the transaction, to default on an upcoming payment on the bonds that will be held by the affiliate notwithstanding the fact that Hovnanian has sufficient resources to make the payment.  Payments to other holders of that bond issue will not be withheld.  Defendants expect this default to trigger a "Credit Event" with respect to credit default swap ("CDS") protection contracts that Plaintiff

and others have sold that are referenced to Hovnanian bonds. Defendants also expect that the below-market interest rate long term bonds issued as part of the transaction will come into play in the determination of the CDS protection sellers' liability in connection with the Credit Event, inflating that liability. GSO purchased a substantial position in CDS protection contracts, as well as substantial positions in Hovnanian debt and equity securities, in anticipation of the Hovnanian transaction, and stands to profit significantly on its CDS position in the event a Credit Event is triggered by Hovnanian's default on the bonds held by the affiliate. This anticipated profit was factored into the below-market pricing of the long term bonds and certain other financing that Hovnanian is providing to GSO in the transaction. Plaintiff characterizes the Hovnanian transaction and GSO's purchase of CDS contracts in anticipation of the transaction as a market manipulation scheme violative of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and alleges that Defendants' disclosures in connection with the exchange offer and consent solicitation make material misstatements and omit to disclose material information, thus violating Section 14(e) of the Exchange Act.

CDS Contracts

A CDS contract is one under which a protection seller agrees to make certain payments in the event of certain standardized Credit Events (including a bond issuer's failure to pay a debt of $1 million or more when due on a bond referenced in the CDS contract (a "reference security")) to a protection buyer which, in exchange for the protection, makes periodic payments to the protection seller that are similar to premium payments on an insurance policy. (Hambrook Decl., Docket Entry No 8, ¶¶ 3-4.) CDS contracts are governed by standard form documentation published by the International Swaps and Derivatives Association ("ISDA") and are actively traded in an over the counter CDS market. (Id.) The amount of the payment

upon the occurrence of a Credit Event is determined based upon the par value of the reference

obligation and the market value of the "cheapest-to-deliver" (i.e., lowest value) outstanding debt

security of the entity that issued the reference security (the "Reference Entity").  (Id. ¶ 4.)

CDS contracts are generally sold by dealers through a central clearing house.

(Mollett Decl., Docket Entry No. 44, ¶ 35.)  A protection purchaser who owns a reference

security may buy a corresponding CDS contract to limit its exposure to a default, or an otherwise

uninterested party may strategically purchase CDS protection as a form of speculation, placing a

bet on the probability that the Reference Entity will default on its obligations.  (Hr'g Tr. at

223:12-224:5)

The standard form 2014 ISDA CDS contract definitions include the following

definition of a "failure to pay":

> after the expiration of any applicable Grace Period (after the satisfaction of any
> conditions precedent to the commencement of such Grace Period), the failure by the
> Reference Entity to make, when and where due, any payments in an aggregate amount of
> not less than the Payment Requirement under one or more Obligations, in accordance
> with the terms of such Obligations at the time of such failure.

(Annex, Americas DC Meeting Statement December 21, 2016, Docket Entry No. 44-1, ECF

page 6 (internal quotation marks omitted).)  The threshold Payment Requirement to trigger a

failure to pay is $1 million for North American transactions.  (Id. at ECF page 7.)

If a protection purchaser believes that a Credit Event, such as a failure to pay, has

occurred, it may request that ISDA's Determinations Committee (the "DC"), which is composed

of 10 sell-side and 5 buy-side firms, determine whether such an event has occurred.  (Mollett

Decl. ¶ 36.)  After a determination that a Credit Event has occurred, the DC conducts an auction

procedure to determine the final price for settlement of the CDS.  (Id. ¶ 39.)  The auction process

typically identifies the "cheapest-to-deliver" security of the Reference Entity.  (Id.)  Following

determination of the amount to be paid, the protection seller has two options: it may take

"physical delivery" at par value of Reference Entity securities owned by the protection buyer or

it may make a cash payment based on a formula derived from the difference between the auction

price and the par value of the "cheapest-to-deliver" note.  (Mollett Decl. ¶ 38-39).  This amount

is readily calculable once the auction price of the least expensive note is known.  (See Hr'g Tr. at

130:23-131:12.)

CDS market participants are sophisticated investors.  (See Hr'g Tr. at 200:9-11.)

The GSO-Hovnanian Transaction

Hovnanian is a large construction firm that "designs, constructs, markets and

sells" residential properties.  (Sorsby Decl., Docket Entry No. 43, ¶¶ 4-6.)  Hovnanian "suffered

serious financial losses as a result of the recession and collapse of the homebuilding market in

the United States" between 2007 and 2011.  (Id. ¶ 8.)  Hovnanian issued various series of bonds

with varying security arrangements and yields, including a series of notes maturing in 2019 and

featuring an 8% interest yield (the "8% Notes") and a series featuring a 7% yield (the "7%

Notes"), to raise capital to expand amid the recovering housing market.  (Id. ¶ 9; Form 8-K dated

November 5, 2014, Docket Entry No. 46-7; Form 8-K dated January 7, 2014, Docket Entry No.

46-5.)  Under conditions imposed on Hovnanian in connection with a previous refinancing

transaction, if the 7% Notes are outstanding on October 15, 2018, another $75 million in senior

debt will become due immediately.  (Sorsby Decl. ¶ 12.)  In connection with a different

refinancing, Hovnanian issued two series of secured notes (the "Secured Notes") subject to a

covenant preventing Hovnanian from using any cash on hand to redeem the bulk of the

outstanding 7% or 8% Notes.  (Id. ¶ 11.)  Because of this covenant, Hovnanian must refinance

the 8% Notes before their maturity date.  (Sorsby Decl. ¶ 11; Form 8-K dated November 5, 2014.)

In November 2016, Plaintiff determined that the probability of Hovnanian defaulting on its debt was less than the market price of its unsecured debt indicated and it began selling what, by December 28, 2017, would amount to $260.5 million worth of CDS protection contracts referencing various series of Hovnanian's debt.  (Hambrook Decl. ¶¶ 5, 11.)  Solus also purchased over $31,779,000 worth of Hovnanian bonds, including 7% and 8% Notes, and held 112,497 shares of Hovnanian common stock as of December 28, 2017.  (Id. ¶ 11.)

Faced with the impending need to refinance the 7% and 8% Notes, Hovnanian sought lenders in early 2017, but met with little initial success.  (Sorsby Decl. ¶ 15.)   In February 2017, Ryan Mollett, senior managing director at GSO, which provides financing to distressed companies, began to contemplate a transaction, inspired by a December 2016 intentional default and CDS Credit Event involving iHeart Communications, Inc., that would exploit features of the CDS market.  (Mollett Decl., ¶¶ 1, 6, 8.)  This new transaction would involve GSO purchasing CDS protection and then extending financing at favorable rates to the relevant Reference Entity in exchange for a covenant to default intentionally on a small number of the reference securities that had been transferred to a subsidiary of the Reference Entity in connection with the financing transaction, thus triggering a "failure to pay" event requiring CDS sellers to settle with GSO and other CDS protection buyers.  (Id. ¶¶ 6, 9.)

When Mollett saw J. Larry Sorsby, Hovnanian's Chief Financial Officer, at a conference in late February 2017, he told him that he was contemplating a way to refinance Hovnanian's 7% and 8% Notes, but did not elaborate further.  (Id. ¶ 10.)  Mollett began to refine his plan with a focus on Hovnanian, and began reviewing Hovnanian's debt instruments to

determine whether a default sufficient to constitute a "failure to pay" event, but not of such magnitude as to trigger a cross-default on all of Hovnanian's outstanding debt, could be engineered.  (Id. ¶ 9; Hr'g Tr. at 61:17-24.)  On August 1, 2017, Mollett arranged for Sorsby to meet with GSO's outside counsel to explore the possibility of entering into a refinancing transaction.  (Mollett Decl. ¶¶ 17-18; Sorsby Decl. ¶¶ 18-19.)  On October 20, 2017, GSO and Hovnanian executed a nondisclosure agreement and began to negotiate in earnest.  (Sorsby Decl. ¶ 20; Mollett Decl. ¶¶ 19-20.)

On November, 13, 2017, Hovnanian received a letter from the law firm of White & Case LLP on behalf of an ad hoc group of investment funds, which described and expressed the group's misgivings about the proposed transaction between GSO and Hovnanian.  (Sorsby Decl. ¶ 23; Letter from Case & White LLP to Sorsby dated Nov. 13, 2017, Docket Entry No. 46-13.)  Bloomberg News then published an article on November 15, 2017, that described the transaction.  (Sorsby Decl. ¶ 23; Sridhar Natarajan et al., A High-Stakes Hedge Fund Battle Erupts Over Hovnanian Debt, BLOOMBERG NEWS, Docket Entry No. 46-15.)  Throughout November, Hovnanian also began negotiating financing agreements with several other potential lenders, including Solus, to enable the company to raise funds if it could not come to an agreement with GSO.  (Sorsby Decl. ¶¶ 25, 32.)  Solus' proposal included below market financing, but also included an unusual provision under which Hovnanian would be in default under Solis' financing instruments if any failure by Hovnanian to pay any of its debt obligations constituted a failure to pay Credit Event with respect to CDS contracts.  (Sorsby Decl. ¶ 26; Docket Entry No. 46-20.)  Hovnanian is not a party to any CDS contract.  (Sorsby Decl. ¶ 38.)

Hovnanian determined that the terms offered by GSO, which included long term financing at rates below those offered by Solus and other potential financers, were in the best

interests of Hovnanian's shareholders, and decided to pursue the refinancing transaction with GSO. (Sorsby ¶ 33.) The transaction features several instruments providing below market financing to Hovnanian. (See Hr'g Tr. at 51:23-52:1.) It further contemplates that GSO, and other bondholders, will exchange up to $185 million in 8% Notes in exchange for new 13% notes due in 2026 and new 5% notes due in 2040 ("13%" and "5% Notes" respectively). (Offering Memorandum, Docket Entry No. 7-11, at 5-10.) Sunrise, a Hovnanian subsidiary, will purchase $26 million worth of the 8% Notes and Hovnanian would agree not to make a required May 1, 2018, interest payment of $1.04 million to Sunrise on the bonds Sunrise will acquire in connection with the transaction. (Hambrook Decl. ¶ 13.) The payment default on the Sunrise bonds will just exceed the threshold required to trigger a CDS failure to pay Credit Event. (Hambrook Decl. ¶ 13; see Form 8-K dated December 28, 2017, at ECF page 144; see also Mollett Decl. ¶ 9.) This element of the transaction is specifically intended to trigger such a Credit Event with respect to CDS protection referenced to Hovnanian securities. (See Hr'g Tr. at 48:15-19, 51:17-22.) The contemplated payment default is far short, however, of the magnitude necessary to trigger cross-defaults on Hovnanian's other financial obligations. (Hambrook Decl. ¶ 13.) The purposes of combining the 13% Notes, which are expected to be valued above par, with the long-term and low-yield 5% Notes, which are expected to be valued below par, were to create a package that is, on average, attractive to investors, and also create a bond trading well below par so as to maximize monetary recovery for GSO under an CDS failure to pay Credit Event, by operation of the "cheapest-to-deliver" rule. (Hr'g Tr. at 127:19-128:18; Hambrook Decl. ¶ 13.)

       Hovnanian CDS contracts are also included in the CDX High Yield Index, which includes CDS contracts from 100 companies, all given equal weight, and which may be affected

by fluctuations in the value of Hovnanian CDS contracts.  (Pickel Decl., Docket Entry No. 9, ¶ 10; Hr'g Tr. at 190:1-5.)

   Robert Pickel, Plaintiff's expert witness and the former General Counsel and Chief Executive Officer of ISDA, testified, and the Court finds, that the CDS market operates based on the market participants' ability to accurately assess risk, which such participants currently do based on the working assumption that Reference Entities will endeavor to avoid default whenever possible to protect their reputations and their access to capital markets.  (Pickel Decl. ¶¶ 1, 5, 11.)  Pickel and Defendants' expert, Robert Selvaggio, disagree as to whether allowing the instant transaction to proceed will create a precedent that will cause transactions based on intentional defaults to proliferate and, if so, whether market participants will be unable to accurately assess risks and leave the CDS market, thereby depriving lenders of a source of insurance and causing reverberating effects in other sectors that use CDS valuations to assess the health of companies.  (See Pickel Decl. ¶¶ 11, 12; see also Selvaggio Decl., Docket Entry No. 45, ¶¶ 1, 10, 26-29.)  The Court need not and does not make a determination as to whether similar transactions will proliferate and whether the CDS market faces, as Pickel hypothesizes, an "existential threat" from such proliferation.  (See Pickel Decl. ¶ 11.)

   The Court does find, however, that any proliferation of engineered defaults that did occur could likely be mitigated by actions on the part of ISDA.  ISDA, whose membership is comprised of CDS market participants, has a process in place to study and approve modifications to its standard documentation, definitions, and Master Agreement that could change the definition of a failure to pay event.  (Hr'g Tr. at 195:6-22.)  Pickel testified that ISDA's mechanisms would be insufficient to confront the threat of cleverly engineered defaults because CDS market participants and the ISDA Determinations Committee require the certainty of a

bright-line rule, and that prohibiting engineered defaults would require a subjective inquiry into a Reference Entity's intent when defaulting.  (Hr'g Tr. at 195:23-196-2.)  The Court is not, however, persuaded that ISDA is so powerless to act in an effective way with respect to the effect of intentional defaults on the CDS market, given the numerous proposals to prohibit such engineered defaults, as to require an injunction by this Court to prevent irreparable damage to the CDS marketplace.  (Cf. Hr'g Tr. at 196: 3-25; Selvaggio Decl. ¶¶ 34-40 (noting examples of ISDA changing its documentation to prohibit problematic defaults); Fabien Carruzzo et al., iHeart and Other Unconventional CDS Credit Events, Pl. Ex. 409, at 5-6 (suggesting several proposals to prohibit engineered defaults).)

CONCLUSIONS OF LAW

A preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies."  Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 60 (2d Cir. 1985).  Indeed, the Supreme Court has characterized injunctive relief as "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 22 (2008); see also Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion") (internal quotation marks and citation omitted).  A preliminary injunction is "never awarded as of right," and in each case "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Winter, 555 U.S. at 24 (quoting Amoco Production Co. v. Village of Gambell, AK, 480 U.S. 531, 542 (1987)).

"To obtain a preliminary injunction, the moving party must demonstrate (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction."  Red Earth LLC v. U.S., 657 F.3d 138, 143 (2d Cir. 2011) (internal quotation marks and citation omitted).  In this Circuit, "[a] showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'"  Faiveley Transport Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (quoting Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999)).  "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  See Grand River Enterprise Six Nations Ltd. v.  Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks and citations omitted).  Furthermore, "it has always been true that irreparable injury means injury for which a monetary award cannot be adequate compensation and that where money damages is adequate compensation a preliminary injunction will not issue."  Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979).

Plaintiff argues that it will suffer irreparable harm: (1) in its role as a Hovnanian bondholder through the potential tender of its 8% Notes in exchange for the purportedly inferior 5% and 13% Notes; and (2) in its role as a CDS protection seller because it will be forced to either take physical delivery of the below-market Hovnanian bonds at par value or make a settlement payment derived from the difference between the auction price and the par value of such bonds.  For the following reasons, the Court concludes that Plaintiff has not met its burden

of demonstrating that it will suffer irreparable harm in the absence of the issuance of a

preliminary injunction.

Plaintiff argues that, notwithstanding the fact that CDS settlement payment

liabilities and bond values are readily calculable, this case presents a situation where Plaintiff

cannot be made whole by money damages because the effects of this transaction on Hovnanian's

capital structure (i.e., the bond exchanges) cannot be unwound and it would be impossible to put

all parties back into their precise pre-transaction asset ownership positions.  Plaintiff cites several

cases for the proposition that irreparable harm may be found where a court is unable to

"unscramble the eggs" and return the parties to the positions they would have occupied but for

the defendant's misconduct, in this instance by reinstating the exchanged bonds or the CDS

contracts that would have been settled following a Hovnanian default.  Plaintiff's cases are

inapposite, as they involved mergers, proxy statements, and other transactions implicating

corporate governance or control and largely predate the Supreme Court's decision in eBay Inc. v.

MercExchange L.L.C., 547 U.S. 388 (2006), which rejected presumptions of irreparable harm

and confirmed a standard that considers "whether the public interest would . . . disserved" by

injunctive relief as a factor separate from the question of irreparable harm.  See Silberstein v.

Aetna, Inc., No. 13 CIV 8759 (AJN), 2014 WL 1388790, at *3-4 (S.D.N.Y. 2014) (discussing

impact of eBay and its progeny, and rejecting theory that denying stockholders right to cast

informed vote constitutes irreparable harm per se).  Plaintiff's reliance on Am. Insured Mortg.

Inv'rs v. CRI, Inc., No. 90 CIV. 6630 (MBM), 1990 WL 192561, at *2, 6 (S.D.N.Y. Nov. 26,

1990), which enjoined an exchange offer that had the potential to affect a corporate organization

and management, and Greenlight Capital, L.P. v. Apple, Inc., No. 13 CIV. 900 RJS, 2013 WL

646547, at *8-9 (S.D.N.Y. Feb. 22, 2013), which enjoined a proxy vote on various corporate

governance proposals that were improperly bundled, is similarly misplaced.[1]

Because the impact of the challenged GSO-Hovnanian transaction is essentially

economic, consisting of termination of CDS protection contracts referencing Hovnanian

securities and payments to be made under such contracts, and possible changes in the attributes

of Plaintiff's Hovnanian debt holdings, rather than one affecting corporate control, ownership or

governance, "unscrambling" -- restoration to pre-transaction positions -- is not necessary to

remedy any harm if Plaintiff succeeds on its claims.  Plaintiff can be compensated with an

amount of money consistent with the economic harm suffered.  Accordingly, Plaintiff has not

made the requisite showing that it would suffer irreparable harm.

Plaintiff also asserts that the Court should consider the prospect of irreparable

public harm, arguing that allowing this transaction to proceed would cause a proliferation of

similar transactions that would existentially threaten the CDS market.  Assuming for purposes of

this discussion, and without deciding the matter, that public harm can be considered in the

context of a determination of irreparable harm, the Court concludes that Plaintiff has not made

the requisite irreparable harm showing based on harm to the public, harm to itself, or a

---

[1]     Plaintiff also cites Sonesta Int'l Hotels Corp. v. Wellington Assoc., 483 F.2d 247 (2d Cir. 1973) for the proposition that it is appropriate to enjoin a tender offer because the court has more effective tools to prevent harm from a failure to disclose before the underlying transaction occurs.  That decision, however, concerned voting in advance of a corporate control transaction and in any event predated the Second Circuit's modern articulation of the preliminary injunction standard.  See also Schmidt v. Enertec Corp., 598 F. Supp. 1528, 1543-44 (S.D.N.Y. 1984) (finding no demonstration of irreparable harm in case alleging disclosure violations in connection with exchange offer for debentures).  Nor, unlike in another case cited by Plaintiff, Brenntag Int'l Chems., Inc., v. Bank of India, is there any evidence here that Defendants would be unable to pay a damages award.  See id., 175 F.3d 245, 249 (2d Cir. 1999).

combination of the two.  Plaintiff cites <u>In re Nw. Airlines Corp.</u> for the proposition that public

harm may be considered in determining whether irreparable injury would flow from the denial of

an injunction.  349 B.R. 338, 384 (S.D.N.Y. 2006), <u>aff'd,</u> 483 F.3d 160 (2d Cir. 2007) (quoting

<u>Long Island R. Co. v. Int'l Ass'n of Machinists</u>, 874 F.2d 901, 910 (2d Cir. 1989)) ("In making

the determination of irreparable harm, both harm to the parties and to the public may be

considered.").  Plaintiff does not, however, point to any authority in which a court has found

irreparable injury based solely on public harm without any demonstrated irreparable harm to the

plaintiff.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Long Island R. Co.</u>, 874 F.2d at 910-11.

Unlike the situation in <u>Northwest Airlines</u>, where the plaintiff airline faced the

prospect of failing as a business and the general public faced the loss of the service of a major air

carrier in the absence of injunctive relief barring a strike, and <u>Long Island Railroad Company</u>,

where cessation of rail services by a strike was found to present a prospect of irreparable harm

both to the railroad and to the general public,[2] the Court here has found no showing of

irreparable harm to Plaintiff Solus.  Furthermore, the allegedly threatened community of CDS

market participants, consisting of CDS traders and dealers, is a relatively insular and

sophisticated subset of the public.  CDS market participants are empowered, through ISDA

membership and participation in its governance mechanisms, to create rules to mitigate

engineered-transaction related risks through changes to ISDA documentation, policies, and

procedures; the allegedly anticipated harm is thus neither inevitable nor irreparable.  <u>See</u> <u>Lanvin</u>

<u>Inc. v. Colonia, Inc.</u>, 739 F. Supp. 182, 192–93 (S.D.N.Y. 1990) ("A movant for extraordinary

relief cannot mask an ongoing failure on its part to mitigate its damages").  Finally, Plaintiff fails

---

[2]     <u>See</u> <u>In re Nw. Airlines Corp.</u>, 349 B.R. at 384 (S.D.N.Y. 2006); <u>see also</u> <u>Long Island R. Co.</u>, 874 F.2d at 911.

to meet its burden to demonstrate that an award of post hoc damages in a case such as this one would be insufficient to deter other lenders from engaging in similar transactions, and that a preliminary injunction would be necessary for deterrence purposes.  See Kingvision Pay-Per-View Ltd. v. Lalaleo, 429 F. Supp. 2d 506, 516 (E.D.N.Y. 2006) (denying a permanent injunction to plaintiff that could not demonstrate that damages were insufficient to deter continued violations of the Cable Communications Policy Act).

Accordingly, Plaintiff has failed to meet its burden of demonstrating the prospect of irreparable harm in the absence of injunctive relief, and its motion for a preliminary injunction is denied.  In the absence of the requisite showing of irreparable harm, it is unnecessary for the Court to address the parties' additional arguments.  Defendants' motion to strike certain portions of the Supplemental Declaration of Robert Pickel (Docket Entry No. 68) is denied without prejudice as moot.

CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is denied.  This Memorandum Opinion and Order resolves the January 11, 2018, Order to Show Cause (Docket Entry No. 3) and Docket Entry No. 68.

This case remains referred to Magistrate Judge Moses for general pretrial management.

SO ORDERED.

Dated: New York, New York
        January 29, 2018

                                             /s/ Laura Taylor Swain
                                             LAURA TAYLOR SWAIN
                                             United States District Judge