UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                                    :
SOLUS ALTERNATIVE ASSET                             :
MANAGEMENT LP,                                       :
                                                    :
                              Plaintiff,             :        No. 1:18-cv-00232-LTS-BCM
                                                    :
              - against -                            :
                                                    :
GSO CAPITAL PARTNERS LP, HOVNANIAN                   :
ENTERPRISES, INC., K. HOVNANIAN                      :
ENTERPRISES, INC., K. HOVNANIAN AT                   :
SUNRISE TRAIL III, LLC, ARA K.                       :
HOVNANIAN and J. LARRY SORSBY,                       :
                                                    :
                              Defendants.            :
------------------------------------------------------------------ x


# MEMORANDUM OF LAW IN SUPPORT OF GSO CAPITAL PARTNERS LP'S MOTION TO DISMISS THE AMENDED COMPLAINT


FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP


7 Times Square
New York, NY  10036-6516
(212) 833-1100

March 2, 2018                          *Attorneys for Defendant GSO Capital Partners LP*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ......................................................................................................4

ARGUMENT .........................................................................................................................8

I.      SOLUS'S MARKET MANIPULATION CLAIM FAILS AS A MATTER OF LAW ................................................................................................................9

          A.     The Alleged Scheme Was Not "In Connection With" the Purchase or Sale of CDS ..................................................................................10

          B.     The Refinancing Was Fully Disclosed and Is Not Deceptive or Manipulative ........................................................................................14

          C.     Solus Failed to Sufficiently Allege that GSO Had the Requisite Scienter ..............................................................................................17

          D.     Solus Failed to Allege Reasonable Reliance ...............................................18

          E.     Solus Has Suffered No Legally Cognizable Damages ............................21

II.     SOLUS CANNOT STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH PROSEPCTIVE ECONOMIC ADVANTAGE ..........21

          A.     Solus Failed to Allege that GSO Directed Its Conduct At Solus's CDS Dealers..........................................................................................22

          B.     Solus Failed to Allege That Its Relationship with Any CDS Dealer Was Damaged ..........................................................................................23

          C.     Solus Failed to Allege Any Sufficiently Culpable Conduct .....................24

CONCLUSION......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*16 Casa Duse, LLC v. Merkin*,
   791 F.3d 247 (2d Cir. 2015)..................................................................................24

*Ala. Farm Bureau Mut. Cas. Co. v. Am. Fidelity Life Ins. Co.*,
   606 F.2d 602 (5th Cir. 1979) ..............................................................................16

*Alki Partners, L.P. v. Vatas Holding GmbH*,
   769 F. Supp. 2d 478 (S.D.N.Y. 2011), *aff'd*, 472 F. App'x 7 (2d Cir. 2012)..........17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)........................................................................ *passim*

*In re Authentidate Holding Corp. Secs. Litig.*,
   2006 WL 2034644 (S.D.N.Y. July 14, 2006) ..........................................................4

*Bittens v. Bd. of Managers of Octavia Condo.*,
   132 A.D.3d 487 (1st Dep't 2015) .......................................................................23

*Buffalo Forge Co. v. Ogden Corp.*,
   717 F.2d 757 (2d Cir. 1983)................................................................................16

*Burns Jackson Miller Summit & Spitzer v. Lindner*,
   59 N.Y.2d 314 (1983) ..........................................................................................24

*Campbell v. Nat'l Media Corp.*,
   1994 WL 612807 (E.D. Pa. Nov. 3, 1994) ............................................................11

*Carvel Corp. v. Noonan*,
   3 N.Y.3d 182 (2004) ....................................................................................22, 24

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.*,
   547 F.3d 115 (2d Cir. 2008)................................................................................24

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*,
   480 F.2d 341 (2d Cir. 1973)................................................................................10

*In re Citigroup Auction Rate Secs. Litig.*,
   700 F. Supp. 2d 294 (S.D.N.Y. 2009)..................................................................18

ii

**Page(s)**

*In re Citigroup, Inc.*,
  2011 WL 744745 (S.D.N.Y. Mar. 1, 2011), *aff'd sub nom. Finn v. Barney*,
  471 F. App'x 30 (2d Cir. 2012) ...................................................................16

*Cohen v. Stevanovich*,
  722 F. Supp. 2d 416 (S.D.N.Y. 2010)........................................................18

*Davidson Pipe Co. v. Laventhol & Horwath*,
  120 F.R.D. 455 (S.D.N.Y. 1988) ..............................................................19

*Dealtime.com Ltd. v. McNulty*,
  123 F. Supp. 2d 750 (S.D.N.Y. 2000)........................................................12

*Elias v. Rolling Stone LLC*,
  192 F. Supp. 3d 383 (S.D.N.Y. 2016)......................................................8, 9

*Engstrom v. Elan Corp., plc*,
  2011 WL 4946434 (S.D.N.Y. Oct. 18, 2011) .......................................17, 18

*G.K.A. Beverage Corp. v. Honickman*,
  55 F.3d 762 (2d Cir. 1995)....................................................................22, 23

*Good Hill Master Fund L.P. v. Deutsche Bank AG*,
  146 A.D.3d 632 (1st Dep't 2017) .............................................12, 15, 20, 24

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
  50 N.Y.2d 183 (1980) ...............................................................................24

*Henneberry v. Sumitomo Corp. of Am.*,
  415 F. Supp. 2d 423 (S.D.N.Y. 2006)........................................................22

*JBCHoldings NY, LLC v. Pakter*,
  931 F. Supp. 2d 514 (S.D.N.Y. 2013)........................................................25

*In re JP Morgan Auction Rate Secs. (ARS) Mktg. Litig.*,
  867 F. Supp. 2d 407 (S.D.N.Y. 2012)........................................................17

*Kirch v. Liberty Media Corp.*,
  449 F.3d 388 (2d Cir. 2006)...................................................................22, 23

*Levitin v. PaineWebber, Inc.*,
  933 F. Supp. 325 (S.D.N.Y. 1996), *aff'd* 159 F.3d 698 (2d Cir. 1998) ..................................10

*Mayor & Council of Balt., M.D. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013).........................................................................8

*In re Merrill Lynch Auction Rate Secs. Litig.*,
  704 F. Supp. 2d 378 (S.D.N.Y. 2010), *aff'd*, 671 F.3d 120 (2d Cir. 2011) ......................18, 19

iii

**Page(s)**

*In re Merrill Lynch Auction Rate Secs. Litig.*,
    851 F. Supp. 2d 512 (S.D.N.Y. 2012), *aff'd*, 571 F. App'x 8 (2d Cir. 2014).....................5, 18

*Miller v. Pac. Inv. Mgmt. Co. LLC*,
    2013 WL 12305507 (S.D.N.Y. Apr. 23, 2013)..........................................................................8

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993).................................................................................................12

*Mintz v. Baron*,
    2006 WL 2707338 (S.D.N.Y. Sept. 19, 2006)...................................................................4, 5

*Mobil Corp. v. Marathon Oil Co.*,
    669 F.2d 366 (6th Cir. 1981) ...............................................................................................16

*In re Nortel Networks Inc.*,
    2017 WL 932947 (Bankr. Del. Mar. 8, 2017) ......................................................................19

*Piccoli A/S v. Calvin Klein Jeanswear Co.*,
    19 F. Supp. 2d 157 (S.D.N.Y. 1998)....................................................................................22

*Plasticware, LLC v. Flint Hills Res., LP*,
    852 F. Supp. 2d 398 (S.D.N.Y. 2012)..................................................................................22

*PPX Enters., Inc. v. Audiofidelity Enters, Inc.*,
    818 F.2d 266 (2d Cir. 1987)...........................................................................................23, 24

*Pross v. Katz*,
    784 F.2d 455 (2d Cir. 1986).................................................................................................11

*Roth v. Solus Alternative Asset Mgmt, LP*,
    258 F. Supp. 3d 364 (S.D.N.Y. 2017)..................................................................................19

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010).......................25

*S.E.C. v. Masri*,
    523 F. Supp. 2d 361 (S.D.N.Y. 2007)..................................................................................11

*S.E.C. v. Zandford*,
    535 U.S. 813 (2002)..............................................................................................................11

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)..................................................................................................14, 15, 16

*Solus Alt. Asset Mgmt. LP v. GSO Capital Partners LP*,
    2018 WL 620490 (S.D.N.Y. Jan. 29, 2018) .................................................................. *passim*

iv

**Page(s)**

*In re UBS Auction Rate Secs. Litig.*,
   2010 WL 2541166 (S.D.N.Y. June 10, 2010) ........................................................18

*United States v. O'Hagan*,
   521 U.S. 642 (1997)...........................................................................................13

*Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*,
   455 F. App'x 102 (2d Cir. 2012) ....................................................................22, 24

*Vitro S.A.B. de C.V. v. Aurelius Capital Mgmt., L.P.*,
   99 A.D.3d 564 (1st Dep't 2012) ..........................................................................25

*Wilson v. Merrill Lynch & Co., Inc.*,
   671 F.3d 120 (2d Cir. 2011)...........................................................................16, 17

**Statutes and Other Authorities**

17 C.F.R. § 230.144A(a)(1) ......................................................................................5

17 C.F.R. § 240.10b-5 ............................................................................................10

75 Fed. Reg. 68560 ...........................................................................................12, 14

15 U.S.C. § 78c(a)(13)-(14) ................................................................................13, 14

15 U.S.C § 78j(b) ....................................................................................................10

3 THOMAS LEE HAZEN, TREATISE ON THE LAW OF SECURITIES REGULATION
   § 12:20 (3d ed. 2017) .........................................................................................11

Fed. R. Civ. P. 9(b) ..................................................................................................1

Fed. R. Civ. P. 12(b)(6).............................................................................................1

v

Defendant GSO Capital Partners LP ("GSO") respectfully submits this brief in support of its motion to dismiss Solus Alternative Asset Management LP's ("Solus") amended complaint dated February 1, 2018 ("Amended Complaint" or "AC"), pursuant to Fed. R. Civ. P. 9(b), 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA").

## PRELIMINARY STATEMENT

Solus failed in its attempt to enjoin an extensively negotiated, arms-length refinancing transaction (the "Refinancing") that benefits Hovnanian[1] and its stakeholders, on the one hand, and, GSO, a longtime supporter of Hovnanian, on the other. *See Solus Alt. Asset Mgmt. LP v. GSO Capital Partners LP*, 2018 WL 620490 (S.D.N.Y. Jan. 29, 2018) (the "Ruling").  Solus did not appeal that Ruling.  Solus – a sophisticated multibillion dollar hedge fund and rejected suitor of its own Hovnanian refinancing transaction – instead amended its Complaint and is pursuing a plenary action in the hopes of continuing to profit from credit default swap ("CDS") contracts it sold that reference Hovnanian ("Hovnanian CDS").  CDS contracts are sold to contract buyers for up-front premium payments in exchange for the seller's obligation to indemnify against certain standardized "Credit Events," such as a Reference Entity's debt payment default.  Having sold such contracts, receiving substantial premiums, Solus hopes to never pay out on them, by using this lawsuit and the resources of the Court as leverage in a future proceeding before the International Swaps and Derivatives Association ("ISDA") to determine whether a Hovnanian Credit Event has in fact occurred.

Solus alleges in the Amended Complaint that the Refinancing was fraudulent and tortious because it might lead to the occurrence of such a Credit Event, potentially requiring Solus to pay out on its Hovnanian CDS contracts.  But, as explained herein, the Refinancing was

---

[1] As used herein, 'Hovnanian" means defendants Hovnanian Enterprises, Inc., K. Hovnanian Enterprises, Inc. ("K. Hovnanian"), and K. Hovnanian at Sunrise Trail III, LLC ("Sunrise"), collectively.

the result of an intense parallel, negotiated process among GSO, Solus and others, which Solus lost.  The final terms of the Refinancing were exhaustively disclosed and had a legitimate business purpose – to refinance Hovnanian's debt while strengthening its capital structure and lowering its cost of capital.  The Refinancing, which Hovnanian announced on February 2, 2018 had closed, has helped Hovnanian achieve these goals.

GSO received Hovnanian securities in the Refinancing, as well as the potential for a return on Hovnanian CDS contracts that it purchased.  Under the terms of the Refinancing, Hovnanian is expected to miss a May 1, 2018 interest payment owed on certain of its debt, which, following a 30-day grace period, may lead to a request for an ISDA Determinations Committee (a "DC") to decide whether a failure-to-pay Credit Event has occurred.  If a DC determines that a Credit Event in fact occurred, ISDA will then conduct an auction to set the final price for settlement of the CDS contracts.  That price depends on many factors – such as (i) the pricing of Hovnanian's then-outstanding debt securities, and (ii) general market conditions – that are generally outside the control of GSO and other CDS purchasers.

In entering the Refinancing, GSO accepted the risk that these events might not come to pass.  Solus is taking a different tack.  Mindful that none of its standardized CDS contracts have been or will be breached as a result of the Refinancing, and mindful too that ISDA permits CDS holders to transact with Reference Entities, even if it would result in the triggering of a Credit Event, Solus seeks to transform its remorse over selling immense amounts of Hovnanian CDS, which may now come due, into a federal lawsuit.  Solus alleges a market manipulation claim under federal securities law, and a claim for tortious interference with prospective economic advantage.  In neither instance has Solus met its pleading burden:

3333231.1

**Section 10(b)** (**Count I**): Solus alleges that, through the Refinancing, GSO and Hovnanian manipulated the market for Hovnanian CDS contracts.  But the Exchange Act requires that such a claim be made "in connection with the purchase or sale" of CDS.  Solus's claim fails because no CDS were bought or sold in the Refinancing, and Solus's claimed injury (if it ever occurs) will be triggered not by the purchase or sale of any Hovnanian security exchanged in the Refinancing, but by the standard provisions of every CDS contract.  In other words, Solus's claim is that it will be injured because it may have to pay out under the terms of those contracts.  Federal securities law does not protect a CDS seller from the consequences of its contractual arrangements, as is clear from the fact that the SEC proposed but *chose not to adopt* a regulation that could have done just that.

That aside, Solus's 10(b) claim also fails because the Refinancing was not in any way deceptive or manipulative.  Rather, the terms of the Refinancing about which Solus complains (and more) were disclosed to the public and, separately, to Hovnanian's bondholders such as Solus.  Moreover, as Solus concedes, GSO's intent in entering the Refinancing was no different from that of any other for-profit business: to increase profit.  As such, Solus fails to allege (much less with particularity) that GSO intended to defraud sellers of Hovnanian CDS, as it must do to state a claim.

Solus is a sophisticated CDS trader that, for its own benefit, made an ultimately unsuccessful offer to Hovnanian of below-market refinancing, specifically in order to *avoid* a Credit Event.  The 10(b) claim should therefore also be dismissed because Solus could not have reasonably relied on the Refinancing never possibly triggering a Credit Event.  ISDA's standardized rules permit market participants like GSO and Solus to behave this way.  In fact, market participants like Solus knew of two well-publicized instances of transactions similar to

the Refinancing which, based on ISDA DC determinations, triggered Credit Events.  Last, Solus has suffered no legally cognizable damages.  It has not alleged that it paid out a single dollar under its Hovnanian CDS contracts, and it may never do so.

*Tortious Interference* (**Count III**):  Solus's claim for tortious interference with prospective economic advantage likewise fails.  Such a claim requires Solus to plausibly allege that it was *about to enter* into a business relationship (*i.e.*, a contract) with a third party, but that GSO maliciously prevented the consummation of that relationship through conduct directed at a third party, not Solus.  Solus comes nowhere close.  As Solus alleges, it has *already entered into* contracts with its CDS dealers (which the Amended Complaint does not allege that either Solus or its counterparties have breached), and the Refinancing would deny it the benefits it wants to receive from those contracts.  New York tort law does not recognize such a claim.  Absent are any allegations that GSO directed any conduct towards Solus's CDS dealers (who are not parties herein) in their capacities as Solus's dealers.  And as is evident from the Amended Complaint, GSO and Hovnanian engaged in the Refinancing in furtherance of their own economic interests, not out of malice towards Solus or via wrongful means.  This is a complete defense to Solus's claim of interference with its prospective economic advantage in the market for CDS contracts.

For these reasons, the Amended Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS[2]

### The Refinancing

On December 28, 2017, Hovnanian filed with the SEC a Current Report on Form 8-K including voluminous attachments (the "8-K"), and also provided to bondholders like Solus

---

[2] GSO accepts as true the facts alleged in the Amended Complaint only for purposes of this motion.  Further, "[a] court may consider, in deciding a motion to dismiss, documents that are integral to the complaint or are incorporated by reference in the pleadings."  *In re Authentidate Holding Corp. Secs. Litig.*, 2006 WL 2034644, at *1 (S.D.N.Y. July 14, 2006) (Swain, J.) (citing cases).  A court may also consider public documents filed with the SEC, *Mintz v.*

a Confidential Offering Memorandum (the "COM").  These documents exhaustively detailed the

terms of the Refinancing launched that same date.  (*See generally* 8-K, COM.)[3]  Part of the

Refinancing included a private exchange offer to "qualified institutional buyers" who were

holders of K. Hovnanian's 8% Senior Notes due 2019 (the "8% Notes") such as Solus[4] (the

"Exchange") (*see* COM at 12), in which the 8% Notes could be exchanged for a combination of

cash, 13.5% Senior Notes due 2026 and 5% Senior Notes due 2040 (together, the "New Notes")

(AC ¶ 53).  The Exchange, which expired on January 29, 2018 (*id.*), put Hovnanian, a

nationwide home-builder and provider of mortgage financing (*id.* ¶ 21), in a significantly better

long-term financial position by strengthening its capital structure and lowering its cost of capital.

Beyond the Exchange, the terms of the Refinancing, all of which were disclosed,

included the following:

*First*, GSO provided a term loan to Hovnanian, at 5.0% interest, expiring in nine

years, in the initial amount of $132.5 million (the "Term Loan").  The Term Loan was used to

refinance all of Hovnanian's 7% Senior Notes due 2019 (the "7% Notes").  (*See* 8-K at 3-4.)

*Second*, pursuant to a Support Agreement with Hovnanian, GSO tendered over

$126 million of 8% Notes in the Exchange.  (*Id.* at 2; AC ¶ 53.)  The minimum tender amount

for the Exchange to take effect was $140 million.  (AC ¶ 53.)  Holders of the 8% Notes who, like

---

*Baron*, 2006 WL 2707338, at *2 (S.D.N.Y. Sept. 19, 2006) (Swain, J.), and may take judicial notice of news articles offered for the purpose of demonstrating the existence of information in the market, *In re Merrill Lynch Auction Rate Secs. Litig.*, 851 F. Supp. 2d 512, 526 n.4 (S.D.N.Y. 2012), *aff'd*, 571 F. App'x 8 (2d Cir. 2014).

[3] True and correct copies of the 8-K and COM are included as Exhibits 12 and 10, respectively, to the accompanying Declaration of Craig S. Waldman, Esq., dated March 2, 2018 ("Waldman Decl.").  "Adler Decl." means the accompanying declaration of Philippe Adler, dated March 2, 2018.

[4] Pursuant to SEC Rule 144A, a "qualified institutional buyer" is an entity that, for example, owns and invests on a discretionary basis at least $100 million in securities.  17 C.F.R. § 230.144A(a)(1).  In other words, such buyers are highly sophisticated.  The initial offering for K. Hovnanian's 8% Notes was also to qualified institutional buyers pursuant to Rule 144A (*see* COM at 1), and Solus alleges that it is a holder of 8% Notes (AC ¶¶ 131, 139).

GSO, tendered their 8% Notes into the Exchange were expected to receive 121% to 122% of the par value of their notes.  (AC ¶ 53 (referring to Hovnanian disclosures).)

*Third*, a covenant in the indenture governing the New Notes provides that Hovnanian (including its subsidiaries) shall not make any interest payments prior to maturity on $26 million in principal amount of the 8% Notes, which will be tendered and then bought by a Hovnanian subsidiary – defendant Sunrise.  (*See* 8-K at 7-8 & Ex. 99.1.)  In connection therewith, Sunrise acknowledged that due to this provision, it would not receive any interest payments, but it expressly did "not waive[] its entitlement to such interest payments" on its 8% Notes.  (*See* COM at 12.)  The next interest payment on Sunrise's 8% Notes is due on May 1, 2018.  (AC ¶ 56.)  The missed payment will not trigger any cross-default provisions in Hovnanian's bond indentures and loan documents.  (*Id.* ¶ 57.)

*Fourth*, K. Hovnanian's $75 million senior secured term loan facility (the "Existing Term Loan") is expected to be refinanced in September 2018 with a new senior secured first lien revolving credit facility from GSO for up to $125 million.  (8-K at 3-4 & Ex. 99.4.)  To provide additional incremental capital, GSO also agreed to purchase in 2019 $25 million of K. Hovnanian's 10.5% senior secured notes due 2024.  (8-K at 3-4 & Ex. 99.4.)

The business rationale of the Refinancing was self-evident.  Among other things, it allowed Hovnanian to refinance its 7% Notes and 8% Notes due in 2019 with debt maturing in 2026 and 2040.  (*See* COM at 22.)  Also, pursuant to an earlier Hovnanian refinancing, if any of its 7% Notes were outstanding on October 15, 2018, or any new indebtedness that refinanced the 7% Notes had a maturity date prior to January 15, 2021, the maturity of its Existing Term Loan would accelerate (or "spring") from August 1, 2019 to October 15, 2018.  (*See* Waldman Decl. Ex. 11 at 84.)  But thanks to the Refinancing, the 7% Notes were all redeemed.

6

**Hovnanian Credit Default Swaps**

Separate from the package of securities it received in the Exchange, GSO may also receive another economic benefit from the Refinancing.  As Hovnanian disclosed in the COM, GSO is a net purchaser of Hovnanian CDS contracts.  (COM at 3, 81.)  As Hovnanian also disclosed, the covenant in the indenture governing the New Notes that restricts Hovnanian's ability to timely make the May 1, 2018 interest payment on Sunrise's 8% Notes may result in the occurrence of a Credit Event under Hovnanian CDS contracts held by GSO and others.  (8-K at Ex. 99.1; COM at 14.)  If that occurs, it could trigger payments to GSO and other net purchasers of Hovnanian CDS contracts, and result in "significant monetary exposure for those entities that sold" such contracts.  (8-K at 99.1; COM at 14.)

Solus is a seller of Hovnanian CDS contracts.  It alleges that it has "sold more than $260 million of protection on Hovnanian debt," (AC ¶ 90) and that, if a Credit Event is deemed to have occurred, it will suffer injury (*id.* ¶ 91).  Solus admits, however, that it too made an offer to provide refinancing to Hovnanian, on "attractive" (meaning below-market) terms, as part of a parallel, negotiated process involving several financial firms.  (*Id.* ¶ 49 n.7.)  Hovnanian chose to accept the terms offered by GSO over those offered by Solus.  (*Id.*)

**Solus's Claims and Procedural History**

Solus commenced this case by order to show cause seeking a preliminary injunction on January 11, 2018, purporting to allege two causes of action against GSO: (1) for securities fraud under Section 10(b) and Rule 10b-5(a) and (c) thereunder, on the ground that GSO's participation in the Refinancing amounted to "deceptive and manipulative acts in furtherance of a scheme to defraud" the market for Hovnanian CDS contracts (*see* Dkt. No. 1 ¶¶ 104-114); and (2) for tortious interference with prospective economic advantage, on the

ground that GSO used "improper means" to trigger Solus's obligations under Solus's existing

Hovnanian CDS contracts (*id.* ¶¶ 136-144).

        After a full-day evidentiary hearing on January 25, 2018, and the Ruling denying

Solus a preliminary injunction on January 29, 2018, Solus filed the Amended Complaint on

February 1, 2018.  (Dkt. No. 75.)  Among other things, by this amendment, Solus sought to take

advantage of the expedited discovery it obtained before the hearing.

        Solus continues to assert the same two claims against GSO.  Even though this is

its second attempt, Solus still fails to state a claim against GSO.  Accordingly, the Court should

dismiss, with prejudice, the Amended Complaint as against GSO in its entirety.[5]

## ARGUMENT[6]

        To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "'a complaint must

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face.'"  *Elias v. Rolling Stone LLC*, 192 F. Supp. 3d 383, 390 (S.D.N.Y. 2016) (quoting *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009)), *rev'd in part on other grounds*, 872 F.3d 97 (2d Cir. 2017).

"Importantly, the 'plausibility' standard applies only to a complaint's factual allegations.

[Courts] give no effect at all to 'legal conclusions couched as factual allegations.'"  *Mayor &

Council of Balt., M.D.  v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (citation omitted);

*accord*, *Elias*, 192 F. Supp. 3d at 390.  "Instead, the Court must examine only the well-pleaded

factual allegations, if any, and then determine whether they plausibly give rise to an entitlement

to relief."  *Elias*, 192 F. Supp. 3d at 390 (internal quotation omitted).  "Dismissal is appropriate

---

[5] *Miller v. Pac. Inv. Mgmt. Co. LLC*, 2013 WL 12305507, at *4 (S.D.N.Y. Apr. 23, 2013) (Swain, J.) (dismissing market manipulation claims with prejudice where "any amendment to the already amended complaint would be futile," because more detailed allegations could not have stated a claim).

[6] Hovnanian and the individual defendants have incorporated by reference GSO's arguments in support of dismissal of Solus's 10(b) (Count I) and tortious interference (Count III) claims.  All arguments as to GSO herein should therefore be understood to apply with equal force and weight to Hovnanian, Ara K. Hovnanian, and J. Larry Sorsby.

when it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law."  *Id.* (internal quotations omitted).

# I.
## SOLUS'S MARKET MANIPULATION CLAIM FAILS AS A MATTER OF LAW

Solus contends that GSO, a net purchaser of Hovnanian CDS contracts, "engineered and carried out a scheme to manipulate" the "market for Hovnanian CDS" in violation of Section 10(b) and Rule 10b-5(a) and (c) by participating in the Refinancing, a transaction solely involving the purchase and sale of Hovnanian *bonds*.  (AC ¶¶ 75-76, 103-113.) Pursuant to the Refinancing, it is anticipated that Hovnanian will miss an interest payment on debt owned by Sunrise.  Following a 30-date grace period (Waldman Decl. Ex. 2 § 5.01(i)), an ISDA DC may be asked to determine whether this comprises a failure-to-pay Credit Event, and, Solus speculates (*see* AC ¶ 97), the DC may determine that it was in fact a Credit Event, which may in turn trigger a payout by net sellers of Hovnanian CDS (like Solus) under their CDS contracts, in amounts (if any) that cannot now be determined.[7]

In *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007), the Court of Appeals for the Second Circuit definitively set forth the elements for a claim of open market manipulation, setting a high bar for the novel claim Solus asserts.  Solus must sufficiently plead: "(1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities

---

[7] The amount cannot now be determined, and in fact may be zero, because the settlement price for CDS contracts is determined by an ISDA auction, typically based on the "cheapest-to-deliver" principle, using the Reference Entity's least expensive debt obligation (as a percentage of par).  (*See* Waldman Decl. Ex. 4 § 3.2; AC ¶ 60.)  No one can state today what the least expensive Hovnanian bond will be as of the time of any ISDA auction (which is unlikely to occur before June 2018), or what that bond's pricing will be.

exchange." *Id.* at 101.[8]  Said differently, Solus must show "intentional or willful conduct" by GSO "designed to deceive or defraud investors by controlling or artificially affecting the price of" Hovnanian CDS.  *Id.* at 100 (citation omitted); *see also Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 383 (2d Cir. 1973) ("So long as the investor's motive in buying or selling a security is not to create an artificial demand for, or supply of, the security, illegal market manipulation is not established.").

Here, Solus has not made, and cannot make, the requisite showing that (i) GSO acted "in connection with the purchase or sale" of CDS contracts, (ii) the Refinancing was deceptive, and hence manipulative within the meaning of the statute, (iii) GSO possessed scienter, or an intent to defraud, (iv) Solus reasonably relied on a market free of transactions that may result in a Credit Event, and (v) Solus suffered damages.  For at least these reasons, Solus's market manipulation claim should be dismissed with prejudice.

**A.      The Alleged Scheme Was Not "In Connection With" the Purchase or Sale of CDS**

As a threshold matter, Solus's market manipulation claim fails in the face of the plain language of Section 10(b) and Rule 10b-5, each of which requires that the alleged scheme at issue be employed "in connection with the purchase or sale of" a security.  *See* 15 U.S.C § 78j(b); 17 C.F.R. § 240.10b-5.  Solus principally alleges that GSO conducted a "scheme" that meets this requirement because the Refinancing involved the exchange of 8% Notes for New Notes.  (AC ¶ 95.)  This assertion does not pass muster.

A purported fraud is not "in connection with" the purchase or sale of a security because a "fraud merely involving" some securities is alleged.  *Levitin v. PaineWebber, Inc.*, 933 F. Supp. 325, 328 (S.D.N.Y. 1996), *aff'd* 159 F.3d 698 (2d Cir. 1998).  Rather, to satisfy this

---

[8] "Because a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b)." *Id.* at 101-102 (collecting cases).

requirement, the alleged fraud must be "integral to the purchase and sale of the securities in question." *Pross v. Katz*, 784 F.2d 455, 459 (2d Cir. 1986); 3 THOMAS LEE HAZEN, TREATISE ON THE LAW OF SECURITIES REGULATION § 12:20 (3d ed. 2017) (the "in connection with" requirement not satisfied by "any wrongdoing that just happens to involve securities but is not directly connected"). Solus's claim runs afoul of this rule because it is rooted in the flawed premise that GSO manipulated the market for Hovnanian CDS contracts by taking action with respect to Hovnanian bonds – altogether different securities.[9] (*See* AC ¶ 76.)

　　　　Plainly stated, no CDS contracts were bought or sold in the Refinancing,[10] and the Amended Complaint is devoid of allegations that the Refinancing was intended to dupe Solus (or anyone else) into buying or selling Hovnanian CDS contracts. Moreover, Solus's alleged injury in this case – the possibility that it may one day have payment obligations under its Hovnanian CDS contracts (AC ¶ 91) – will be triggered (if at all) by future events based on the terms of its standardized CDS contracts, following a potential determination by an ISDA DC. Solus suffered no injury due to the Refinancing, which has now closed.

　　　　Payouts under CDS contracts are no more made "in connection with the purchase or sale of" a security (let alone a *different* security) than, for example, contractually required coupon payments are made in connection with separate purchases and sales of the underlying

---

[9] Solus may rely on *S.E.C. v. Zandford*, 535 U.S. 813 (2002) for the broad proposition that a market manipulation claim can reach any activity that merely "coincide[s]" with the purchase or sale of a security. *Zandford*, however, is inapposite because there, the defendant allegedly took improper action with respect to the *same security* transferred to him by plaintiff. 535 U.S. at 820. Solus also may rely on decisions for the proposition that federal securities law reaches the alleged manipulation of an underlying security in order to affect the price of related derivatives. Such decisions are equally inapposite. For instance, *S.E.C. v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007), does not analyze the Exchange Act's "purchase or sale" requirement. As another example, *Campbell v. Nat'l Media Corp.*, 1994 WL 612807, at *4 (E.D. Pa. Nov. 3, 1994), stands only for the noncontroversial assertion that the exercise of options pursuant to an employment contract can meet that requirement. In any event, Solus does not allege that any of GSO's trading in the underlying securities at issue here, *i.e.*, Hovnanian bonds, manipulated the price of those securities, let alone the trading prices of Hovnanian CDS.

[10] K. Hovnanian, the issuer of securities under the Refinancing, disclosed that it was not a party to any CDS contracts. (8-K at Ex. 99.1.)

bond.  Solus's grievance is, at bottom, a matter of contract law, not securities law.  *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) ("The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract."); *Dealtime.com Ltd. v. McNulty*, 123 F. Supp. 2d 750, 761 (S.D.N.Y. 2000) (a breach of contract involving securities is "not federal securities fraud").  Solus should not be permitted to shoehorn that grievance into a federal securities claim, where, even though none of the standard ISDA terms for its CDS contracts have been breached, the Refinancing happened to involve *some* securities.  *See Good Hill Master Fund L.P. v. Deutsche Bank AG*, 146 A.D.3d 632, 636-37 (1st Dep't 2017) (rejecting the argument that a CDS counterparty breached a duty of good faith by engaging in self-serving conduct).

Indeed, the SEC's own rule-making activities indicate that Rule 10b-5 does not apply to payments or deliveries under CDS contracts.  In 2010, the SEC proposed – but chose not to adopt – Proposed Rule 9j-1, which would have expanded federal securities law to cover manipulation "in connection with the exercise of any right or performance of any obligation under a" CDS contract.  75 Fed. Reg. 68560, 68561-62 (proposed Nov. 8, 2010).  Included within the scope of that rule would have been conduct to "manipulate the price or value of the reference underlying [(a term the SEC defined in the Proposed Rule to mean, *e.g.*, the "deliverable obligation")] of a security-based swap for the purpose of benefiting such person's position in the" CDS.  *Id.* at 68563 & n.15; *see also* Adler Decl. Ex. A at 4 (noting Proposed Rule 9j-1 would have "address[ed] instances in which . . . [a] credit protection buyer under a single-name CDS attempts to interfere with the underlying reference entity in an attempt to induce a credit event entitling it to payments from the credit protection seller").

12

Nor can Solus plausibly contend that, following an ISDA auction, the "in connection with" requirement will be met on the grounds that the Exchange Act's definitions of "purchase" and "sale" include the "termination" of a security-based swap "prior to its scheduled maturity date." 15 U.S.C. § 78c(a)(13)-(14).  The cash or physical settlement of a CDS contract[11] after a Credit Event is not a volitional early termination *prior to the scheduled maturity date* of that contract.  Rather, the CDS settlement is the natural termination event contemplated by standardized ISDA guidance – the settlement date *is* the maturity date for the CDS once a Credit Event occurs.[12]  (*See* Waldman Decl. Ex. 3 § 1.15 ("Upon the occurrence of a Termination Date, the parties will have no further obligations towards each other in respect of the Credit Derivative Transaction").)

Put another way, cash settlement and physical settlement are non-volitional acts that flow directly from the rights and obligations of the parties to a standardized CDS contract, and their occurrence – following a Credit Event – "terminates" the relationship.  (*Id.*)  The termination of a CDS contract by operation of its terms is *not* an investment decision akin to a "purchase" or "sale," so as to bring it within the scope of the antifraud provisions of the Exchange Act.  (Nor is the settlement of CDS in itself deceptive, which is the "statutory requirement" under 10(b) – "that there be 'deceptive' conduct 'in connection with' a securities transaction."  *United States v. O'Hagan*, 521 U.S. 642, 659 (1997).)  To hold otherwise would risk subjecting all CDS payments to securities fraud claims by CDS market participants who,

---

[11] In a "cash" settlement, the CDS protection seller makes a cash payment based on a formula derived from the difference between the auction price and the par value of the cheapest-to-deliver note of the Reference Entity.  *See infra* n.7; Ruling, at *2.  In a "physical" settlement, the CDS protection seller must purchase a specified amount of CDS protection purchaser's holdings in Reference Obligations at par.  Ruling, at *2.

[12] ISDA guidance also refers to a "Scheduled Termination Date."  (Waldman Decl. Ex. 3 § 1.14.)  This is simply the outer limit of the life of the swap (*e.g.*, a 5-year CDS contract) that the parties agreed would apply *absent* a Credit Event.  (*Id.*)

13

like Solus, may regret their decision to sell credit protection. But inasmuch as the SEC did not adopt Proposed Rule 9j-1, that is not the law.[13]

Solus further alleges that the "in connection with" requirement is met because, following a possible determination that a Credit Event has occurred, it would be "forced to transact" in securities by virtue of its Hovnanian CDS contracts, as it would have to make payments to its CDS dealers. (AC ¶ 96.) But Solus *chose* to trade in CDS and to contractually bind itself to the obligations thereunder as well as under ISDA's rules governing payouts. This includes the obligation – at Solus's own option – to either physically settle or cash settle its CDS. (*Id.* ¶ 60.) Solus can choose cash settlement, and by making a cash payment pursuant thereto, it will not be transacting in securities, forcibly or otherwise. And under either settlement method, a voluntary entrant into a contract, like Solus, can hardly claim it is being "forced" by the terms of the contract to transact in securities. (*See* Waldman Decl. Ex. 3 Article VII & Article VIII.)

**B.    The Refinancing Was Fully Disclosed and Is Not Deceptive or Manipulative**

Even if Solus had sufficiently alleged a "scheme" employed "in connection with" the purchase or sale of Hovnanian CDS contracts (it did not), the Court should still dismiss the Amended Complaint because Solus cannot make the threshold showing that the Refinancing was in any way "manipulative," meaning that, GSO, through the Refinancing, "inject[ed] inaccurate information into the marketplace or creat[ed] a false impression of supply and demand for" Hovnanian CDS "for the purpose of artificially depressing or inflating the price" thereof. *ATSI*, 493 F.3d at 101 (citation omitted); *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476-77

---

[13] In Proposed Rule 9j-1, the SEC considered regulation of "payments or deliveries" that occur "after the purchase of a security based swap but before the sale or *termination* of the security based swap." 75 Fed. Reg. 68560, 68560 (emphasis added). In so stating, the SEC could only have meant a termination "prior to its scheduled maturity date," because that was (and remains) the limit imposed by the words of Sections 3(a)(13) and (a)(14) of the Exchange Act upon the SEC's rule-making authority. *See* 15 U.S.C. § 78c(a)(13)-(14).

(1977).  The Refinancing resulted from a parallel, negotiated process in which GSO, Solus, and others vied for Hovnanian's business, and Hovnanian accepted the proposal offering it the best economic terms.  It was intended to be, and is, beneficial to Hovnanian, its investors, and GSO. And given the volume and granular nature of Hovnanian's disclosures, including that GSO was a net purchaser of Hovnanian CDS contracts, no deception was possible.  The very features of the Refinancing that Solus claims are "deceptive" (*see* AC ¶¶ 75-76) were exhaustively disclosed.  It would be natural to wonder, as the Court did,[14] who could have been manipulated or deceived under these circumstances, particularly in the specialized CDS market, where it is axiomatic that participants may act against the interest of other CDS holders.  *Good Hill*, 146 A.D.3d at 636-37. Sophisticated entities like Solus plainly were not deceived.  *See Santa Fe*, 430 U.S. at 474 (no market manipulation claim lies where security holders' "choice was fairly presented, and they were furnished with all relevant information on which to base their decision").

The extent of Hovnanian's disclosure, which was substantial to the market, and even more so to its bondholders like Solus (who received the COM, not just the 8-K), is evident from the detailed nature of the Complaint and Amended Complaint (each 146 paragraphs).  The 8-K and the COM, along with the deal documents that Hovnanian appended to the 8-K, disclosed to the market, *inter alia*, that (a) GSO was a net purchaser of Hovnanian CDS contracts, from which GSO would economically benefit if a Credit Event was deemed to occur (COM at 3, 81) and (b) the non-payment of interest on the 8% Notes held by Sunrise "may result in the occurrence of a 'credit event' under" Hovnanian CDS "resulting in significant monetary exposure for those entities that sold such credit default swaps[,]" (8-K at Ex. 99.1).[15]

---

[14] *See* Jan. 25, 2018 Hr'g Tr. at 256:14-15, 258:17-21.

[15] Hovnanian also 8-K'd the Complaint, at the Court's direction, so any market participants could review Solus's allegations for themselves.  *Available at*

Also, as Solus concedes, there was disclosure from sources other than Hovnanian, such as speculation in the financial press about the Refinancing, well before Hovnanian announced it.[16]  (*See* AC ¶ 4.)  Since at least that point, Solus (or any other seller of Hovnanian CDS contracts) had the ability to hedge its position, or offer alternatives to Hovnanian, as Solus did.  (*See id* ¶ 49 n.7.)

The law in this Circuit is clear:[17] the market cannot have been misled by a fully transparent transaction like the Refinancing.  *See Santa Fe*, 430 U.S. at 478 ("[O]nce full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute."); *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 130 (2d Cir. 2011) ("[T]he market is not misled when a transaction's terms are fully disclosed.") (citation omitted); *In re Citigroup, Inc.*, 2011 WL 744745, at *6-7 (S.D.N.Y. Mar. 1, 2011) (Swain, J.) (noting that "a plaintiff cannot premise a claim of securities fraud on conduct and risks that were previously disclosed to the investing public" and dismissing market manipulation claim where "extensive public information and disclosures" revealed the market risks at issue), *aff'd sub nom. Finn v. Barney*, 471 F. App'x 30 (2d Cir. 2012).[18]

---

https://www.sec.gov/Archives/edgar/data/357294/000143774918000557/hov20180111_8k.htm (last visited Mar. 1, 2018).

[16] *See, e.g.*, Sridhar Natarajan, Katherine Burton & Lisa Abramowicz, *A High-Stakes Hedge Fund Battle Erupts Over Hovnanian Debt*, Bloomberg, Nov. 15, 2017; Matt Levine, *Blackstone May Do Its Cleverest CDS Trade Again*, Bloomberg, Nov. 17, 2017.

[17] Solus may assert that a manipulation claim can survive dismissal notwithstanding the disclosure of facts that constituted the alleged scheme, but the authorities do not support this.  In *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366, 376 (6th Cir. 1981), claims were brought under the Williams Act, not Section 10(b), and in any event, the Second Circuit has deemed this decision to be an "unwarranted extension of the Williams Act," *Buffalo Forge Co. v. Ogden Corp.*, 717 F.2d 757, 760 (2d Cir. 1983).  And in *Ala. Farm Bureau Mut. Cas. Co. v. Am. Fidelity Life Ins. Co.*, 606 F.2d 602, 613 (5th Cir. 1979), the Fifth Circuit merely held that the plaintiff had raised triable issues of fact based on allegations that defendants *failed to disclose* certain aspects of the stock repurchase plan at issue, not that there could have been a manipulative scheme even with such disclosures.

[18] There is no legitimate dispute about the adequacy of Hovnanian's market disclosures.  In the Complaint, Solus asserted claims against Hovnanian for non-disclosure under Sections 10(b) and 14(e) of the Exchange Act, and Rule

3333231.1

C.      **Solus Failed to Sufficiently Allege that GSO Had the Requisite Scienter**

A plaintiff asserting a market manipulation claim must also allege, with particularity, that the defendant's alleged manipulative scheme was undertaken with the requisite scienter.  *ATSI*, 493 F.3d at 102 ("Because a claim for market manipulation requires a showing of scienter, the PSLRA's heightened standards for pleading scienter also apply.").  Indeed, "[t]his pleading requirement is particularly important in manipulation claims because in some cases scienter is the only factor that distinguishes legitimate" market conduct "from improper manipulation."  *Id.*  Accordingly, Solus was required to plead "with particularity facts giving rise to a strong inference that" GSO "intended to deceive" sellers of Hovnanian CDS contracts "by artificially affecting the market price of" those contracts.  *Id.*; *see also Wilson*, 671 F.3d at 129.  Solus does not meet this high threshold.

Scienter can be demonstrated through facts showing a "motive and opportunity to commit fraud."  *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 494 (S.D.N.Y. 2011), *aff'd*, 472 F. App'x 7 (2d Cir. 2012).  But generalized business motives that could be imputed to any for-profit entity are routinely held to be insufficient.  *See In re JP Morgan Auction Rate Secs. (ARS) Mktg. Litig.*, 867 F. Supp. 2d 407, 420-421 (S.D.N.Y. 2012) (citing cases).  In other words, a "strong inference of scienter is not raised by alleging that a legitimate investment vehicle" – such as CDS contracts – "creates an opportunity for profit through manipulation."  *ATSI*, 493 F.3d at 104; *Engstrom v. Elan Corp., plc*, 2011 WL 4946434, at *9

---

10b-5(b), and a control person liability claim against the individual defendants for non-disclosure under Section 20(a).  (Dkt. No. 1 ¶¶ 115-135.)  Those claims are notably absent from the Amended Complaint.

3333231.1

(S.D.N.Y. Oct. 18, 2011) (a "desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company" and does not establish scienter) (citation omitted).[19]

In the Amended Complaint, Solus acknowledges that GSO was motivated by the prospect of maximizing its profit when it offered Hovnanian advantageous refinancing terms. (*See* AC ¶¶ 46, 61, 84.)  Solus must have been motivated by that same prospect when it too offered "attractive" refinancing terms to Hovnanian.  (*Id.* ¶ 49 n.7.)  That GSO had the motive and opportunity to realize profits on the Hovnanian CDS contracts it had bought by entering into a mutually beneficial transaction with Hovnanian does not translate into an intent on GSO's part to defraud sellers of Hovnanian CDS.  To find otherwise would run contrary to a long line of case law finding that allegations of a profit motive are insufficient to establish scienter.  *See, e.g., In re Merrill Lynch*, 851 F. Supp. 2d at 528 ("Plaintiff's scienter allegations fall short of the motive and opportunity standard because they amount to no more than allegations of a general business motive to make a profit."); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 428-29 (S.D.N.Y. 2010) ("[A] generalized motive to earn 'profits' is insufficient to allege scienter.").

**D.     Solus Failed to Allege Reasonable Reliance**

A "necessary element of a market manipulation claim" is damages "caused by a reliance on an assumption of an efficient market free of manipulation."  *In re UBS Auction Rate Secs. Litig.*, 2010 WL 2541166, at *22 (S.D.N.Y. June 10, 2010) (citation omitted).  As such, Solus "must show that [it was] deceived by reliance on [d]efendants' deceptive conduct."  *Id.* And that reliance must be "reasonable."  *Id.*  Courts evaluate this element by analyzing, among other things, the "entire context of the transaction" and the "sophistication of the parties[.]"  *In re*

---

[19] Alternatively, scienter can be demonstrated by alleging "strong circumstantial evidence of conscious misbehavior or recklessness."  *In re Citigroup Auction Rate Secs. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009) (Swain, J.).  Solus makes no such allegation against GSO.

*Merrill Lynch Auction Rate Secs. Litig.*, 704 F. Supp. 2d 378, 393 (S.D.N.Y. 2010) (citation

omitted), *aff'd*, 671 F.3d 120 (2d Cir. 2011); *Davidson Pipe Co. v. Laventhol & Horwath*, 120

F.R.D. 455, 460 (S.D.N.Y. 1988) ("A sophisticated investor is held to a higher duty of

inquiry[.]").

    As this Court recognized, "CDS market participants are sophisticated investors."

Ruling, at *2, *6 (the "community of CDS market participants . . . is a relatively insular and

sophisticated subset of the public"). Solus is no exception.[20] This undercuts Solus's allegation

that it is an "innocent CDS protection seller" (*see* AC ¶¶ 67, 84) deceived by "reli[ance] upon a

normally functioning market" for CDS contracts (*see, e.g.*, *id.* ¶¶ 41-42). Indeed, Solus concedes

that it sought to leverage its CDS position by offering to provide refinancing to Hovnanian on

"attractive" (*i.e.*, below-market) terms as part of a parallel, negotiated process to secure the

company's business. (*Id.* ¶ 49 n.7.) In doing so, Solus was advancing its self-interest by seeking

to enter a transaction with Hovnanian which would *avoid* a Credit Event. Solus cannot plausibly

plead reliance when it tried to affect the CDS market to its own economic advantage.

    Moreover, the mere fact that the market value of Solus's Hovnanian CDS position

may deteriorate should a DC determine that a Credit Event occurred does not in any way suggest

a CDS market malfunction. In fact, Solus has not plausibly alleged that the market for

Hovnanian CDS operated contrary to reasonable expectations, even after the Refinancing was

rumored and then disclosed. Solus, as a party to CDS contracts (*Id.* ¶ 41), understood that

holders of Hovnanian CDS are expressly permitted by their form ISDA contracts to "engage in

any kind of . . . investment banking with" a Reference Entity, and may act "with respect to such

business in the same manner" as it would if its CDS holdings "did not exist," regardless of

---

[20] *Roth v. Solus Alternative Asset Mgmt, LP*, 258 F. Supp. 3d 364, 370 (S.D.N.Y. 2017) (Solus is a "sophisticated part[y]"); *In re Nortel Networks Inc.*, 2017 WL 932947, at *1 (Bankr. Del. Mar. 8, 2017) (same).

whether such action "might constitute or give rise to a Credit Event."  (*See* Waldman Decl. Ex. 3 § 11.1(b)(iii); *see also id.* § 11.1(b)(iv), (vii) (buyers and sellers of CDS contracts need not make disclosures to one another).)  New York courts have found that even "aggressive" dealings in CDS contracts that have an adverse impact on the holdings of other parties in the marketplace are not out of bounds.  *See Good Hill*, 146 A.D.3d at 636-37 (such dealings are "in good faith and . . . commercially reasonable" in light of ISDA's definitions).

CDS market participants were familiar with transactions resembling the Refinancing that result in a Credit Event.  In 2013, an ISDA DC unanimously ruled that a Credit Event had occurred triggering payments on CDS contracts after Codere Finance (Luxembourg), S.A. made a payment under a revolving credit facility two days after it was due. (Adler Decl. Ex. B.)  The ISDA Credit Derivatives Definitions were updated in 2014, and far from constraining such transactions, ISDA included the language described above.  In December 2016, an ISDA DC unanimously decided that a failure by iHeart Communications, Inc. to redeem at maturity $57.1 million of its outstanding notes held by its wholly-owned subsidiary Clear Channel Holdings, Inc. comprised a failure-to-pay Credit Event.  (*Id.* Ex. C.)  The 2014 Definitions have not been modified since (nor has any other relevant standardized ISDA documentation).  Media speculation prior to the announcement of the Refinancing included comparisons to these precedents.[21]  Solus therefore cannot claim that it was deceived by reliance on a market free of such dealings.

---

[21] *See* Matt Levine, *Blackstone May Do Its Cleverest CDS Trade Again*, BLOOMBERG, Nov. 17, 2017; Chris Davis, *Blackstone-Hovnanian CDS Deal Revives Credit Rules Debate*, RISK.NET, Dec. 22, 2017 (attached as Adler Decl. Ex. D).  Since iHeart and Codere, there has been market discussion of ways to amend standardized ISDA documents.  *See* Ruling, at *4 (citing Fabien Carruzzo *et al.*, *iHeart and Other Unconventional CDS Credit Events* (attached as Waldman Decl. Ex. 8) as "suggesting several proposals to prohibit engineered defaults").  No such amendments have been adopted.

E.      **Solus Has Suffered No Legally Cognizable Damages**

Finally, the Court should dismiss Solus's claim because it did not plead that it suffered any cognizable damages.  *See ATSI*, 493 F.3d at 101.  Its claim is premature.

As to Solus' Hovnanian CDS contracts, no Credit Event has been determined, requiring payment by or to any party.  It will not be known if there is a qualifying Credit Event unless an ISDA DC makes a determination to this effect, which it may or may not do.  In any event, there cannot even be a request for such a determination until a 30-day grace period expires after May 1, 2018, when K. Hovnanian is expected to miss its next interest payment on Sunrise's 8% Notes.  (AC ¶ 57; Waldman Decl. Ex. 2 § 5.01(i).)  If a DC determines that a qualifying Credit Event has occurred, parties who are sellers of protection against a Hovnanian Credit Event, such as Solus, will be contractually obligated to pay on their CDS contracts.  (AC ¶ 60.)  But the extent and timing of those payments (if any) will not be known until after ISDA holds an auction to set the price for settling Hovnanian CDS contracts (*id.*) under either the cash method or the physical method.  Whether GSO receives payments under its Hovnanian CDS contracts, and whether Solus makes payments under its Hovnanian CDS contracts, turns on the outcome of the auction.  (*See generally* Waldman Decl. Ex. 4 § 3.2.)

It is no surprise, therefore, that Solus describes its damages as contingent on the outcome of future events.  (*See* AC ¶¶ 91-92.)  Because Solus has suffered no cognizable damages, and may never do so, it cannot sustain a market manipulation claim.

## II.
## SOLUS CANNOT STATE A CLAIM FOR TORTIOUS INTERFERENCE WITH PROSEPCTIVE ECONOMIC ADVANTAGE

The Court should also dismiss Solus's claim for tortious interference with "prospective economic advantage."  To adequately state such a claim, Solus must plead "that '(1) it had a business relationship with a third party; (2) [GSO] knew of that relationship and

intentionally interfered with it; (3) [GSO] acted solely out of malice, or used dishonest, unfair, or improper means; and (4) [GSO's] interference caused injury to the relationship.'"  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (citation omitted).[22]  It failed to do so.

**A.     Solus Failed to Allege that GSO Directed Its Conduct At Solus's CDS Dealers**

Conduct constituting tortious interference with prospective economic advantage "is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship."  *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (2004) (citing cases); *see also G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995) (dismissal warranted where complaint lacked "allegations that appellees had any contact with [plaintiffs'] customers or that appellees tried to convince the customers to make contracts with them rather than the [plaintiffs]").

Here, Solus fails to allege that GSO directed any conduct towards Solus's "third-party CDS dealers" in their capacity as Solus's dealers.  (*See* AC ¶ 122-28.)  Rather, Solus alleges that defendants generally knew Solus had entered CDS contracts, and directed their allegedly tortious conduct *at Solus*.  (*See id.*)  This does not state a cognizable claim.  *See, e.g.*, *Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398, 402–03 (S.D.N.Y. 2012) (dismissing claim where plaintiff failed to allege "*specific* business relationships with which [d]efendant allegedly interfered" and where "[p]laintiff only allege[d] conduct directed at itself, not any conduct [d]efendant directed at [p]laintiff's customers or other businesses"); *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 167–68 (S.D.N.Y. 1998) (same).

---

[22] Courts sometimes refer to this cause of action by different names, such as tortious interference with prospective business advantage, or with business relations.  "Regardless of which term or phrase is used, the same legal standards apply."  *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 465 n.23 (S.D.N.Y. 2006); *see also Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 105 (2d Cir. 2012).

3333231.1

**B.**    **Solus Failed to Allege That Its Relationship with Any CDS Dealer Was Damaged**

The Court should also dismiss the tortious interference claim because Solus failed to allege that its relationships with its third party CDS dealers have been injured in any way.  *See Kirch*, 449 F.3d at 400.  This is not a typical case where a plaintiff was about to consummate a business relationship with a third party, and a defendant maliciously interfered for the purpose of preventing it.  Here, Solus alleges that it has *already entered into* CDS contracts with its dealers (AC ¶ 122), and nowhere contends that its relationship with those dealers has been or will be disturbed.[23]  Its claim should be dismissed for this reason alone.  *See PPX Enters., Inc. v. Audiofidelity Enters, Inc.*, 818 F.2d 266, 270 (2d Cir. 1987) ("[A] claim of tortious interference with prospective economic advantage usually involves interference with a 'business relationship not amounting to a contract,' resulting in a breach or severance of the relationship itself, or at least some injury to that relationship.") (citations omitted); *see also G.K.A.*, 55 F.3d at 768 ("It is axiomatic that, in order to prevail on this claim, [plaintiffs] would have to show that the appellees intentionally caused the retailers not to enter into a contractual relation with them.").

Instead, Solus contends that the "benefit" it expected to receive from its existing Hovnanian CDS contracts would be "frustrate[d]" if its payment obligations under those contracts were triggered by the Refinancing.  (*See* AC ¶ 126.)  In other words, the gravamen of Solus's claim is not that any of its underlying business relationships are at risk, but rather that, if a Credit Event is deemed to occur, it will be required to pay out on its Hovnanian CDS contracts (*see, e.g.*, *id.* ¶¶ 91, 126) – a natural consequence of those contracts.  The law of tortious inference with prospective economic advantage, however, does not protect parties from such

---

[23] Solus cannot allege a claim for tortious interference *with contract* because its Hovnanian CDS contracts with its dealers have not been, and will not be, breached as a result of the Refinancing.  *Bittens v. Bd. of Managers of Octavia Condo.*, 132 A.D.3d 487, 487 (1st Dep't 2015) ("[W]ithout an actual breach of the underlying contract, a cause of action for tortious interference with a contract fails.").

risks.  *See PPX*, 818 F.2d at 270 ("We fail to see how 'interference' with the benefits derived

from a relationship that leaves the relationship itself unchanged in any way can also constitute

interference with the underlying business relations."); *Burns Jackson Miller Summit & Spitzer v.

Lindner*, 59 N.Y.2d 314, 335 (1983) (noting that "[n]o New York case" has recognized a claim

for tortious interference with business relations based on allegations that the interference caused

"plaintiff's performance of its contracts with its clients to be more expensive or burdensome").

## C.   Solus Failed to Allege Any Sufficiently Culpable Conduct

Finally, Solus fails to sufficiently allege "wrongful means."  *Guard-Life Corp. v.

S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980).  "'[A]s a general rule,' in order to

satisfy the third element of" this claim, "'the defendant's conduct must amount to a crime or an

independent tort'" or be undertaken "for the sole purpose of inflicting intentional harm on" the

plaintiff.  *Valley Lane*, 455 F. App'x at 106 (quoting *Carvel*, 3 N.Y.3d at 190).  This element

"sets a high bar" for a plaintiff, *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015),

because the "mere interest or expectation in establishing a contractual relationship" – an interest

that is not implicated by Solus's claim – "must be balanced against the 'competing interest of the

interferer,' as well as the broader policy of fostering healthy competition," *Catskill Dev., L.L.C.

v. Park Place Entm't Corp.,* 547 F.3d 115, 132 (2d Cir. 2008) (internal citations omitted).

Here, Solus fails to allege that GSO engaged in criminal or independently tortious

conduct, or that GSO was motivated by pure malice.  In fact, Solus has alleged that GSO was

motivated by economic self-interest, *see supra* Part I.C, which means that its intent was not

purely malicious.  And both ISDA rules and New York precedent make clear GSO's conduct is

entirely in keeping with market standards that are well understood by Solus.  *See* Waldman Decl.

Ex. 3 §§ 11.1(b)(iii), (iv), (vii); *Good Hill*, 146 A.D.3d at 637.  Solus falls far short of meeting

the high threshold on this element of its tortious interference claim.

24

3333231.1

As New York courts have made clear, "an action taken in economic self-interest is" by definition "not an action taken 'for the sole purpose of inflicting intentional harm on plaintiffs.'" *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 412 (S.D.N.Y. 2009) (dismissing claim where alleged "bribes" were intended to further defendants' "economic self-interest"), *aff'd*, 387 F. App'x 72 (2d Cir. 2010); *see also JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 536 (S.D.N.Y. 2013) ("[A]ctions taken in furtherance of 'normal economic self-interest' [are] not actionable under New York law."); *see also Vitro S.A.B. de C.V. v. Aurelius Capital Mgmt., L.P.*, 99 A.D.3d 564, 565 (1st Dep't 2012) ("As creditors, defendants have a clear economic interest in this matter, separate from any possible malicious motive.").

## CONCLUSION

For the reasons set forth above, the Court should dismiss, with prejudice, the causes of action alleged by Solus against GSO.

Dated:   New York, New York
         March 2, 2018

Respectfully Submitted,

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP

_____ s/ Philippe Adler _____
Eric Seiler
Philippe Adler
Andrew M. Englander
7 Times Square
New York, New York  10036-6516
(212) 833-1100

*Attorneys for Defendant GSO Capital Partners LP*