**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

SOLUS ALTERNATIVE ASSET
MANAGEMENT LP,

                Plaintiff,

            v.

GSO CAPITAL PARTNERS LP,
HOVNANIAN ENTERPRISES, INC., K.
HOVNANIAN ENTERPRISES, INC., K.
HOVNANIAN AT SUNRISE TRAIL III, LLC,
ARA K. HOVNANIAN and J. LARRY
SORSBY,

                Defendants.

Civil Action No.
18 Civ. 232 (LTS)(BCM)

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**
**BY DEFENDANTS HOVNANIAN ENTERPRISES, INC.,**
**K. HOVNANIAN ENTERPRISES, INC.,**
**K. HOVNANIAN AT SUNRISE TRAIL III, LLC,**
**ARA K. HOVNANIAN AND J. LARRY SORSBY**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 3

    A.    Hovnanian's Significant Debt Load Following The Financial Crisis.................... 3

    B.    Hovnanian's Evaluation And Acceptance Of The Best Refinancing Terms .......... 5

    C.    The Potential Late May 2018 ISDA Credit Event ................................................ 6

    D.    The Initial Complaint And The Court's Denial Of A Preliminary
         Injunction ............................................................................................................ 8

    E.    The Amended Complaint .................................................................................... 10

ARGUMENT .......................................................................................................................... 10

I.    Solus Cannot Allege A Fraudulent Scheme In Connection With A Securities
    Transaction Under Section 10(b) ..................................................................................... 10

    A.    The Alleged Scheme Was Not In Connection With The Purchase Or Sale
         Of CDS Contracts ............................................................................................... 11

    B.    A Fully Disclosed, Legitimate Business Transaction Cannot Be Deceptive ........ 12

    C.    Solus Does Not Allege That It Was Injured ........................................................ 13

II.    The Section 20(a) Claim Fails For The Same Reasons As The Section 10(b)
    Claim And Because Solus Fails To Allege Culpable Participation ................................... 14

III.    The Tortious Interference Claim Fails Because The Transaction Was Undertaken
    For Legitimate Business Purposes And Did Not Induce A Breach Of Any
    Contract ............................................................................................................................ 16

IV.    The Declaratory Judgment Claims Are Procedurally And Substantively Deficient ........ 18

    A.    Solus Cannot Procedurally Maintain Counts IV And V ...................................... 19

    B.    Solus's Declaratory Judgment Claims Are Substantively Meritless ................... 22

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*59TH St. Assocs. v. Reliance Mediaworks Ltd.*,
   No. 14 Civ. 7435 (NRB), 2016 WL 861212 (S.D.N.Y. Mar. 4,
   2016) ........................................................................................................................... 23

*Acacia Nat'l Life Ins. Co. v. Kay Jewelers, Inc.*,
   203 A.D.2d 40 (N.Y. App. Div. 1994) ....................................................................... 24

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ......................................................................................... 14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................... 10

*ATSI Comms., Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ......................................................................................... 15

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) .................................................................................................... 14

*Beleson v. Schwartz*,
   419 F. App'x 38 (2d Cir. 2011) .................................................................................. 15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................................... 10

*Bigda v. Fischbach Corp.*,
   898 F. Supp. 1004 (S.D.N.Y. 1995) ........................................................................... 23

*Boguslavsky v. Kaplan*,
   159 F.3d 715 (2d Cir. 1998) ....................................................................................... 15

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ......................................................................................... 4

*Charles Schwab Corp v. Bank of America Corp.*,
   --- F.3d ----, 2018 WL 1022541 (2d Cir. Feb. 23, 2018) ........................................... 12

*Colyer v. First Colony Corp.*,
   77 N.Y.S.2d 37 (N.Y. Sup. Ct. 1947) ........................................................................ 25

*Coniber v. Ctr. Point Transfer Station, Inc.*,
   137 A.D.3d 1604 (N.Y. App. Div. 2016) ................................................................... 22

*Cummings v. Chesapeake Energy Corp.*,
No. CIV-16-00647-HE, 2017 WL 3836112 (W.D. Okla. Feb. 8,
2017) .......................................................................................................................... 21

*Echostar Satellite L.L.C. v. ESPN, Inc.*,
79 A.D.3d 614 (N.Y. App. Div. 2010) .................................................................. 22, 23

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
837 F. Supp. 2d 162 (S.D.N.Y. 2011) ......................................................................... 20

*Emmet & Co. v. Catholic Health E.*,
37 Misc. 3d 854 (N.Y. Sup. Ct. 2012) *aff'd*, 114 A.D.3d 605 (N.Y.
App. Div. 2014) ...................................................................................................... 20, 21

*Fishbaum v. Liz Claiborne, Inc.*,
189 F.3d 460, 1999 WL 568023 (2d Cir. 1999) ........................................................... 16

*Forcucci v. Bd. of Educ.*,
No. 1:14-CV-00830 (MAT), 2016 WL 4160200 (W.D.N.Y. Aug.
5, 2016) ......................................................................................................................... 4

*Greenwald v. Orb Commc'ns & Mktg., Inc.*,
192 F. Supp. 2d 212 (S.D.N.Y. 2002) ......................................................................... 15

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
50 N.Y.2d 183 (1980) .................................................................................................. 17

*In re Glob. Crossing, Ltd. Sec. Litig.*,
322 F. Supp. 2d 319 (S.D.N.Y. 2004) ......................................................................... 14

*In re Parmalat Sec. Litig.*,
376 F. Supp. 2d 472 (S.D.N.Y. 2005) ................................................................... 11, 14

*In re UBS Auction Rate Sec. Litig.*,
No. 08 CV 2967(LMM), 2009 WL 860812 (S.D.N.Y. 2009) ........................................ 14

*Indian River Islands Corp. v. Mfrs. Trust Co.*,
253 A.D. 549 (N.Y. App. Div. 1938) ........................................................................... 24

*Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*,
No. 07 Civ. 0432(LAP), 2008 WL 650403 (S.D.N.Y. Mar. 7,
2008) ............................................................................................................................ 23

*Lapin v. Goldman Sachs Grp., Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006) ......................................................................... 15

*Leykin v. AT&T Corp.*,
  423 F. Supp. 2d 229 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d
  Cir. 2007) ........................................................................................................... 12

*MedImmune, Inc. v. Genetech, Inc.*,
   549 U.S. 118 (2007) ........................................................................................... 21

*Mill Fin., LLC v. Gillett*,
  41 Misc. 3d 1206(A) (N.Y. Sup. Ct. 2013) ........................................................ 23

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,
  87 N.Y.2d 614 (1996) ................................................................................... 17, 18

*PPX Enters. v. Audio Fidelity Enters.*,
  818 F. 2d 266 (2d Cir. 1987) .............................................................................. 18

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ............................................................................... 10

*S.E.C. v. Rorech*,
  720 F. Supp. 2d 367 (S.D.N.Y. 2010) ................................................................ 16

*S.E.C. v. Texas Gulf Sulphur Co.*,
  401 F.2d 833 (2d Cir. 1968) ............................................................................... 11

*Santa Fe Indus. v. Green*,
  430 U.S. 462 (1977) ...................................................................................... 12, 14

*SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*,
  934 F. Supp. 2d 516 (E.D.N.Y. 2013), *aff'd* 548 F. App'x 741 (2d
  Cir. 2014) ........................................................................................................... 20

*Silsby v. Icahn*,
  17 F. Supp. 3d 348 (S.D.N.Y. 2014) .................................................................... 4

*Silver v. Queensboro Farm Prods., Inc.*,
  33 Misc.2d 57 (N.Y. Sup. Ct. 1961) ................................................................... 25

*Southold Savings Bank v. Cutino*,
  118 A.D.2d 555 (N.Y. App. Div. 1986) .............................................................. 24

*State Enters., Inc. v. Southridge Co-op. Section 1, Inc.*,
  238 N.Y.S.2d 724 (1963) .................................................................................... 17

*Taylor City Gen. Emps. Ret. Sys. v. Magna Int'l*,
  967 F. Supp. 2d 771 (S.D.N.Y. 2013) ................................................................ 16

*Walnut Place LLC v. Countrywide Home Loans, Inc.*,
    96 A.D.3d 684 (N.Y. App. Div. 2012) ........................................................................... 21

*Waxman v. Cliffs Natural Res. Inc.*,
    222 F. Supp. 3d 281 (S.D.N.Y. 2016) ................................................................. 19, 20, 21

**Statutes and Rules**

15 U.S.C. § 78bb(a)(1) .................................................................................................... 15

15 U.S.C. § 78j(b) ............................................................................................... 2, 11, 15

15 U.S.C. § 78t(a) ............................................................................................... 2, 15, 16

15 U.S.C. § 78u-4(b) ...................................................................................................... 10

17 C.F.R. § 240.10b-5 ............................................................................................... 2, 11

Fed. R. Civ. P. 12(b)(6) .................................................................................................. 10

Fed. R. Civ. P. 9(b) ........................................................................................................ 10

**Other Authorities**

<u>Prosser and Keeton on the Law of Torts</u>, § 130 (5th ed. 1984) ..................................... 17

Defendants Hovnanian Enterprises, Inc. ("Hovnanian" or the "Company"), K. Hovnanian Enterprises, Inc. ("K. Hovnanian"), K. Hovnanian at Sunrise Trail III, LLC ("Sunrise Trail"), Ara K. Hovnanian, and J. Larry Sorsby (the "Individual Defendants") (collectively, the "Hovnanian Defendants") respectfully submit this memorandum of law and the Declaration of Craig S. Waldman, Esq. in support of their Motion to Dismiss Plaintiff's Amended Complaint.

## PRELIMINARY STATEMENT

On January 29, 2018, this Court rejected Solus's attempt to enjoin an extensively negotiated, arms-length refinancing transaction between Hovnanian, one of the nation's largest homebuilders, and GSO Capital Partners LP, a credit-oriented alternative asset manager. As the proceedings demonstrated, the refinancing transaction is vital to Hovnanian's financial health because it restructures Hovnanian's debt by refinancing bonds maturing in 2019 with debt that will not mature until at least 2026 and provides Hovnanian with a $125 million loan to refinance certain other debt and to fund its ongoing operations. Solus, a sophisticated investor in credit default swaps ("CDS"), now seeks monetary damages in connection with one component of the refinancing transaction—a covenant by Hovnanian to miss interest payments on notes due to its own subsidiary—which may ultimately implicate Solus's CDS contracts with third parties.

Solus's suit, on its face, makes no practical sense. For one thing, Hovnanian completed the transaction for the legally permissible reason that it is in the Company's economic self-interest—*i.e.*, the best financial terms offered to it. That uncontested fact undermines all of Solus's claims. For another, the missed interest payment would not occur until May 2018 and, at that point, an additional series of contingent events still must take place before Solus would suffer any losses. In the meantime, Solus can trade to minimize its exposure or even exit its position altogether. Regardless of what the future may hold, however, Solus has not sufficiently pleaded any viable claims for at least the following four reasons.

*First*, while the Hovnanian Defendants adopt all of GSO's Section 10(b) arguments, Hovnanian briefly address three additional arguments warranting dismissal.  Specifically, Solus's Section 10(b) market manipulation claim is unprecedented—and legally unsupportable—because Solus cannot allege any fraudulent conduct by Hovnanian "in connection with" the purchase or sale of Solus's CDS contracts with third parties.  Alleging that a component of this refinancing transaction *may* affect the extent to which Solus will have to perform under a separate CDS contract with a third party is too attenuated for the purposes of Section 10(b) and Rule 10b-5.  Moreover, there is no authority that supports extending securities fraud liability to a legitimate, arms-length, and fully disclosed transaction because deception is the quintessential component of a Section 10(b) claim.  Here, Hovnanian fulsomely disclosed all of the components of the transaction.  Finally, Solus concedes that it has not yet suffered any injury.

*Second*, because Solus's Section 10(b) claim fails, so does its Section 20(a) claim against the Individual Defendants.  Moreover, Solus fails to allege culpable conduct by Mr. Hovnanian and Mr. Sorsby.  To the contrary, the disclosure documents evidence that these two individuals, along with the rest of the Company's Board of Directors, consulted with the Company's officers and advisors and ultimately determined, pursuant to the Board's informed business judgment and in compliance with its fiduciary duties, that the proposal offered by GSO was a valid refinancing transaction that offered the best value to the Company and its shareholders.

*Third*, Solus's claim of tortious interference with prospective economic advantage is a transparent attempt to secure this Court's assistance in retaining lucrative premiums for CDS it sold while eliminating its bargained-for risk of having to pay out on those contracts in the event of a default.  That is a perversion of the tort, which finds no support in New York case law.  The claim does not protect parties from the consequences of known investment risks; rather it

protects a claimant's rights prior to the consummation of a contract from illegal interference by third parties, which indisputably did not occur here.  Additionally, Solus has not alleged the directed, malicious conduct that is the gravamen of a claim.  Instead, Solus acknowledges that Hovnanian took action in its economic interest and rejected Solus's inferior refinancing offer.

*Fourth*, Solus's declaratory judgment claims fail because Solus did not comply with the "no-action clause" in the indenture governing K. Hovnanian's 8% Notes. This "no-action" clause prohibits noteholders like Solus from asserting claims except in narrow circumstances.  Solus does not plead any of those narrow circumstances.  Even if Solus had complied with the no-action clause, moreover, the declaratory judgment claims also fail on the merits because, among other things, the Company's subsidiary has not waived its right to timely interest payments and New York law does not recognize a claim for anticipatory breach for non-payment of a debt.

The Amended Complaint is, at bottom, an attempt by Solus to recover any losses it may suffer in the future as a result of risky CDS contracts that it made with non-parties.  Unlike traditional securities claims, Solus's objective is not aimed at benefitting Hovnanian's shareholders, the Company, or its creditors, all of who have been substantially harmed by Solus's conduct.  It is therefore unsurprising that in order to proceed with this litigation, Solus tries to fit square pegs into round holes—by stretching its claims beyond any cognizable bounds in an attempt to avoid its CDS obligations.  For these reasons, as well as those discussed below and in GSO's brief, which are incorporated herein by reference, the Hovnanian Defendants respectfully ask this Court to dismiss the claims in the Amended Complaint with prejudice.

## STATEMENT OF FACTS

### A.    Hovnanian's Significant Debt Load Following The Financial Crisis

Hovnanian, founded in a trailer in Toms River, New Jersey in 1959 by an Armenian-American immigrant, is today one of the nation's largest homebuilders. Ex. 11 at 4; Am. Compl.

¶¶ 21, 37.[1]  Ara K. Hovnanian serves as CEO of the Company, and J. Larry Sorsby serves as CFO.  Am. Compl. ¶¶ 24-25.  The Company designs, constructs, markets, and sells single-family detached homes, attached townhomes and condominiums, urban infill, and active lifestyle homes in planned residential developments.  Ex. 11 at 4.  In 2017 alone, Hovnanian delivered 6,149 homes and employed 1,905 full-time employees directly and thousands more through subcontractors.  *Id.* at 5.

Like virtually all U.S. homebuilders, Hovnanian was negatively impacted by the recession and collapse of the homebuilding market in the U.S. that began in 2007.  Am. Compl. ¶ 38.  Despite these hardships, and unlike many of its competitors, Hovnanian was able to persevere through the crisis and continue its operations.  *Id.* ¶ 39.  To continue operations as the homebuilding markets recovered, Hovnanian issued significant debt.  *Id.*

From 2008 to 2017, Hovnanian executives worked to reduce the debt load it had incurred during the recession by over a billion dollars.  *Id.*  To that end, on January 10, 2014, Hovnanian's wholly owned subsidiary, K. Hovnanian issued $150 million in 7% Notes due 2019 and, later that same year, issued another $250 million in 8% Notes due 2019 (collectively, the "2019 Notes").  *See* Ex. 1 at 2; Ex. 2 at 2.

In July 2017, K. Hovnanian refinanced certain secured debt maturing in 2018 and 2020 by issuing new 10% Senior Secured Notes due 2022 and 10.5% Senior Secured Notes due 2024 (the "Secured Notes").  Ex. 9.  These Secured Notes contained provisions restricting the

---

[1] On this motion, "the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken."  *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  The Hovnanian Defendants respectfully request that this Court take judicial notice of the documents referenced in the Amended Complaint, including the exhibits attached to the declaration of Craig S. Waldman, Esq. (identified herein as "Ex."), and the Court's findings of facts from its January 29, 2018 Memorandum Opinion and Order (the "Mem. Op.") (Dkt. 75).  *See* Am. Compl. at 1; Fed. R. Evid. 201; *Forcucci v. Bd. of Educ.*, No. 1:14-CV-00830 (MAT), 2016 WL 4160200, at *4 n.5 (W.D.N.Y. Aug. 5, 2016).

Company's ability to refinance the 2019 Notes—it could only use indebtedness maturing after July 15, 2024, or equity, or a maximum of $50 million in cash.  *Id.* at 8-K Ex. 4.1, 87.  In addition, as part of a 2016 refinancing, if any of the 7% Notes remained outstanding on October 15, 2018, or any new indebtedness that refinanced the 7% Notes had a maturity date prior to January 15, 2021, the maturity of the Company's $75 million senior secured term loan would accelerate (or "spring") to October 15, 2018 from August 1, 2019.  Ex. 11 at 84.

Thus, Hovnanian had a pressing need to refinance the 2019 Notes no later than September 2018.  Am. Compl. ¶ 39.  Hovnanian's senior management and Board of Directors began evaluating options for this refinancing by the middle of 2017.  *See id.* ¶ 49.

## B.    Hovnanian's Evaluation And Acceptance Of The Best Refinancing Terms

On December 28, 2017, following thorough evaluation by its senior management and Board of Directors and months of negotiations with multiple parties offering refinancing terms (including Solus), *see* Am. Compl. ¶ 49, Ex. 12 at 8-K Ex. 99.4, Hovnanian entered into certain financing agreements with GSO to refinance the 2019 Notes and provide additional capital (the "GSO Transaction").

As part of the GSO Transaction, K. Hovnanian launched an exchange offer (the "Exchange Offer").  Under the terms of the Exchange Offer, K. Hovnanian offered to exchange up to $185 million of the 8% Notes for a combination of: (i) cash, (ii) K. Hovnanian's newly issued 13.5% Senior Notes due 2026 (the "New 2026 Notes"); and (iii) K. Hovnanian's newly issued 5% Senior Notes due 2040 (the "New 2040 Notes" and, together with the New 2026 Notes, the "New Notes").  Am. Compl. ¶ 53; Ex. 12 at 7.  The GSO Transaction provided Hovnanian with other important features, including: (i) a 5% unsecured term loan from GSO to finance the redemption of the 7% Notes and up to $80 million for refinancing of the 8% Notes that remain outstanding following the Exchange Offer; (ii) a $125 million secured revolving

credit facility from GSO to refinance the secured term loans and for additional capital to invest in its business and provide a strong financial foundation for the long-term; and (iii) $25 million in proceeds from the issuance of additional secured notes to GSO in 2019, also to provide additional capital.  Am. Compl. ¶¶ 54-55, Ex. 12 at 3-5.  The Company and its Board decided to pursue the GSO Transaction because it offered the best terms and value to the Company, its stockholders, and other stakeholders.  Ex. 12 at 8-K Ex. 99.4; Mem. Op. at 7-8.  Indeed, these terms were substantially better financial terms than were offered by any other party.  *See* Mem. Op. at 7-8.

Under the terms of the Exchange Offer, Sunrise Trail, a wholly-owned subsidiary of Hovnanian, purchased $26 million of 8% Notes that were tendered in the Exchange Offer.  Am. Compl. ¶¶ 53, 56.  The New Notes include a restrictive covenant barring K. Hovnanian, and Hovnanian as a guarantor, from paying interest on the 8% Notes held by Sunrise Trail.  Am. Compl. ¶ 56; Ex. 12 at 8.  All other bondholders will receive interest payments.  The Confidential Offering Memorandum ("COM") for the Exchange Offer expressly states that although Hovnanian shall not make an interest payment to Sunrise Trail, Sunrise Trail "has not waived its entitlement to such interest payments."  Ex. 10 at 12.

Interest on the 8% Notes is payable every six months, with the next payment due on May 1, 2018.  Am. Compl. ¶ 56.  A failure to pay interest on May 1, 2018, following a 30-day grace period, may result in the occurrence of an Event of Default under the indenture governing the 8% Notes (the "Indenture").  Ex. 2 at 78, § 5.01.

### C.    The Potential Late May 2018 ISDA Credit Event

According to the Amended Complaint, Solus holds a significant position in the CDS market where it has sold credit derivatives concerning whether Hovnanian will default on its debt obligations.  Am. Compl. ¶ 41.  Hovnanian is not party to, or otherwise involved in, any swap

agreements with Solus—rather, these contracts are entirely made between Solus and third parties. *See* Ex. 12 at 8-K Ex. 99.1; Am. Compl. ¶ 122.

A failure by Hovnanian to pay interest on May 1, 2018 may result in the occurrence of a "Failure To Pay Credit Event" under CDS contracts referencing Hovnanian debt entered into by third parties, including Solus. Am. Compl. ¶ 57; Ex. 2, at 78, § 5.01; Ex. 12 at 8-K Ex. 99.1. A credit event is not a certainty, however, as a CDS protection purchaser (here, whoever is the counter-party to the CDS sold by Solus) must ask a Determinations Committee (a "DC") of the International Swaps and Derivatives Association ("ISDA") to find a Failure-to-Pay Credit Event. *See* Ex. 4 § 3.1(c)(ii), *cited in* Am. Compl. ¶ 57. The DC alone can determine whether a credit event has actually occurred. *See id*. Any affected party may then challenge the request to declare a credit event and submit briefs regarding the claimed event.

To the extent the DC finds a credit event, entities that sold CDS protection, such as Solus, will not have an obligation to make payments under their CDS contracts until the price of the "cheapest-to-deliver" security is determined through an ISDA-run auction. Am. Compl. ¶ 60. The price reached through the ISDA process and whether there will even be an auction is unknown at this time. If there were an auction, entities that sold CDS protection have the option to make a net cash payment to their counter-parties or purchase the cheapest-to-deliver debt instruments as part of the auction process. *Id*. Hovnanian, a non-party to any CDS contracts, would not receive, or have to make, any payment or deliver any debt instrument if the DC finds a Failure-to-Pay Credit Event under Hovnanian-referencing CDS. Ex. 12 at 8-K Ex. 99.1.

The terms of Solus's standardized CDS agreements with third parties explicitly allow any party involved in the CDS agreements to act "in the same manner as each of them would if such Credit Derivative Transaction did not exist, regardless of whether any such action might have an

adverse effect on [Solus or another party associated with the transaction] . . . *including without limitation any action which might constitute or give rise to a Credit Event*."  Ex. 3 at § 11.1(b)(iii) (emphasis added).

Hovnanian included detailed disclosures regarding the GSO Transaction, including disclosure of the potential consequences of the failure to make the May 1, 2018, interest payment, in offering documents for the Exchange Offer and in an 8-K filing:

> We understand that the non-payment of interest on such Purchased 8.0% Notes may result in the occurrence of a "credit event" under certain credit default swap contracts entered into by third-parties, resulting in significant monetary exposure for those entities that sold such credit default swaps.  Although we are not a party to any of these credit default swap contracts, we and our officers and directors may become subject to legal proceedings, and review from the Securities and Exchange Commission, Commodity Futures Trading Commission and other regulatory bodies, regarding the occurrence, or anticipated occurrence, of such "credit event."  In addition, certain third parties have threatened legal action against us if we proceed with certain refinancing transactions, which may include all or a portion of the Transactions. . . .

Ex. 12 at 8-K Ex. 99.1.

Because of the 30-day grace period for the May 1, 2018, interest payment prior to any triggering of an "Event of Default", there can be no arguable "credit event" with respect to the 8% Notes until May 31, 2018.  Ex. 2  at 78, § 5.01; Ex. 12 at 8-K Ex. 99.1.  Additionally, Hovnanian has the option to redeem bonds before the grace period expires, other than the bonds held by Sunrise Trail.  *Id.*  Pursuant to the terms of the new unsecured term loan facility from GSO, beginning on May 28, 2018, K. Hovnanian may draw those loans to redeem 8% Notes that remained outstanding following completion of the Exchange Offer.  Ex. 12 at 8-K Ex. B.

### D.    The Initial Complaint And The Court's Denial Of A Preliminary Injunction

On January 11, 2018, Solus filed its initial complaint and a motion seeking a preliminary injunction that would prohibit the Exchange Offer from closing.  In its initial complaint, Solus asserted violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) against

Hovnanian and GSO; violations of Section 20(a) against Ara K. Hovnanian and J. Larry Sorsby; and a claim against all Defendants for tortious interference with prospective economic advantage.  Solus also alleged that Hovnanian failed to make sufficient disclosures in violation of Sections 10(b) and 14(e) of the Exchange Act and Rule 10b-5—a claim it has now abandoned in view of Hovnanian's extensive disclosures regarding the GSO Transaction, including the filing of a Form 8-K attaching Solus's initial complaint the day after it was filed.

On January 25, 2018, the Court presided over a full-day evidentiary hearing regarding Solus's preliminary injunction motion, including testimony from four fact witnesses and two experts, as well as extensive oral argument.[2]  In a decision dated January 29, 2018, the Court denied Solus's motion, holding that Solus did not make "the requisite showing that it would suffer irreparable harm" because it could be "compensated with an amount of money consistent with the economic harm suffered," if any.  Mem. Op. at 13.  The Court also made a number of findings of fact, including that "CDS market participants are sophisticated investors" (*id.* at 5); that ISDA has the power to adjust the default terms of the ISDA master agreement (*id.* at 9); that in light of "a covenant preventing Hovnanian from using any cash on hand to redeem the bulk of the outstanding 7% or 8% Notes . . . Hovnanian must refinance the Notes before their maturity date" in 2019 (*id.* at 5-6); and that, in deciding to pursue the GSO Transaction, "Hovnanian determined that the terms offered by GSO, which included long term financing at rates below those offered by Solus and other potential financers, were in the best interests of Hovnanian's shareholders" (*id.* at 7-8).  The Court did not address the parties' arguments regarding the likelihood of success on the merits.

---

[2] After hearing nearly five hours of testimony, the Court told Solus, "I am very much looking forward to you telling me who was deceived here."  Hr'g Tr. at 256:14-15.  Later, the Court stated, "So, tell me who you are pointing at here [Hovnanian or GSO] as having an illegitimate purpose" because "there are two parties to this transaction and one has said we get a strategic benefit and the other one says we get a lifeline and we are a contributing business in this society and this lets us grow and contribute value to the real estate market."  *Id.* at 260:6-13.

**E.      The Amended Complaint**

The Exchange Offer expired on January 29, 2018, at 11:59 p.m. and the GSO Transaction closed on February 1, 2018.  *See* Ex. 16.  Solus filed its Amended Complaint on the same day as the closing.  Like the initial complaint, the Amended Complaint alleges that the GSO Transaction violates Sections 10(b) and 20(a) of the Exchange Act and constitutes tortious interference with prospective economic advantage.  Solus no longer asserts inadequate disclosure claims under Section 10(b) and 14(e) of the Exchange Act.  Solus added two claims for declaratory judgment that (i) Sunrise Trail has waived its entitlement to interest payments under the Indenture and (ii) the Exchange Offer breached the Indenture.

## ARGUMENT

Under Federal Rule 12(b)(6), a complaint must contain allegations plausibly suggesting an entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  A complaint cannot survive if it "pleads facts that are 'merely consistent with' a defendant's liability" but "stops short of the line between possibility and plausibility of entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).  Additionally, securities fraud claims must specify with particularity the circumstances constituting the alleged fraud.  *See* Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b); *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).

The claims in the Amended Complaint fail because they attempt to convert Hovnanian's good faith decision to accept the best financing terms offered to it into either a federal securities law violation or a business tort.  None of the claims is viable.

**I.      Solus Cannot Allege A Fraudulent Scheme In Connection With A Securities Transaction Under Section 10(b)**

The Hovnanian Defendants respectfully incorporate by reference the Section 10(b) arguments raised by GSO, and write separately to briefly address additional arguments

concerning the failure to sufficiently allege that the Hovnanian Defendants took action "in connection with" the sale or purchase of Solus's CDS contracts, that their conduct was deceptive, or that Solus has suffered any injury.

For its novel "scheme to defraud" claim, Solus proceeds under Rule 10b-5(a) and (c), which prohibit "any device, scheme, or artifice to defraud" and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.  The claim requires the "(i) commi[ssion of] a deceptive or manipulative act, (ii) with *scienter*, that (iii) . . . affected the market for securities or was otherwise in connection with their purchase or sale, and that (iv) . . . caused the plaintiff's injuries."  *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 492 (S.D.N.Y. 2005).

### A.    The Alleged Scheme Was Not In Connection With The Purchase Or Sale Of CDS Contracts

Solus's scheme liability claim is rooted in the flawed premise that Defendants manipulated Hovnanian-related CDS by taking action with respect to unrelated Hovnanian bonds—a different security altogether.  *See* Am. Compl. ¶¶ 52-57.  Solus cannot hold Hovnanian liable for fraud because the bond refinancing may have effects on the CDS market in which Hovnanian has no part.  As the Second Circuit long ago observed, the "in connection with" requirement was intended to ensure "that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell" the security at issue.  *See S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 858-61 (2d Cir. 1968).  Solus's purchases and sales of CDS contracts predated the GSO Transaction, Am. Compl. ¶ 2, and thus, Solus cannot argue that the alleged scheme *caused* its original transactions in CDS contracts.  *Cf. Charles Schwab Corp v. Bank of America Corp.*, --- F.3d ----, 2018 WL 1022541, at *15 (2d Cir. Feb. 23, 2018) (rejecting plaintiff's claim rooted

in an alleged fraud "that affected the amount of money it received on instruments it *had already purchased*" where defendants' conduct occurred months afterwards and "bore no relation to that original purchase") (emphasis in original).

### B.     A Fully Disclosed, Legitimate Business Transaction Cannot Be Deceptive

As the Supreme Court has long held, the federal securities laws are not meant to redress breaches of fiduciary duty, alleged corporate mismanagement, or "unfair" transactions in the absence of a fraud. *See Santa Fe Indus. v. Green*, 430 U.S. 462, 473 (1977). Legitimate, fully disclosed business transactions cannot form the basis for scheme liability under the securities laws. *See, e.g.*, *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 241-42 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007).

Unable to identify a misleading statement or other deceptive conduct by any Defendant with respect to the GSO Transaction, Solus instead refers to a number of statements by Mr. Hovnanian and Mr. Sorsby on earnings calls held long before the challenged transaction was announced. The first was made by Mr. Hovnanian in March 2016 that "the last thing any bondholders would want to see and certainly that the company would want to see is any kind of default." *See* Am. Compl. ¶¶ 2, 45, 64. Significantly, nothing in the Amended Complaint provides any facts to suggest that Mr. Hovnanian's statement was untrue at the time it was made—nearly two years ago—and, as such, that statement cannot be the basis for a Section 10(b) violation. Far from supporting Solus, this statement, when viewed in its proper context, is irrelevant to Solus's claim: Mr. Hovnanian made the statement in a first-quarter 2016 earnings call—when Hovnanian was in a precarious financial condition—regarding "debt that [was] maturing" at the time, *not* the 2019 Notes involved in the disputed transaction. Likewise, statements by Larry Sorsby that Hovnanian had "sufficient sources of liquidity" and "sufficient liquidity" were true at the time they were made in March 2016 and June 2016, respectively. As

the context makes clear, Mr. Sorsby was referring specifically to Hovnanian's ability to pay bonds maturing in 2016 and 2017. *Compare id.* ¶ 45 *with* Ex. 5 at 11 and Ex. 6 at 9.

Solus also points to statements made by Mr. Sorsby in 2017 which it says constituted "confirmations of Hovnanian's efforts to avoid default." Am. Compl. ¶ 64. In June 2017, Mr. Sorsby stated that Hovnanian could "certainly do the same playbook again" by "pay[ing] off more debt in a short-term basis similar to what we did from October of 15 to 2016." *Id.* That statement was made prior to the Company's July 2017 refinancing, which as explained above, imposed significant restrictions on its ability to pay off debt with cash. The final statement was made by Mr. Sorsby in early September 2017 that the Company did not feel "urgent pressure" to refinance. *Id.* This statement also does not support an inference of falsity in any way—in fact, the Company did not announce the refinancing deal until about four months later, and was still exploring multiple offers at that time.

Ultimately, the Hovnanian Defendants' alleged market activity here—the Exchange Offer and the purchase of 8% Notes by Sunrise Trail with the expectation that K. Hovnanian will miss interest payments—was fully disclosed on December 28, 2017, in a Form 8-K with exhibits, and additionally to bondholders like Solus in the COM. *See supra* at 6. For a full six weeks before then, a refinancing that would contain such a default was widely reported in the press as a matter of general market expectation. Am. Compl. ¶ 4. Where, as here, the security holders implicated by a transaction "could either accept the price offered or reject it," "their choice was fairly presented, and they were furnished with all relevant information on which to base their decision," no claim will lie. *Santa Fe Indus. v. Green*, 430 U.S. at 473.

### C. Solus Does Not Allege That It Was Injured

Solus must allege that the challenged conduct caused its injuries. *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d at 493; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)

(requiring "causal connection between a defendant's misrepresentation and a plaintiff's injury"); *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 329 (S.D.N.Y. 2004) ("to survive a motion to dismiss, plaintiffs must allege . . . they were injured").

Solus alleges only that it "will suffer significant harm."  Am. Compl. ¶ 113.  Solus's failure to allege that it *has* suffered harm is fatal to its Section 10(b) claim.  *See In re UBS Auction Rate Sec. Litig.*, No. 08 CV 2967(LMM), 2009 WL 860812, at *6 (S.D.N.Y. 2009) (no standing where "Plaintiffs have failed to allege any injury they personally suffered").

Apparently recognizing that it has no legally cognizable damages, Solus alleges that it has incurred "mark-to-market" losses on its CDS holdings from November 2017 through the present.  *See* Am. Compl. ¶ 109.  Solus initially pleaded that these losses were in excess of $60 million but then amended this allegation to refer to "tens of millions," reflecting that (a) these mark-to-market valuations can change daily based on a variety of factors, and (b) Solus is likely modifying its CDS positions.  Regardless, internal accounting marks are not "actual damages" attributable to the "act complained of."  15 U.S.C. § 78bb(a)(1).  As the Second Circuit has recognized, the "traditional  measure" of 10(b) damages is "out-of-pocket" loss.  *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012).  Moreover, Solus does not explain how it could recover purported "mark-to-market" losses post-dating the full disclosure on December 28, 2017, of the "act complained of"—the intended payment default.

## II.   The Section 20(a) Claim Fails For The Same Reasons As The Section 10(b) Claim And Because Solus Fails To Allege Culpable Participation

A Section 20(a) control person claim requires "(1) a primary violation [of the Exchange Act] by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  Because there

14

has been no violation of Section 10(b), the Section 20(a) claim against Messrs. Hovnanian and

Sorsby fails. *See Beleson v. Schwartz*, 419 F. App'x 38, 41 (2d Cir. 2011); *Greenwald v. Orb*

*Commc'ns & Mktg., Inc.*, 192 F. Supp. 2d 212, 228 (S.D.N.Y. 2002) (Swain, J.).

Moreover, Solus has failed to allege that either Mr. Hovnanian or Mr. Sorsby is a

"culpable participant" in the alleged fraudulent scheme.  "In order to withstand a motion to

dismiss, a section 20(a) claim must allege, at a minimum, particularized facts of the controlling

person's conscious misbehavior or recklessness."  *Lapin v. Goldman Sachs Grp., Inc.*, 506 F.

Supp. 2d 221, 246 (S.D.N.Y. 2006).  This requires an "individualized determination . . . of the

[controlling person's] particular culpability," including "that the controlling person knew or

should have known that the primary violator . . . was engaging in fraudulent conduct."  *Id.* at 247

(quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)).

Solus has failed to allege facts showing that Mr. Hovnanian and Mr. Sorsby acted

knowingly wrongfully or recklessly.  Indeed, the Amended Complaint together with the

disclosure documents plainly evidence that the Individual Defendants believed that they and the

rest of the Board were undertaking a legitimate refinancing that offered the best available terms

for the Company and its shareholders.  *See* Am. Compl. ¶ 4; Ex. 10 at 89-90.

In order to avoid this legitimate business purpose, Solus alleges, in sensationalistic

fashion, that the Individual Defendants "agree[d] to receive a bribe from GSO" and "directly

made numerous oral misrepresentations."  Am. Compl. ¶¶ 100-101.  The only specific

allegations concern public statements about Hovnanian's debt made in 2016 and mid-2017, well

before the alleged scheme, and which do not suggest in any way that the Company would not

enter into the transaction that GSO ultimately offered if that transaction offered the best value to

the Company and its shareholders.  *See id.* ¶¶ 2, 45, 64; *see also supra* at 13.

Solus weakly tries to bolster its scienter case by alleging in a footnote that the Individual

Defendants have "executed stock transactions" in Hovnanian common stock.  *Id.* ¶ 61 n.10.

Solus's allegations are misleading and non-actionable.  The Form 4s filed by Mr. Hovnanian and

Mr. Sorsby demonstrate that the referenced stock transactions were the pre-ordained granting of

stock awards.  *See* Ex. 14 at 1 & n.3; Ex. 13 at 1 & n.1.  There is nothing sinister about receiving

pre-determined stock awards and engaging in the cashless exercises that go along with them.

Moreover, these awards were made in January 2018, after the GSO Transaction was fully

disclosed, making them legally irrelevant.  *Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460, 1999

WL 568023, at *4 (2d Cir. 1999) (only "unusual" trading supports scienter); *Taylor City Gen.*

*Emps. Ret. Sys. v. Magna Int'l*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013) ("Insider trading gives

rise to a strong inference of scienter 'only when it is dramatically out of line with prior trading

practices at times calculated to maximize the personal benefit from undisclosed inside

information.'") (quoting *S.E.C. v. Rorech*, 720 F. Supp. 2d 367, 414 (S.D.N.Y. 2010)).

While Mr. Hovnanian and Mr. Sorsby serve as the CEO and CFO respectively, Solus

fails to set forth plausible facts showing that either one had fraudulent intent in this fully vetted,

fully disclosed transaction that followed the model of other CDS-impacting transactions (Codere

in 2013 and iHeart in 2016).  *See* Ex. 8.

## III.   The Tortious Interference Claim Fails Because The Transaction Was Undertaken For Legitimate Business Purposes And Did Not Induce A Breach Of Any Contract

In addition to the following arguments, the Hovnanian Defendants respectfully

incorporate by reference the tortious interference arguments raised by GSO.  Solus's claim for

tortious interference is yet another instance of Solus trying to fit a square peg into a round hole,

as Solus's theory does not conform with any claim cognizable under New York law.

The claim of tortious interference with contract is recognized in New York for wrongful actions by a defendant that cause the breach of an existing contract. *See Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 189 (1980); Prosser and Keeton on the Law of Torts, § 130 (5th ed. 1984). The claim is designed to be filed against competitors who lure away a plaintiff's contractual counter-party through unlawful means. *See State Enters., Inc. v. Southridge Co-op. Section 1, Inc.*, 238 N.Y.S.2d 724, 726 (1963). Here, Solus cannot assert a claim for *tortious interference with contract* because there has been no breach of its CDS contracts. *See* Am. Compl. ¶¶ 73, 126.

New York courts recognize a second form of tortious interference where the plaintiff is close to entering into a contract and the defendant has prevented the contract from being consummated through illegitimate means. *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 621 (1996). This claim is known as *tortious interference with prospective "contract rights," "business relations,"* or *"prospective economic advantage."* Solus claims that as a result of the GSO Transaction, it will have to make payments on existing contracts, not that Hovnanian interfered with its ability to enter into the contracts in the first place.

Because it cannot plausibly assert either of the existing tortious interference claims, Solus has invented an entirely new theory—that it can claim interference with its "anticipated return on investment" from an existing contract that has not been breached. There is no such claim under New York law, and for good reason. Then-Chief Judge Kaye of the New York Court of Appeals cautioned against the potential creep of tortious interference law into the contractual arena in *NBT Bancorp*, explaining that New York has been loath to impinge on competitive behavior and companies acting legitimately in their own self-interest and reiterating the need for a breach where a contract already exists. 87 N.Y.2d at 622. Here, Solus would have the courts police

17

activity exogenous to an existing contract that the plaintiff thought impinged on his expected

profit-taking.  The applications would be limitless, and this Court should refuse to engage in

such an unprecedented expansion of  New York law, especially one that is so contrary to the

Court of Appeals' guidance.  *See id.* at 623 (a mere "expectation" is "not entitled to the same

protection that would have been accorded a legally enforceable right to performance").

      In any event, Solus's attempt to plead a claim for prospective economic advantage fails to

allege three of the four required elements of the claim, for the reasons described in GSO's

Memorandum of Law.  Notably, Solus has failed to allege, as required, that Hovnanian had any

involvement in the CDS market, knew any of Solus's CDS counter-parties, or contacted any of

these counter-parties and induced them to act detrimentally to Solus.[3]  Moreover, the GSO

Transaction indisputably provides Hovnanian with low-rate financing, for a long duration, and

resolves a pressing need for refinancing, all advancing Hovnanian's legitimate business interests;

thus, Solus does not plausibly allege that the Hovnanian Defendants acted solely out of malice or

used wrongful means, such as criminal or independently tortious conduct.  *See PPX Enters. v.*

*Audio Fidelity Enters.*, 818 F. 2d 266, 269-70 (2d Cir. 1987).  Solus's legal adventure must fail.

## IV.    The Declaratory Judgment Claims Are Procedurally And Substantively Deficient

      In Counts IV and V of the Amended Complaint, Solus asks this Court to declare that (i)

Sunrise Trail has "waived" its right to timely interest payments on the 8% Notes and that,

consequently, K. Hovnanian's agreement not to timely pay such interest is not an "Event of

Default" under the Indenture (Count IV); and (ii) K. Hovnanian's agreement not to timely pay

interest to Sunrise Trail separately constitutes a breach of Indenture Section 3.04(d) (Count V).

Solus, however, (i) has not shown compliance with the Indenture's "no-action" clause, which

---

[3] To be clear, Solus's CDS contractual counter-parties are dealers and brokers, such as Barclays, who serve as the
buying and selling intermediaries in the CDS market.  Am. Compl. ¶¶ 41, 122.

bars noteholders from asserting claims arising under the Indenture like those here, and (ii) also

lacks standing to assert Count IV.  Both Counts are also meritless as a matter of law.

### A.        Solus Cannot Procedurally Maintain Counts IV And V

#### 1.        The Indenture's No-Action Clause Bars Counts IV And V

Section 5.06 of the Indenture bars noteholders like Solus from bringing any suit arising

under or concerning the Indenture except in narrow circumstances:

> No holder of any Notes shall have any right by virtue of or by availing of any
> provision of this Indenture to institute any suit, action or proceeding in equity or
> at law upon or under or with respect to this Indenture . . . for any other remedy
> hereunder, unless such Holder previously shall have given to the Trustee written
> notice of default and of the continuance thereof, as hereinbefore provided, and
> unless the Holders of not less than 25% in aggregate principal amount of the
> Notes then outstanding shall have made written request to the Trustee to institute
> such action . . . in its own name as Trustee hereunder and shall have offered to the
> Trustee such reasonable indemnity as the Trustee may require against the costs,
> expenses and liabilities to be incurred therein or thereby, and the Trustee for 60
> days after its receipt of such notice, request and offer of indemnity shall have
> neglected or refused to institute any such action . . . .

Ex. 2 at 84, § 5.06.  Noteholders like Solus "expressly covenanted" that they would not have

"any right . . . to enforce any right under this Indenture or the Notes, except in the manner herein

provided."  *Id.*

These clauses are standard in indentures and routinely enforced to bar noteholder claims

for breach of the indenture or for a declaration of rights or remedies thereunder.  *See, e.g.*,

*Waxman v. Cliffs Natural Res. Inc.*, 222 F. Supp. 3d 281, 292-93 (S.D.N.Y. 2016) (claims for

breach of the indenture and declaration that exchange offer thereunder was invalid dismissed for

failure to comply with no-action clause); *SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*,

934 F. Supp. 2d 516, 531 (E.D.N.Y. 2013) ("Courts routinely enforce these no-action clauses to

bar shareholders from bringing lawsuits" and holding that no-action clause barred noteholders

from asserting claims for breach of indenture) (citing cases), *aff'd* 548 F. App'x 741 (2d Cir.

2014); *Emmet & Co. v. Catholic Health E.*, 37 Misc. 3d 854, 861 (N.Y. Sup. Ct. 2012) (explaining that "a party cannot sue to assert its rights under an indenture while ignoring the indenture's restriction on its ability to sue") *aff'd*, 114 A.D.3d 605 (N.Y. App. Div. 2014).

Here, Solus's declaratory judgment claims, which seek early determinations that K. Hovnanian has breached the Indenture and that Sunrise Trail has waived its right to timely interest payments thereunder coming due months from now, are undisputedly "upon or under or with respect to this Indenture" and thus fall squarely within the no-action clause's ambit. Solus has not pleaded compliance with the clause's procedural prerequisites to suit, including that (i) it holds at least 25% of the 8% Notes' outstanding principal balance; (ii) it made a demand on the trustee to bring suit and offered an appropriate indemnity; (iii) the trustee has refused to sue; or (iv) Solus waited 60 days following the trustee's refusal to sue to commence this action. This alone is grounds for dismissal. *Waxman*, 222 F. Supp. 3d at 292; *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 187 (S.D.N.Y. 2011).

Further, Solus has not (and cannot) demonstrate the existence of a "default"—*i.e.*, the actual non-payment of interest by K. Hovnanian to Sunrise Trail—under the Indenture that would permit it to sue. Count IV seeks a declaration that *no default has occurred*,[4] and Count V seeks a declaration that the Indenture has been breached because K. Hovnanian *in the future* may not make the May 1, 2018 interest payment to Sunrise Trail. Without an actual, existing default, Solus cannot comply with the no-action clause and its claims must be dismissed. *See Walnut Place LLC v. Countrywide Home Loans, Inc.*, 96 A.D.3d 684, 684 (N.Y. App. Div. 2012).[5]

---

[4] Under the Indenture, a "default" is defined as "any event . . . that is, or after notice or the passage of time or both would be, an Event of Default." Ex. 2 at 14, §1.01. In Count IV, Solus seeks a declaration that K. Hovnanian's *anticipated* non-payment of the interest due on May 1, 2018 will not constitute an Event of Default.

[5] The Indenture permits noteholders to sue to obtain payments owed to them under the Indenture "on or after such" dates they come due without having to comply with the no-action clause. Ex. 2 at 84, § 5.06. As courts have held, however, this exception is limited to suits to obtain past due payments owed to the noteholder personally; it does not

Finally, Solus cannot maintain Count IV for the separate reason that the no-action clause expressly prohibits noteholders from asserting claims that would "affect, disturb or prejudice the rights of any other Holder of Notes . . . except in the manner herein provided and for the equal, ratable and common benefit of all Holders of Notes." Ex. 2 at 84, § 5.06. Solus seeks a determination that Sunrise Trail has "waived" its entitlement to timely interest payments without Sunrise Trail's express written consent. This would "affect, disturb or prejudice" Sunrise Trail's rights in a manner not permitted under the Indenture, *see id.* at 81, § 5.01 (requiring written consent to waive certain defaults), and would, in any event, not be for the equal, ratable and common benefit of all noteholders. This is impermissible.

### 2.    Solus Lacks Standing To Assert Count IV

Solus also lacks Article III standing to bring Count IV, which seeks a declaration that Sunrise Trail has "waived" its right to timely interest payments. *See MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007) (there must be "a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment"). Solus's only real interest in seeking that declaration is to avoid paying out under its CDS contracts.[6] Any non-payment of timely interest on the Notes held by Sunrise Trail by K. Hovnanian has an immediate economic impact only on Sunrise Trail, not Solus. While any non-payment would result in a Default that over time could mature into an

---

apply to suits, like the one here, seeking a declaration that another noteholder has waived its right to timely future payments and that the Indenture will be breached at some point in the future. *See, e.g.*, *Emmet & Co.*, 37 Misc. 3d at 859-60 (interpreting substantively similar carve-out language as permitting bondholders to sue to collect unpaid interest only); *Waxman*, 222 F. Supp. 3d at 293-94 (same); *Cummings v. Chesapeake Energy Corp.*, No. CIV-16-00647-HE, 2017 WL 3836112, at *3-4 (W.D. Okla. Feb. 8, 2017) (same) (applying New York law).

[6] Solus is expected to argue before the ISDA DC that there has *not* been a failure-to-pay event because Sunrise Trail "waived" its right to receive interest payments thus negating the occurrence of an Event of Default under the Indenture, an argument that was asserted by CDS protection sellers and rejected by the ISDA DC in iHeart. *See* Exs. 7 and 8. It appears that Solus is trying to obtain rulings from the Court on issues collateral to this litigation so that it can use them (or at least try to draw inferences in its favor) before the ISDA DC. Hovnanian will not play any role in the ISDA determination process, but believes the Court should be aware of this dynamic.

Event of Default under the Indenture, Solus will continue to receive timely interest payments on its Notes, will receive principal upon the Notes' maturity and will have whatever rights are available under the Indenture to accelerate the Notes or to take other actions.  The determination that Sunrise Trail has or has not waived its right to timely interest payments does not alter the availability of Solus's rights in its capacity as a noteholder.  Under these circumstances, it is clear that there is no justiciable controversy of "sufficient immediacy and reality" between Solus and Sunrise Trail or K. Hovnanian that would give Solus standing to proceed with Count IV, much less give Solus standing to pursue the rights of K. Hovnanian against Sunrise Trail.

### B.      Solus's Declaratory Judgment Claims Are Substantively Meritless

#### 1.      Sunrise Trail Has Not Waived Its Right To Timely Interest Payments

Under New York law, which governs the interpretation of the Indenture, *see* Ex. 2 at 109, § 12.07, waiver "is an intentional relinquishment of a known right and should not be lightly presumed." *Echostar Satellite L.L.C. v. ESPN, Inc.*, 79 A.D.3d 614, 617 (N.Y. App. Div. 2010). It "must be based on a clear manifestation of intent to relinquish a contractual [provision]," *Coniber v. Ctr. Point Transfer Station, Inc.*, 137 A.D.3d 1604, 1607 (N.Y. App. Div. 2016) (internal quotation omitted), and cannot be "inferred from a doubtful or equivocal act" or "silence or inaction," including the failure to take immediate action to remedy a breach of contract, *Echostar Satellite*, 79 A.D.3d at 617-18.  *See also 59TH St. Assocs. v. Reliance Mediaworks Ltd.*, No. 14 Civ. 7435 (NRB), 2016 WL 861212, at *7 (S.D.N.Y. Mar. 4, 2016). The burden of pleading and proving waiver is on the party asserting it, and can be resolved as a matter of law on a motion to dismiss where, as here, the allegations of waiver are implausible or contradicted by documentary evidence properly before the Court.  *See Mill Fin., LLC v. Gillett*, 41 Misc. 3d 1206(A), at *4-5 (N.Y. Sup. Ct. 2013).

Here, Sunrise Trail has not waived its right to timely interest payments.  Under the Indenture, noteholders cannot waive any "Default or Event of Default in the payment of . . . interest" on the Notes—that is, any non-payment of interest on the scheduled due date— "without the consent of each Holder affected," Ex. 2 at 103-104, §§ 9.02(b)(ii); 9.02(b)(viii), which must be "in writing," *id.* at 81, § 5.01.  Sunrise Trail did not execute any such written waiver.  These restrictive terms are routinely enforced under New York law and bar Solus's waiver claim here.  *Mill Fin.*, 41 Misc.3d 1206(A) at *5 (no waiver found on motion to dismiss where contract required any waiver to be in writing); *Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1013 (S.D.N.Y. 1995) (same); *Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*, No. 07 Civ. 0432(LAP), 2008 WL 650403, at *8-9 (S.D.N.Y. Mar. 7, 2008) (no waiver clause precluded finding on motion to dismiss that defendants waived right to terminate contract).

Even if Solus could overcome these provisions, its claim that Sunrise Trail waived its right to timely payments is demonstrably false.  The only statement in the Exchange Offer documents regarding Sunrise Trail's "expectation, intent, and desire" in acquiring the Notes, Am. Compl. ¶ 134, is found in the COM, which states that Sunrise Trail "has not waived its entitlement to such interest payments."  Ex. 10 at 12.  Sunrise Trail has not contracted away its ability to insist that such interest payment be timely made, to sue to collect on untimely payments, or to seek recompense for delayed payment of such interest.[7]  Under these circumstances, Solus's allegations of waiver are deficient and must be dismissed.  *See, e.g.*, *Southold Savings Bank v. Cutino*, 118 A.D.2d 555, 555 (N.Y. App. Div. 1986) (no waiver of right to timely payment despite accepting late payments for period of time where party made clear that it was not waiving its right to insist on timely payments) (citing cases).

---

[7] The Notes Sunrise Trail received state, consistent with the standard form required by the Indenture, that "[i]nterest will be payable semiannually" to it "commencing May 1, 2018."  Ex. 2 at 40, § 2.01; *id.* at A-4.

### 2. Solus Cannot Prematurely Declare A Default Before Any Interest Payment Owed To Sunrise Trail Is Missed

In its original complaint and preliminary injunction papers, Solus alleged and argued in support of its now-abandoned Section 14(e) claim that K. Hovnanian's agreement not to timely pay future interest on Sunrise Trail's Notes constituted an undisclosed breach or anticipatory breach of the Indenture. *See, e.g.*, Am. Compl. ¶ 69. At the preliminary injunction hearing, the Hovnanian Defendants explained that under New York law, there is no legal default or breach for non-payment of interest on the Notes until after the interest comes due and is not paid and that, accordingly, there can be neither a breach nor an anticipatory breach of the Indenture on the basis that K. Hovnanian will not make such future interest payments. Hr'g Tr. at 247:7-21 (citing *Indian River Islands Corp. v. Mfrs. Trust Co.*, 253 A.D. 549, 551-52 (N.Y. App. Div. 1938) and *Acacia Nat'l Life Ins. Co. v. Kay Jewelers, Inc.*, 203 A.D.2d 40, 43-44 (N.Y. App. Div. 1994)). These authorities defeat any claim that K. Hovnanian's agreement not to pay timely interest to Sunrise Trail constitutes a breach or an anticipatory breach of the Indenture.

Rather than amend its complaint to address these authorities, Solus attempts to end-run around them by deleting all allegations that an anticipatory breach has occurred and, instead, seeks a declaration that the Indenture has been breached. Am. Compl. ¶¶ 142, 144. However, just as New York law does not permit Solus to sue for breach of contract for non-payment of interest when that interest has not yet come due, so too does it prohibit Solus from seeking a declaration that such a breach has occurred or will occur. As courts have held in similar circumstances, Solus must first wait until such interest payments (i) come due under the Indenture's terms, (ii) are not paid, and (iii) the grace period expires without payment, and then sue for breach of contract. *Colyer v. First Colony Corp.*, 77 N.Y.S.2d 37, 40-41 (N.Y. Sup. Ct.

1947) (dismissing declaratory claim that plaintiff was entitled to future contractual payments);

*Silver v. Queensboro Farm Prods., Inc.*, 33 Misc.2d 57, 58-59 (N.Y. Sup. Ct. 1961) (same).

### 3.    The Exchange Offer Does Not Violate Indenture Section 3.04(d)

Count V is also subject to dismissal for the independent reason that such anticipated

untimely interest payments do not constitute a breach of Section 3.04(d) of the Indenture.  That

provision provides simply that "[t]he Company and its Affiliates may acquire Notes

by . . . tender offer . . . so long as such acquisition does not otherwise violate the terms of this

Indenture."  Ex. 2 at 54, § 3.04(d).  Nothing in the terms of the Exchange Offer here, however,

requires or obligates K. Hovnanian not to pay interest on Sunrise Trail's 8% Notes, as

covenanted in the Indenture, and nothing about Sunrise Trail's acquisition of the Notes itself

violates any Indenture provision.  Further, even if the terms of Section 3.04(d) could be read

expansively to cover not just tender offers expressly referenced therein, but also other

instruments not concerning acquisition of the Notes, such as the indenture on the New Notes (it

cannot), Solus's claims would still fail because nothing in the indenture for the New Notes either

modifies the Indenture's covenant that K. Hovnanian make such timely payment on Sunrise

Trail's 8% Notes or compels K. Hovnanian not to do so.  In the absence of such language, Solus

cannot demonstrate that K. Hovnanian's expected untimely payment of interest to Sunrise Trail

breaches Section 3.04(d) of the Indenture.

### <u>CONCLUSION</u>

For the foregoing reasons, the Hovnanian Defendants respectfully request that the

Amended Complaint be dismissed with prejudice.  *See Wilson v. Merrill Lynch & Co., Inc.*, 671

F.3d 120, 139-40 (2d Cir. 2011).

Dated:  March 2, 2018

s/ *Lynn K. Neuner*
Lynn K. Neuner
Craig S. Waldman
Michael J. Osnato
Simpson Thacher & Bartlett LLP
425 Lexington Ave
New York, NY 10017

*Attorneys for Hovnanian Enterprises, Inc.,  K.*
*Hovnanian Enterprises, Inc., K. Hovnanian at*
*Sunrise Trail III, LLC, Ara K. Hovnanian and*
*J. Larry Sorsby*