**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOLUS ALTERNATIVE ASSET MANAGEMENT LP<br><br>*Plaintiff,*<br><br>-against-<br><br>GSO CAPITAL PARTNERS L.P.,<br>HOVNANIAN ENTERPRISES, INC.,<br>K. HOVNANIAN ENTERPRISES, INC.,<br>K. HOVNANIAN AT SUNRISE TRAIL III, LLC,<br>ARA K. HOVNANIAN, and<br>J. LARRY SORSBY,<br><br>*Defendants.* | **ORAL ARGUMENT REQUESTED**<br><br>**No. 18-cv-232 (LTS) (BCM)** |

---

**Plaintiff's Omnibus Memorandum Of Law In Opposition To**
**Defendants' Motions To Dismiss The Amended Complaint**

---

Jonathan E. Pickhardt
Daniel P. Cunningham
Andrew S. Corkhill
Ellison Ward Merkel
QUINN EMANUEL URQUHART &
 SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

Michael E. Liftik
*pro hac vice*
QUINN EMANUEL URQUHART &
 SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000

*Attorneys for Plaintiff*

**Table Of Contents**

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 4

      A.     The Credit Default Swap Market ..................................................................... 4

      B.     Solus' Investment In Hovnanian ...................................................................... 5

      C.     GSO's Scheme To Manipulate The Market For Hovnanian CDS ................... 6

      D.     Hovnanian's Agreement To Participate In GSO's Manipulative Scheme ...... 7

      E.     The CDS Market's Response To Defendants' Manipulative Scheme ............. 8

ARGUMENT .................................................................................................................... 10

I.      The Amended Complaint States A Claim Under Section 10(b) And Rule 10b-5
      Respecting Defendants' Scheme To Defraud And Manipulate ........................... 10

      A.     Solus Adequately Alleges A Scheme "In Connection With" The Purchase
             Or Sale Of Securities ..................................................................................... 10

      B.     Solus Adequately Alleges That Defendants' Scheme Was Manipulative ...... 15

           1.     Defendants' Scheme Satisfies The Definition Of Manipulative
                 Conduct ............................................................................................. 16

           2.     Defendants' Manipulative Scheme Deceived Market Participants,
                 Including Solus, By Subverting Fundamental Market Assumptions ........ 21

      C.     Solus Adequately Alleges That Defendants Acted With Scienter ................. 23

      D.     Solus Adequately Alleges Reliance ............................................................... 26

      E.     Solus Adequately Alleges Legally Cognizable Damages ............................. 29

      F.     Solus Adequately Alleges Control-Person Liability ..................................... 30

II.     The Amended Complaint States A Claim For Tortious Interference With
      Prospective Economic Advantage ...................................................................... 31

      A.     Solus Adequately Alleges Business Relations With Third Parties ................ 31

i

B.      Solus Adequately Alleges That Defendants Knowingly Interfered With Solus' Third-Party Relationships And Caused Injury To Those Relationships ............................................................................................... 32

C.      Solus Adequately Alleges Defendants Acted With Wrongful Purpose Or Improper Means .................................................................................... 33

III.    The Amended Complaint States A Claim For Declaratory Judgment ............................ 34

A.      Solus Adequately Alleges That Sunrise Trail Waived Its Right To Timely Interest Payments ................................................................................ 34

B.      Solus Adequately Alleges That Hovnanian Has Breached The Indenture ............ 37

C.      The No-Action Clause In The Indenture Does Not Preclude Solus' Claims ........ 39

CONCLUSION ............................................................................................................ 40

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Absolute Activist Master Value Fund, Ltd. v. Ficeto*,
  2013 WL 1286170 (S.D.N.Y. Mar. 28, 2013) ............................................... 23, 25–26

*In re Am. Int'l. Grp., Inc. 2008 Sec. Litig.*,
  741 F. Supp. 2d 511 (S.D.N.Y. 2010) ................................................................. 31

*In re Amaranth Nat. Gas Commodities Litig.*,
  587 F. Supp. 2d 513, 534 (S.D.N.Y. 2008) ......................................................... 18

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ..................................................................... 17, 21

*Barnhart v. Sigmon Coal Co.*,
  534 U.S. 438 (2002) ....................................................................... 13 n.6

*Basile v. Valeant Pharm. Int'l, Inc.*,
  2015 WL 7352005 (C.D. Cal. Nov. 9, 2015) ............................................... 13 n.6

*Birnbaum v. Newport Steel Corp.*,
  193 F.2d 461 (2d Cir. 1952) ................................................................. 29 n.17

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975) ......................................................................... 29 n.17

*Campbell v. Nat'l Media Corp.*,
  1994 WL 612807 (E.D. Pa. Nov. 3, 1994) ........................................................ 14

*Cartica Mgmt., LLC v. Corpbanca S.A.*,
  50 F. Supp. 3d 477 (S.D.N.Y. 2014) ...................................................... 29 n.17

*Carvel Corp. v. Noonan*,
  3 N.Y.3d 182 (2004) ....................................................................... 33–34

*Charles Schwab Corp. v. Bank of America Corp.*,
  883 F.3d 68 (2d Cir. 2018) .................................................................. 12 n.4

*In re Citigroup, Inc.*,
  2011 WL 744745 (S.D.N.Y. Mar. 1, 2011) ................................................. 22 n.11

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984) ............................................................................ 36

*Crane Co. v. Westinghouse Air Brake Co.*,
  419 F.2d 787 (2d Cir. 1969) ............................................................... 16, 20

*Cruden v. Bank of N.Y.*,
  957 F.2d 961 (2d Cir. 1992)............................................................................. 40 n.21

*Dandong v. Pinnacle Performance Ltd.*,
  2011 WL 5170293 (S.D.N.Y. Oct. 31, 2011) ................................................... 25

*Dice v. Inwood Hills Condo.*,
  237 A.D.2d 403 (2d Dep't 1997) ..................................................................... 37

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012)............................................................. 25

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
  837 F. Supp. 2d 162 (S.D.N.Y. 2011)...................................................... 40 n.21

*Engstrom v. Elan Corp., plc*,
  2011 WL 4946434 (S.D.N.Y. Oct. 18, 2011) ............................................ 26 n.14

*ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*,
  95 A.D.3d 498 (1st Dep't 2012) ..................................................................... 28

*Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co. of Reading, Pa.*,
  873 F.2d 229 (9th Cir. 1989) ......................................................................... 40

*FERC v. Barclays Bank PLC*,
  105 F. Supp. 3d 1121 (E.D. Cal. 2015)........................................................... 18

*FERC v. City Power Mktg., LLC*,
  199 F. Supp. 3d 218 (D.D.C. 2016) ................................................................ 17

*Finn v. Barney*,
  471 F. App'x 30 (2d Cir. 2012) ...................................................................... 22

*Forucci v. Bd. of Educ.*,
  2016 WL 4160200 (W.D.N.Y. Aug. 5, 2016) ............................................... 4 n.1

*Frederick Goldman, Inc. v. West*,
  2007 WL 1989291 (S.D.N.Y. July 6, 2007) .................................................... 35

*Fuchs v. Swanton Corp.*,
  482 F. Supp. 83 (S.D.N.Y. 1979) ................................................................... 29

*Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*,
  85 N.Y.2d 232 (1995) ..................................................................................... 35

*Gertskis v. N.Y. Dep't of Health & Mental Hygiene*,
  2014 WL 2933149 (S.D.N.Y. June 27, 2014) .............................................. 4 n.1

iv

*Good Hill Master Fund L.P. v. Deutsche Bank AG*,
   146 A.D.3d 632 (1st Dep't 2017) ................................................................ 29 n.16

*Greenwich Capital Fin. Prods., Inc. v. Negrin*,
   74 A.D.3d 413 (1st Dep't 2010) ................................................................... 28

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
   50 N.Y.2d 183 (1980) ................................................................................... 32–33

*Hannex Corp. v. GMI, Inc.*,
   140 F.3d 194 (2d Cir. 1998) ......................................................................... 34 n.18

*Harsco Corp. v. Segui*,
   91 F.3d 337 (2d Cir. 1996) ........................................................................... 28–29

*IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC*,
   91 F. Supp. 3d 456 (S.D.N.Y. 2015) ............................................................ 26

*In re JP Morgan Auction Rate Sec. (ARS) Mktg. Litig.*,
   867 F. Supp. 2d 407 (S.D.N.Y. 2012) .......................................................... 26 n.14

*Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*,
   2004 WL 444554 (S.D.N.Y. Mar. 10, 2004) ............................................... 14 n.7

*Koch v. SEC*,
   793 F.3d 147 (D.C. Cir. 2015) ...................................................................... 17

*Langner v. Brown*,
   913 F. Supp. 260 (S.D.N.Y. 1996) ............................................................... 29

*Levitin v. PaineWebber, Inc.*,
   933 F. Supp. 325 (S.D.N.Y. 1996) ............................................................... 12 n.4

*Leykin v. AT&T Corp.*,
   423 F. Supp. 2d 229 (S.D.N.Y. 2006) .......................................................... 22 n.11

*Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC*,
   30 A.D.3d 1 (1st Dep't 2006) ....................................................................... 34–35

*Madison Consultants v. Fed. Deposit Ins. Corp.*,
   710 F.2d 57 (2d Cir. 1983) ........................................................................... 14 n.7

*Marcavage v. City of N.Y.*,
   689 F.3d 98 (2d Cir. 2012) ........................................................................... 36

*Markowski v. SEC*,
   274 F.3d 525 (D.C. Cir. 2001) ...................................................................... 16

v

*MedImmune, Inc. v. Genetech, Inc.*,
 549 U.S. 118 (2007) ............................................................. 35

*In re Merrill Lynch Auction Rate Sec. Litig.*,
 851 F. Supp. 2d 512 (S.D.N.Y. 2012) ............................... 26 n.14

*Mut. Shares Corp. v. Genesco, Inc.*,
 384 F.2d 540 (2d Cir. 1967) ............................................. 29 & n.17

*NBT Bancorp v. Fleet/Norstar Fin. Grp.*,
 87 N.Y.2d 614 (1996) ....................................................... 31, 33

*New Stadium LLC v. Greenpoint-Goldman Corp.*,
 44 A.D.3d 449 (1st Dep't 2007) ........................................ 34

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000) ............................................. 25

*In re Parmalat Sec. Litig.*,
 497 F. Supp. 2d 526 (S.D.N.Y. 2007) ............................... 30

*Penguin Grp. (USA) Inc. v. Time/Warner Retail Sales & Mktg. Servs., Inc.*,
 115 A.D.3d 119 (1st Dep't 2014) ...................................... 38–39

*PPX Enters. v. Audio Fidelity Enters.*,
 818 F.2d 266 (2d Cir. 1987) ............................................. 34 n.18

*Prod. Res. Grp., L.L.C. v. Martin Prof'l, A/S*,
 907 F. Supp. 2d 401 (S.D.N.Y. 2012) ............................... 39

*Pross v. Katz*,
 784 F.2d 455 (2d Cir. 1986) ............................................. 12 n.4

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
 317 F. Supp. 2d 301 (S.D.N.Y. 2003) ............................... 33

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
 13 N.Y.3d 398 (2009) ....................................................... 38–39

*Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*,
 523 F. Supp. 2d 376 (S.D.N.Y. 2007) ............................... 39

*Santa Fe Indus., Inc. v. Green*,
 430 U.S. 462 (1977) ......................................................... 22 n.11

*SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*,
 934 F. Supp. 2d 516 (E.D.N.Y. 2013) ............................... 39, 40 n.21

*Schlaifer Nance & Co. v. Estate of Warhol*,
119 F.3d 91 (2d Cir. 1997)........................................................................... 26

*Scutti Enters., LLC v. Park Place Entm't Corp.*,
322 F.3d 211 (2d Cir. 2003)................................................................. 31, 34 n.18

*SEC v. Masri*,
523 F. Supp. 2d 361 (S.D.N.Y. 2007)................................... 13 & n.5, 18, 21, 24 n.12

*SEC v. Texas Gulf Sulphur Co.*,
401 F.2d 833 (2d Cir. 1968)........................................................................ 12 n.4

*SEC v. U.S. Envtl., Inc.*,
155 F.3d 107 (2d Cir. 1998)............................................................................ 23

*SEC v. Zandford*,
535 U.S. 813 (2002)......................................................... 10, 11 n.3, 12 n.4

*Southold Sav. Bank v. Cutino*,
118 A.D.2d 555 (2d Dep't 1986) ..................................................................... 36

*In re Spree.com Corp.*,
2002 WL 1586274 (Bankr. E.D. Pa. June 20, 2002) .......................................... 40

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008)........................................................... 13 n.6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...................................................................................... 25

*This Is Me, Inc. v. Taylor*,
157 F.3d 139 (2d Cir. 1998)............................................................................ 39

*Travellers Int'l AG v. Trans World Airlines, Inc.*,
722 F. Supp. 1087 (S.D.N.Y. 1989)................................................................ 37

*Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*,
455 F. App'x 102 (2d Cir. 2012) ............................................................... 34 n.18

*Waxman v. Cliffs Nat. Res. Inc.*,
222 F. Supp. 3d 281 (S.D.N.Y. 2016).......................................................... 40 n.21

*Wilson v. Merrill Lynch & Co.*,
671 F.3d 120 (2d Cir. 2011)....................................................................... 22 n.11

## Administrative Decisions

*In re Barclays Bank PLC*,
2013 WL 3962269 (F.E.R.C. July 16, 2013) ...................................................... 19

*In re ETRACOM LLC,*
   2016 WL 3405304 (F.E.R.C. Jun. 17, 2016) .................................................... 13, 19

## Rules / Statutes

15 U.S.C. § 78c(a)(10) ............................................................................................ 5

15 U.S.C. § 78c(a)(14) ...................................................................................... 14–15

15 U.S.C. § 78c(a)(68) .......................................................................................... 14

15 U.S.C. § 78cc(a) .............................................................................................. 29

15 U.S.C. § 78t-1(a) ......................................................................................... 13 n.6

28 U.S.C. § 2201(a) .............................................................................................. 39

18 C.F.R. § 1C.2(a) .......................................................................................... 19 n.10

Dodd-Frank Act § 761(a)(2), Pub. L. No. 111-203, 124 Stat. 1376 (2010) ................................. 5

Exchange Act § 3(a)(10) .......................................................................................... 5

Exchange Act § 10(b) ...................................................................................... *passim*

Exchange Act § 20(a) ....................................................................................... 30–31

Fed. R. Evid. 201 .............................................................................................. 4 n.1

## Other Authorities

Black's Law Dictionary (10th ed. 2014) ...................................................................... 13

FERC, *Staff White Paper On Anti-Market Manipulation Enforcement Efforts Ten Years
   After EPAct 2005* ............................................................................................ 20

Prohibition Against Fraud, Manipulation, and Deception in Connection with Security-
   Based Swaps, 75 Fed. Reg. 68560 (propsed Nov. 8, 2010) .................................................. 14

*Strengthening the SEC's Vital Enforcement Responsibilities: Hearing Before the
   Subcomm. on Sec., Ins. & Inv.*, 111th Cong. 65 (2009) (response by Robert Khumazi,
   Director, Div. of Enforcement, SEC) ........................................................................ 5

Plaintiff Solus Alternative Asset Management LP ("Solus") respectfully submits this memorandum of law in opposition to Defendant GSO Capital Partners L.P.'s ("GSO") and Defendants Hovnanian Enterprises, Inc. ("Hovnanian Enterprises"), K. Hovnanian Enterprises, Inc. ("K. Hovnanian"), K. Hovnanian at Sunrise Trail III, LLC ("Sunrise Trail," and together with Hovnanian Enterprises and K. Hovnanian, "Hovnanian" or the "Hovnanian Defendants"), Ara K. Hovnanian and J. Larry Sorsby's (the "Individual Defendants") motions to dismiss the Amended Complaint dated February 1, 2018, ECF No. 75.

## PRELIMINARY STATEMENT

Defendants go to great lengths to isolate the "Refinancing" launched in December 2017 as the primary transaction to be considered by the Court. But that transaction was merely one piece of a year-long scheme by Defendants to deceive and defraud. By their own admission, Defendants engaged in a strategy to manipulate the markets for Hovnanian debt and credit default swaps ("CDS") in order to generate an illicit windfall for GSO. Beginning in March 2017, GSO bought hundreds of millions of dollars in CDS protection referencing Hovnanian debt, with the admitted intent of conspiring with Hovnanian to engineer a sham "failure-to-pay" Credit Event that would obligate protection sellers like Solus to pay out on CDS contracts. Compounding the manipulation, GSO also conspired with Hovnanian to rig the auction that would determine the amount of GSO's profit under its CDS contracts. Specifically, Hovnanian issued new debt that was designed to trade at a significant discount to par on day one so that GSO can deliver that debt into the CDS auction, thereby massively inflating protection payments owed under the CDS contracts. In exchange for agreeing to play a vital role in GSO's manipulative scheme, Hovnanian received significant value in the form of below-market financing from GSO on terms that were significantly better than it could otherwise have received. There is no dispute about these elements of Defendants' manipulative scheme, or the intent underlying them. Indeed, this Court has already made findings

1

of fact on all of these points.

GSO was able to establish a large short position in Hovnanian CDS at a very cheap price because—as this Court has found—market participants relied on the assumption that Hovnanian would pay its debts if it had the ability to do so.  Throughout the period that GSO established its short position, GSO and Hovnanian were the only ones who knew that Hovnanian was intending to subvert this foundational assumption by agreeing to trigger a failure-to-pay Credit Event as a quid pro quo for GSO's uneconomic financing.  By the time Defendants publicly announced their manipulative scheme, there was nothing CDS protection sellers like Solus could do to avoid the resultant harm caused by this deceptive act.  Contrary to Defendants' claims, their scheme was manifestly *un*lawful, and Solus has sufficiently pleaded multiple causes of action.

*First*, Solus has adequately alleged that GSO and the Hovnanian Defendants engaged in a scheme to defraud and manipulate in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).  Defendants' claim that their scheme was not "in connection with" the purchase or sale of securities is plainly belied by the fact that it depended upon the purchase and sale of multiple classes of Hovnanian bonds as well as Hovnanian CDS.  Defendants' argument that their scheme was not manipulative is equally meritless.  This case involves a classic example of cross-product manipulation, in which Defendants engaged in a scheme to manipulate the market for Hovnanian debt securities by inducing a default and creating a Rigged Bond in order to generate an illicit windfall in the related CDS market.  This Court and multiple regulatory agencies have found analogous cross-product manipulations to be violative of statutory antifraud provisions.  Moreover, Defendants' manipulative scheme deceived CDS protection sellers like Solus, because it subverted the fundamental assumption that reference entities such as Hovnanian will pay their debts if they are able to do so.  Defendants' purported "disclosures" do not cure this deception, because they

2

were made after GSO had already finished putting on its short CDS position at the expense of protection sellers such as Solus.

*Second*, Solus has adequately alleged that the Individual Defendants are subject to control-person liability under Section 20(a) of the Exchange Act.  As explained above, Solus has alleged a predicate violation of Section 10(b).  Further, culpable participation is not an element of Section 20(a).  Even if it were, the requirement is easily satisfied here given Solus' allegations that the Individual Defendants were instrumental in effecting the manipulative scheme.

*Third*, Solus has adequately alleged that all Defendants are liable for tortious interference with prospective economic advantage.  New York law provides for tortious interference claims where—as here—a defendant causes the early termination of a contract.  Defendants' argument that they were not interfering with Solus' relationships with its third-party CDS dealers ignores the basic realities of the dealer-intermediated CDS market.  Defendants knew full well that their conduct would result in the termination of Solus' contractual relationships with its dealers and intended that result.  Defendants' claim that Solus failed to allege injury to its dealer relationships is belied by Solus' allegations that Defendants' manipulative scheme will cause the early termination of Solus' Hovnanian CDS.  Moreover, the manner in which Defendants carried out their manipulative scheme establishes that they acted with wrongful purpose and improper means.

*Finally*, Solus has adequately alleged claims for declaratory judgment against K. Hovnanian and Sunrise Trail.  Solus has plainly alleged a viable claim that Sunrise Trail waived its right to timely interest payments by affirmatively deciding to purchase debt securities with full knowledge that its parent company, the issuer of those debt securities, would not comply with its payment obligations.  Solus has also alleged a viable claim that K. Hovnanian breached the indenture for the 8% Notes by covenanting as part of the exchange offer not to pay interest on the

notes held by Sunrise Trail when due.  The no-action clause in the indenture for the 8% Notes does not preclude Solus' declaratory judgment claims.  Moreover, Solus has Article III standing to bring such claims given the injury it has already sustained and which is certain to be exacerbated when Defendants' manipulative scheme is completed.

For the reasons set forth herein, Defendants' motions to dismiss should be denied in their entirety.  Alternatively, Solus should be granted leave to re-plead.

## STATEMENT OF FACTS[1]

### A.      The Credit Default Swap Market

A single-name CDS contract operates in most respects like an insurance policy.  A protection buyer makes premium payments based on the notional value of the contract to a protection seller in exchange for insurance against the occurrence of certain standardized "Credit Events" with respect to a specified "Reference Entity."  Mem. Op. 3; AC ¶ 33.  The size of the premium payments are a function of the notional value of the contract and the Reference Entity's risk of default.  The greater the risk of default, the higher the premium—and therefore the cost of protection—will be.  AC ¶¶ 16, 36.  If a Credit Event occurs, the protection seller is required to make a payment to the protection buyer, in an amount determined based on the notional value of the contract and the market value of the "cheapest-to-deliver" (*i.e.*, lowest value) outstanding debt securities issued by the Reference Entity.  Mem. Op. 3–4; AC ¶¶ 33, 60.  The market value of the cheapest-to-deliver debt securities is established via an auction process overseen by the

---

[1]   In addition to the facts alleged in Solus' Amended Complaint ("AC"), this Statement of Facts also cites to the Court's findings of fact in its January 29, 2018 Memorandum Opinion and Order ("Mem. Op."), ECF No. 69, as well as certain documents submitted into evidence during the January 25, 2018 evidentiary hearing on Solus' preliminary injunction motion, all of which may be taken into account under Federal Rule of Evidence 201.  *See Forucci v. Bd. of Educ.*, 2016 WL 4160200, at *4 n.5 (W.D.N.Y. Aug. 5, 2016); *Gertskis v. N.Y. Dep't of Health & Mental Hygiene*, 2014 WL 2933149, at *1 (S.D.N.Y. June 27, 2014) (drawing facts from the complaint "as well as judicial opinions and other filings from related lawsuits").

Determinations Committee (the "DC") of the International Swaps and Derivatives Association ("ISDA"), which takes place after a Credit Event.  Mem. Op. 4; AC ¶ 60.  The CDS market is a dealer-intermediated market where "CDS contracts are generally sold by dealers through a central clearing house."  *Id.* at 3–4 (quoting Mollett Decl. ¶ 35 (Jan. 22, 2018), ECF No. 44); AC ¶ 36.

When market participants assess a Reference Entity's risk of default, they do so "***based on the working assumption that Reference Entities will endeavor to avoid default whenever possible*** to protect their reputations and their access to capital markets."  Mem. Op. 9 (emphasis added); AC ¶¶ 36, 78.  This assumption is critical to the CDS market, which "operates based on the market participants' ability to accurately assess risk."  Mem. Op. 9; AC ¶¶ 36, 78.

CDS can be used both as a way to hedge risk and as a means of efficiently obtaining long or short exposure to an underlying Reference Entity.  Mem. Op. 4; AC ¶¶ 33, 35.  Congress added "Security Based Swaps"—including CDS—to the definition of "securities" under the Exchange Act in 2011, to ensure that investors in CDS would have the same antifraud protections as investors in more traditional types of securities.  *See* Dodd-Frank Act § 761(a)(2), Pub. L. No. 111-203, 124 Stat. 1376 (2010) (amending Exchange Act § 3(a)(10), 15 U.S.C. § 78c(a)(10)); *Strengthening the SEC's Vital Enforcement Responsibilities:  Hearing Before the Subcomm. on Sec., Ins. & Inv.*, 111th Cong. 65 (2009) (response by Robert Khumazi, Director, Div. of Enforcement, SEC) (stating that authority provided by Dodd-Frank would allow the SEC to "more easily pinpoint where manipulative credit derivative trading occurs in tandem with other trading strategies, such as short selling, that put selling pressure on particular securities").

### B.     Solus' Investment In Hovnanian

After careful credit analysis, Solus concluded in November 2016 that the market was overestimating Hovnanian's probability of default.  Mem. Op. 6; AC ¶ 41.  Accordingly, Solus began buying unsecured notes issued by Hovnanian maturing in 2019 with an 8% coupon (the "8%

Notes"), as well as unsecured notes maturing in 2019 with a 7% coupon (the "7% Notes" and together with the 8% Notes, the "2019 Notes").  *Id*.  Solus increased the size of its long position in Hovnanian by selling CDS protection on Hovnanian's unsecured debt.  *Id*.  By October 31, 2017, Solus had sold $246.5 million in CDS protection on Hovnanian unsecured debt.  Hambrook Decl. Ex. 1 (Jan. 23, 2018), ECF No. 58-1; AC ¶ 41.  $179 million of this protection was sold between September 8, 2017, and October 31, 2017.  Hambrook Decl. Ex. 1.

### C.    GSO's Scheme To Manipulate The Market For Hovnanian CDS

By February 2017, the market price of CDS protection on Hovnanian had declined significantly, indicating that other market participants shared Solus' view that Hovnanian had a low risk of default.  *See id*. Ex. 5; AC ¶ 48.  At that time, GSO had a de minimis position in Hovnanian CDS.  However, GSO began to develop a transaction that "would involve GSO purchasing CDS protection and then extending financing at favorable rates to the relevant Reference Entity in exchange for a covenant to default intentionally on a small amount of the reference securities that had been transferred to a subsidiary of the Reference Entity in connection with the financing transaction, thus triggering a 'failure to pay' event requiring CDS sellers to settle with GSO and other CDS protection buyers."  Mem. Op. 6; AC ¶ 46, 50–56.

GSO told Hovnanian in late February 2017 that it was contemplating transactions to refinance Hovnanian's 2019 Notes.  *Id*.  In furtherance of its proposed scheme, GSO purchased $92 million in CDS protection on Hovnanian between March and mid-June 2017.  Hambrook Decl. Ex. 2; AC ¶¶ 2, 46.  Following further discussions with Hovnanian about a potential refinancing in mid-July 2017, GSO bought an additional $78 million in CDS protection on Hovnanian over a two-week period, bringing its total to $170 million.  Hambrook Decl. Ex. 2; Mollett Decl. ¶¶ 13–15.

On August 1, 2017, Hovnanian met with GSO's outside counsel to discuss the specifics of

GSO's contemplated transaction.  Mem. Op. 7.  Between August 1 and October 20, 2017—at the same time that its attorneys were talking to Hovnanian about a transaction that would require it to trigger a Credit Event—GSO bought an additional $163 million in CDS protection, bringing its total short, or bearish, position to $333 million.  Hambrook Decl. Ex. 2; AC ¶ 46.  While GSO bought this CDS protection through a broker, it was well aware that Solus was the major seller of CDS protection in the market, and that Solus was effectively taking the other side of GSO's position in the market.  AC ¶¶ 41, 123.

During the period that GSO was buying CDS protection on Hovnanian, the market price of one-year CDS protection on Hovnanian debt never exceeded 12 points upfront,[2] and was often less than one point upfront (implying near certainty that Hovnanian would not default).  Hambrook Decl. Ex. 5.  The price remained low because market participants believed Hovnanian had sufficient liquidity to meet its near-term debts, *and assumed that Hovnanian would in fact pay those debts given its ability to do so*, consistent with prevailing assumptions in the CDS market.  AC ¶¶ 16, 42, 71–72.  Had the market known what GSO knew—namely, that GSO had offered Hovnanian cut-rate financing in exchange for its agreement (i) to artificially default on a tiny piece of outstanding debt and (ii) to issue a bond to GSO that would trade substantially below par in the subsequent Credit Event auction—the price of CDS protection would have been materially higher or trading in Hovnanian CDS may have ceased altogether.  AC ¶¶ 36, 46, 74.

### D.    Hovnanian's Agreement To Participate In GSO's Manipulative Scheme

Once GSO had finished putting on its short CDS position, it executed a nondisclosure agreement with Hovnanian and finished negotiating the financing transaction.  "The transaction feature[d] several instruments providing below market financing to Hovnanian," Mem. Op. 8,

---

[2]  "Points upfront" refers to the upfront price expressed as a percentage of notional.

including $132.5 million of 5% notes due in 2027 (the "5% 2027 Notes"), which GSO agreed to buy at par, notwithstanding the fact it believed the notes had a market value of only $79.7 million (around 60 cents on the dollar) at the time they were issued.  Hr'g Tr. 59:20–60:6 (Jan. 25, 2018) (Sorsby), 114:14–115:16 (Mollett); AC ¶¶ 4–10, 50–56, 61–62.  In exchange for this below-market financing, Hovnanian agreed to two key features of the transaction designed to enrich GSO.

*First*, Sunrise Trail, a wholly owned subsidiary of Hovnanian, would purchase $26 million of the 8% Notes tendered into the exchange, and Hovnanian would contractually agree not to make a required May 1, 2018 interest payment on those notes.  Mem. Op. 7–8; AC ¶ 56.  "***This element of the transaction is specifically intended to trigger ... a Credit Event with respect to CDS protection referenced to Hovnanian securities***."  Mem. Op. 8 (emphasis added); AC ¶ 57.

*Second*, Hovnanian offered to exchange up to $185 million of its outstanding 8% Notes for a combination of new 13.5% notes due in 2026 and new 5% notes due in 2040 (the "13.5% Notes" and "Rigged Bond," respectively).  Mem. Op. 8; AC ¶ 53.  Defendants expected the 13.5% Notes to trade above par at issuance, and the Rigged Bond to trade significantly below par.  Mem. Op. 8; AC ¶¶ 11, 60–62, 69.  Indeed, GSO estimated the Rigged Bond would be valued by the market at only 50 cents on the dollar.  Merkel Decl. Ex. 3, at HOV_000193 (Jan. 23, 2018), ECF No. 84-3; AC ¶ 61.  The purpose of combining the 13.5% Notes with the Rigged Bond was "to create a package that is, on average, attractive to investors," while ***creating "a bond trading well below par so as to maximize monetary recovery for GSO under a[] CDS failure to pay Credit Event***, by operation of the 'cheapest-to-deliver' rule."  Mem. Op. 8 (emphasis added); AC ¶¶ 62, 69.

### E.   The CDS Market's Response To Defendants' Manipulative Scheme

Defendants publicly announced the terms of their transaction after the market closed on December 28, 2017.  However, the CDS market first began to hear rumors about a potential engineered Credit Event in mid-November 2017.  Hr'g Tr. 68:3–22 (Sorsby); AC ¶¶ 17, 74, 109.

8

Those rumors caused the price of CDS protection on Hovnanian to spike immediately and dramatically.  The price continued to rise throughout the rest of November and December, hitting 39 points upfront by December 27, implying a near certainty of default by Hovnanian.  Hambrook Decl. Ex. 5; AC ¶¶ 17, 74, 109.  In sharp contrast to the dramatic increase in CDS prices, the market price of Hovnanian debt remained stable throughout November and December, with Hovnanian's notes continuing to trade at or above par.  Hambrook Decl. Ex. 6; AC ¶¶ 17, 74.  This fundamental disconnect between CDS and debt prices—reflected in the chart below—confirms that CDS prices were being manipulated by Defendants' engineered Credit Event and intended issuance of the Rigged Bond.



When Defendants' scheme was publicly announced on December 28, 2017, the harm to protection sellers such as Solus was immediate and unavoidable.  The price of one-year CDS protection was 41 points upfront on December 29, as compared to an average price of approximately 4.6 points upfront during the period between January 1, 2017, and November 15,

2017 (before rumors of the GSO-Hovnanian scheme began).  Hambrook Decl. Ex. 5.  For context,

a protection seller who had sold $100 million of CDS protection between January 1, 2017, and

November 15, 2017, would have suffered a loss of approximately ***$36.4 million*** if it closed out its

position on the day after the transaction was announced.  Additionally, once the contract was

closed out by the CDS seller (or terminated as a result of an artificial Credit Event, as is

contemplated here), the CDS seller would also be defrauded out of ongoing CDS premium

payments (5% per year) for the duration of their CDS contract.  If the average duration of the CDS

was one year, the CDS seller would have suffered an additional loss of $5 million on its $100

million position by having the contract terminated prematurely.  *Id.* Ex. 5.

## ARGUMENT

I.   **THE AMENDED COMPLAINT STATES A CLAIM UNDER SECTION 10(B) AND RULE 10B-5 RESPECTING DEFENDANTS' SCHEME TO DEFRAUD AND MANIPULATE**

### A.   Solus Adequately Alleges A Scheme "In Connection With" The Purchase Or Sale Of Securities

Defendants argue that their scheme—which involves purchasing Hovnanian bonds; buying

Hovnanian CDS; having Hovnanian intentionally default on its own debt in order to trigger a

Credit Event that will cause the sale (*i.e.*, early termination) of Hovnanian CDS; and creating and

issuing new debt securities to artificially increase GSO's profit on its CDS position—was not made

"in connection with" the purchase or sale of a security.  They are wrong.

As Defendants appear to recognize (GSO Br. 11 n.9), the Supreme Court has

unambiguously held that "to effectuate [the] purpose" of 10b-5, the "in connection with"

requirement "***must be read flexibly***, not technically and restrictively."  *SEC v. Zandford*, 535 U.S.

813, 819, 821 (2002) (emphasis added) (quotations omitted).  In *Zandford*, the Court found that

liquidating clients' stock as part of a scheme to embezzle clients' cash "operated as a fraud or

10

deceit" in violation of Section 10(b) because "[i]t is enough that the scheme to defraud and the sale of securities *coincide*," *id.* at 821–22 (emphasis added)—*i.e.*, that "[t]he securities sales and [defendants'] fraudulent practices were not independent events." *Id.* at 820.[3]

In this case, no fewer than seven key components of Defendants' scheme meet the flexible "in connection with" standard (any one of which is sufficient, by itself, to satisfy this requirement):

1. GSO bought CDS protection on Hovnanian for the explicit purpose of establishing a short position that would allow it to profit from Defendants' manipulative scheme;

2. GSO bought 8% Notes for the explicit purpose of being able to tender them into the exchange offer in order to obtain the Rigged Bond;

3. Sunrise Trail bought 8% Notes for the explicit purpose of allowing Hovnanian to trigger a technical payment default;

4. GSO bought 5% 2027 Notes at par in order to provide an inducement to Hovnanian to trigger a technical payment default, and to provide another cheap deliverable obligation in order to drive down the clearing price at the Credit Event auction;

5. K. Hovnanian issued and sold the Rigged Bond, alongside the 5% 2027 Notes, for the explicit purpose of creating a new cheapest-to-deliver obligation;

6. Hovnanian's payment default will trigger the early termination of Hovnanian CDS, which constitutes a "sale" for purposes of federal securities laws; and

7. GSO will sell its Rigged Bonds and 5% 2027 Notes into the ISDA auction in order to maximize its recovery on its CDS.

Defendants attempt (unsuccessfully) to avoid this conclusion by advancing two arguments: (1) the "purchase or sale" requirement is met only where the securities purchased and/or sold are the same securities that were manipulated; and (2) the termination of CDS contracts due to a forced

---

[3]   Defendants' attempt to distinguish *Zandford* is misguided at best.   Defendants claim that *Zandford* is inapplicable because "the defendant allegedly took improper action with respect to the same security transferred to him by plaintiff."   GSO Br. 11 n.9.   But there is no language in *Zandford* that suggests that this was a requirement.   Rather, the Court clearly held that the "in connection with" requirement will be satisfied where the securities transaction and the alleged fraudulent conduct "were not independent events." *Zandford*, 535 U.S. at 820.   That standard is clearly satisfied here.

default is not a "sale" of a security.  As explained below, these arguments are meritless.

*First*, Defendants argue that the "in connection with" requirement is not met because Solus alleges that "GSO manipulated the market for ***Hovnanian CDS contracts*** by taking action with respect to ***Hovnanian bonds***," which are "altogether different securities."  GSO Br. 11 (emphasis added).  As a threshold matter, this argument misstates Solus' claim, which is that Defendants manipulated ***both*** the market for Hovnanian bonds ***and*** the market for Hovnanian CDS contracts. In any case, Defendants do not cite a ***single*** case holding that the "in connection with" requirement can be satisfied only where the "purchase or sale" is of the security being manipulated.  Instead, Defendants cite cases—all but one pre-*Zandford*—that stand for the much narrower proposition that the "in connection with" requirement must involve a misrepresentation or manipulation that impacts the purchase or sale of securities.  *See* GSO Br. 10–11; HOV Br. 11–12.[4]

Moreover, in the context of cross-product manipulation involving derivatives, courts in this district have held that the "in connection with" requirement is satisfied where—like here—the defendant trades in the reference security to manipulate the derivative security.  *See, e.g., SEC v.*

---

[4]   For example, *Levitin v. PaineWebber, Inc.*, 933 F. Supp. 325 (S.D.N.Y. 1996), *cited in* GSO Br. 10, merely ruled that allegations that the defendant earned undisclosed interest on plaintiff's collateral for short sales was not "in connection with" the purchase or sale of securities because there was no allegation that the defendant's practice "related in any way to the value of the securities sold by her or to the price that she received for selling those securities."  *Id.* at 329. Similarly, *Pross v. Katz*, 784 F.2d 455, 457 (2d Cir. 1986), *cited in* GSO Br. 11—which appears to have been abrogated by *Zandford*—held that a false promise to manage funds faithfully was not in connection with the purchase or sale of securities because the promise was not "part of the consideration for a sale of securities."  Finally, *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968), *cited in* HOV Br. 11, far from supporting Defendants' narrow and novel interpretation of "in connection with," held that a company that issues misleading statements need not engage in a specific securities transaction to satisfy the "in connection with" requirement.  *Id.* at 860.  The only case Defendants cite post-*Zandford*, *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 93 (2d Cir. 2018), *cited in* HOV Br. 11–12, arrived at the common-sense conclusion that post-purchase misconduct that "bore no relation to [the] original purchase" was not "in connection with" the purchase or sale of a security.  That is clearly not the case here.

*Masri*, 523 F. Supp. 2d 361, 365–66, 372 (S.D.N.Y. 2007) (ruling that manipulation of the price of "TZA shares" that caused "TZA … put options to expire worthless" violated Section 10(b)); *see also In re ETRACOM LLC*, 2016 WL 3405304, at *22 (F.E.R.C. Jun. 17, 2016) (stating that the Federal Energy Regulatory Commission "consistently" applies the Commission's 10b-5 equivalent statute to "'cross-market' schemes in which market participants improperly trade in one market with the intent to move prices to the benefit of positions in a related market").[5]

This makes perfect sense from an economic and legal perspective. A derivative is a "financial instrument whose value depends on or is derived from the performance of a secondary source such as an underlying bond, currency, or commodity." Black's Law Dictionary (10th ed. 2014). Accordingly, the logical means to manipulate a derivative is to manipulate the underlying security whose value determines the value of the derivative itself. Here, Defendants are doing just that—they are implementing a manipulative scheme in Hovnanian's bonds (the reference security) by creating the Rigged Bond and engineering the payment default in order to impact the value of Hovnanian CDS (the derivative security). Thus, the scheme to defraud is patently "in connection with" the purchase or sale of a security.[6]

---

[5]   Defendants' only response to *Masri* is that the "in connection with" prong was not heavily analyzed. GSO Br. 11 n.9. But this is hardly surprising given the holding in *Zandford* and the fact that Defendants have not pointed to *any* case in which a court has held that the purchase of a security in one market to manipulate a security in another market does not satisfy the requirement.
[6]   Additionally, Congress knew how to create a "same class" requirement when it wanted to do so. Section 20A of the Exchange Act, which provides an express private right of action for insider trading, explicitly limits the cause of action to those who purchased or sold "securities of the same class" as the violator. *See* 15 U.S.C. § 78t-1(a); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 308–09 (S.D.N.Y. 2008). The absence of a similar "same class" provision in 10(b) suggests that there is no such requirement. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002). Notably, even courts interpreting Section 20A's "same class" requirement have not interpreted it as narrowly as Defendants ask this court to interpret the "in connection with" requirement. *See, e.g., Basile v. Valeant Pharm. Int'l, Inc.*, 2015 WL 7352005, at *9 (C.D. Cal. Nov. 9, 2015) (holding common stock and options "should be considered part of the same class").

*Second*, Defendants argue that the forced early termination of Solus' CDS contracts is not "in connection with" the purchase or sale of securities.  This argument is similarly devoid of supporting caselaw.  Instead, Defendants rely on the Securities and Exchange Commission's ("SEC") consideration in 2010 of Proposed Rule 9j-1.  GSO Br. 12.  As an initial matter, nothing can be made of the fact that the SEC chose not to adopt this rule.  As the proposed rule itself noted, securities-based swaps such as CDS were already "subject to the general antifraud and anti-manipulation provisions of the federal securities laws."  *See* Prohibition Against Fraud, Manipulation, and Deception in Connection with Security-Based Swaps, 75 Fed. Reg. 68560, 68561 (proposed Nov. 8, 2010) ("Proposed Rule").  Indeed, the Proposed Rule explicitly noted that the "termination" of a swap—what is at issue here—would already be covered by existing securities laws because it constitutes a "sale."  *Id.* at 68561 n.7; *see also* 15 U.S.C. § 78c(a)(14) (defining a "sale" for security-based swaps to "include the execution, termination (prior to its scheduled maturity date), assignment, exchange or similar transfer …"); *id.* § 78c(a)(68) (defining a "security-based swap" to include CDS); *Campbell v. Nat'l Media Corp.*, 1994 WL 612807, at *4 (E.D. Pa. Nov. 3, 1994) (noting "settled" law that fraud in connection with exercise of options is actionable under Section 10(b)). The Proposed Rule, by contrast, concerned conduct during the life of a swap, *see* Proposed Rule, 75 Fed. Reg. at 68561, which has no relevance here.

Defendants dispute that the early termination of a swap is a "sale" under the Exchange Act by arguing that the termination at issue here is not "prior to [its] scheduled maturity" because a Credit Event constitutes a "termination event" under the governing ISDA contract.  GSO Br. 13–14.  Again, they are wrong.[7]  The 2014 ISDA Credit Derivative Definitions (the "2014

---

[7]   Contrary to Defendants' claim (GSO Br. 13), an early termination need not be "volitional" to constitute a "sale" for purposes of 10(b).  In reality, courts have repeatedly held that forced sales constitute "sales" for purposes of 10(b).  *See, e.g., Madison Consultants v. Fed. Deposit Ins. Corp.*,

Definitions"), like the definitions that preceded them in 2003 (the "2003 Definitions"), define the "Scheduled Termination Date" (*i.e.*, the scheduled maturity) as the date set forth in the confirmation for each CDS trade, which represents the date on which the CDS expires if not previously exercised.  Waldman Decl. Ex. 3 § 1.14 (Mar. 2, 2018), ECF No. 95-3; Corkhill Decl. Ex. 1 § 1.6.  The 2014 Definitions and 2003 Definitions separately define "Termination Date" as either the Scheduled Termination Date, or in the event of a Credit Event, the settlement date that occurs prior to the Scheduled Termination Date.  Waldman Decl. Ex. 3 § 1.15; Corkhill Decl. Ex. 1 § 1.7.  Thus, Defendants' scheme will cause the CDS contracts to terminate on the "Termination Date," which will occur prior to the Scheduled Termination Date (*i.e.*, the "scheduled maturity date" referenced in 15 U.S.C. § 78c(a)(14)).  Accordingly, the forced termination of the CDS contract is a "sale" that satisfies the "in connection with" requirement.

### B.   Solus Adequately Alleges That Defendants' Scheme Was Manipulative

Defendants argue that "Solus cannot make the threshold showing that the Refinancing was in any way 'manipulative,'" because "[t]he very features of the Refinancing that Solus claims are 'deceptive' … were exhaustively disclosed."  GSO Br. 14–16; *see also* HOV Br. 12–13.  This argument is meritless.  Solus has alleged a classic scenario of cross-product manipulation, where the manipulator engages in uneconomic transactions—*i.e.*, transactions counter to the manipulator's financial interests—in a price-making market with the specific intent to benefit derivative positions in a related price-taking market.[8]  Defendants' conduct deceived participants

---

710 F.2d 57, 61 (2d Cir. 1983) ("This Circuit has repeatedly held, however, that an owner of securities who is forced to sell them against his will has standing as a 'seller' for purposes of Rule 10b-5."); *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, 2004 WL 444554, at *4 (S.D.N.Y. Mar. 10, 2004) (claim falls within 10(b) because the "gravamen of MSI's … claim is MSI's forced sale of its NCL shares").

[8]   "Price-making market" refers to the market for the primary referenced security, while "price-taking market" refers to the market for the derivative (whose price will be determined in large part by prices in the primary market).

in the CDS market by subverting the fundamental assumption that Reference Entities such as Hovnanian will seek to pay their debts if they are able to do so.  Defendants' disclosures on December 28 when they announced the Refinancing did nothing to address this deception, because they were made after the trap had already been set in the CDS market.

### 1.      Defendants' Scheme Satisfies The Definition Of Manipulative Conduct

Controlling precedent in the Second Circuit and persuasive authority from other appellate courts holds that uneconomic trading in regulated securities markets for an ulterior purpose not tied to normal investment motives violates the anti-manipulation provisions of Section 10(b) and Rule 10b-5.  This principle traces back at least to the Second Circuit's decision in *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787 (2d Cir. 1969).  There, two competing bidders sought to buy out the public shareholders of Westinghouse Air Brake ("Air Brake"), with one bidder making a tender offer to acquire those public shares.  In order to prevent the success of the tender offer, the second bidder made substantial, above-market purchases of Air Brake stock on the final day of the competing bidder's tender offer, and proceeded to sell these same shares later in the day in off-market private placement transactions.  This uneconomic conduct drove up Air Brake's share price on that day, making the tender offer appear less attractive.  *Id.* at 791, 793.  The Second Circuit held this conduct to be manipulative, observing that the bidder's "massive buying ... coupled with concealed sales, was not consistent with the normal desire of an investor 'to buy at as low a price as possible.'"  *Id.* at 795 (quoting H.R. Rep. No. 1383).

The D.C. Circuit followed similar logic in *Markowski v. SEC*, 274 F.3d 525 (D.C. Cir. 2001).  There, the court held that an underwriting firm engaged in market manipulation when it traded for the "external purpose" of propping up the price of a security it had underwritten "not to profit from later sales of [the securities], but to maintain customer interest in [the underwriter] generally and to sustain confidence in its other securities."  *Id.* at 529.  The court found this trading

to be manipulative based solely on the ulterior motive driving the defendants' trading decisions. *Id.* (endorsing "what appears to be Congress's determination that 'manipulation' can be illegal solely because of the actor's purpose"); *see also Koch v. SEC*, 793 F.3d 147, 155 (D.C. Cir. 2015) (trading intended to inflate the value of hedge fund's assets under management in statements to investors satisfies the definition of market manipulation under Rule 10b-5).

Based on the foregoing precedent, "[s]ecurities transactions that would be lawful if based on a genuine belief that the market has misvalued a security can be unlawfully deceptive if undertaken to obtain some side benefit." *FERC v. City Power Mktg., LLC*, 199 F. Supp. 3d 218, 235 (D.D.C. 2016). In *City Power Marketing*, the court explained:

> *Markowski* and *Koch* thus reveal an important point: under Section 10(b), securities traders are not free to trade for whatever purpose they wish. Traders are presumed to be trading on the basis of their best estimates of a security's underlying economic value, *see, e.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100–01 (2d Cir. 2007), and to trade for other purposes can be deceptive.

*Id.* Thus, in *City Power Marketing*, the Court found that, even though defendants' trading activity in certain complex energy derivatives involved open-market trading, defendants' trades were deceptive because they were "sham transactions" not placed for a proper purpose. *Id.* at 236–37.

The longstanding definition of manipulative conduct described above has developed a specialized application in the context of ***cross-product manipulation*** involving swaps or other financial derivatives. Because derivatives, unlike primary-market securities, derive their value from a separate, price-making market, they are uniquely subject to instances of cross-market manipulation, which occurs when a manipulator engages in conduct that disrupts the normal functioning of the primary, price-making market in order to benefit a derivative position in the price-taking market. A classic example of cross-product manipulation involves a manipulator who engages in uneconomic behavior in the primary market that is profitable *solely* because of its impact on a price-taking derivative position tied to that primary market.

17

The lead case in this Circuit on cross-product manipulation under Section 10(b) and Rule 10b-5 is *SEC v. Masri*.  There, this Court held that allegations that a defendant conducted activity in a primary market (the market for TZA shares) with the specific intent of influencing prices in a derivative market (the market for TZA options) was sufficient to state a claim under Section 10(b) and Rule 10b-5.  *Masri*, 523 F. Supp. 2d at 372.  In so doing, the Court explicitly rejected defendants' argument that their conduct was not actionable because they had been engaged in "open-market" trading (*i.e.*, trading "without additional deceptive or fraudulent conduct").  *Id.* at 371–72.  Courts have also held that cross-product manipulation violates the anti-manipulation provisions of both the Commodity Exchange Act and the Energy Policy Act of 2005.  *See In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 524, 534 (S.D.N.Y. 2008) (finding that decision to "sell a significant number of futures" at or near close in order to "artificially depress the settlement price of those futures," which was profitable "because it held a short position in swaps," was manipulative; "a legitimate transaction combined with an improper motive is commodities manipulation"); *FERC v. Barclays Bank PLC*, 105 F. Supp. 3d 1121, 1127, 1147 (E.D. Cal. 2015) ("Defendants' manipulative scheme involved three parts: (1) setting up a financial position; (2) building a physical position that was in the opposite direction to the financial position; and (3) flattening the physical position through trading dailies to benefit the financial position"; "[h]ere the allegations ... state the use of strategies designed to manipulate prices and deceive purchasers and sellers" (quotations omitted)).

Finally, while the prohibition on cross-product manipulation is well-established in the caselaw of this Court and others, it has received even more attention in the regulatory record of the Federal Energy Regulatory Commission ("FERC"), which has by far the longest jurisdictional

track record over swaps among its sister agencies.[9]   FERC's extensive jurisprudence concerning cross-product manipulation under its analogue to Rule 10b-5 is instructive here.[10]   FERC has aggressively prosecuted cross-product manipulation—which it defines as uneconomic trading in a price-making market intended to benefit a position in a separate, price-taking market—in energy-related derivatives, regardless of whether the trading involved in the scheme was disclosed to the market.  *See, e.g.*, *In re ETRACOM LLC*, 2016 WL 3405304, at \*22 ("The Commission has consistently found to be manipulative 'cross-market' schemes in which market participants improperly trade in one market with the intent to move prices in a particular direction to the benefit of positions in a related market."); *In re Barclays Bank PLC*, 2013 WL 3962269, at \*19 (F.E.R.C. July 16, 2013) ("Th[e] evidence demonstrates that the intentional amassing of the positions and trading to influence price were not based on normal supply and demand fundamentals, but rather on the intent to effect a scheme to manipulate the physical markets in order to benefit the Financial Swaps ....  This behavior overcomes any 'open market' defense.").  In a November 2016 white paper, FERC made clear that the uneconomic nature of the price-making trades is a key touchstone of manipulative intent:

> The Commission considers the uneconomic nature of conduct as another important factor in its determinations of what constitutes fraud.  Uneconomic conduct occurs when an entity knowingly engages in behavior that loses money on a stand-alone basis—or is indifferent to whether it loses money—but engages in the behavior anyway to serve an ulterior purpose (e.g., to move prices in a way that benefits related positions) ... particularly [where] a trader is accepting persistent losses in a

---

[9] FERC has had regulatory authority over energy-related financial derivatives, including swaps, since the passage of the Energy Policy Act in 2005.  While the CFTC and the SEC have had jurisdiction over some derivatives for many years, swaps were largely outside their regulatory ambit prior to 2011, when certain provisions of Dodd-Frank became effective.

[10] *See* 18 C.F.R. § 1C.2(a) ("It shall be unlawful for any entity, directly or indirectly, in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission, (1) To use or employ any device, scheme, or artifice to defraud, … or (3) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity.").

price-setting product while simultaneously having exposure to a position whose value is tied to such trading.

FERC, *Staff White Paper On Anti-Market Manipulation Enforcement Efforts Ten Years After EPAct 2005*, at 13–14 (Nov. 2016).  This position is consistent with the Second Circuit's analysis of manipulative conduct under Section 10(b), as discussed above.  *See Crane Co.*, 419 F.2d at 795.

The alleged conduct here is a quintessential example of cross-product manipulation. Defendants established a position in the derivative, price-taking market (the market for Hovnanian CDS) with the specific intent of subsequently taking action in the primary, price-making market (the market for Hovnanian bonds) that would significantly increase the value of their position in the derivative market.  GSO then manifested that intent by engaging in uneconomic behavior in the price-making bond market—namely, buying bonds at par that were worth far less and requiring the bond issuer to manufacture an artificial payment default—in order to benefit its position in the price-taking CDS market.  In fact, GSO's own analysis shows that its transactions in Hovnanian bonds were uneconomic.  According to GSO's internal calculations, the $132.5 million of 5% bonds due in 2027 that GSO agreed to purchase at par from Hovnanian in order to refinance the 7% Notes had a market value of only $79.7 million (60 cents on the dollar) when they were issued, meaning that GSO agreed to take a day one loss of $52.8 million on that transaction.  *See supra* pp. 7–8.  Relatedly, GSO acquired approximately $68 million in 5% bonds due in 2040, a duration and interest rate so far off market—where market would typically be 12% interest on a 6-year maturity for comparable unsecured bonds—that the bonds were worth only 50% of face value on the day they were issued, implying a day one loss of approximately $34 million.  *See supra* p. 8. These purchases by GSO were "not consistent with the normal desire of an investor to buy at as low a price as possible."  *Crane Co.*, 419 F.2d at 795 (quotations omitted).

Critically, the ***sole*** purpose of these uneconomic transactions was to manufacture a Credit

20

Event and create cheap deliverable obligations in the price-making market—*i.e.*, the market for Hovnanian bonds—in order to benefit GSO's price-taking derivative position in Hovnanian CDS. The ulterior motives behind Defendants' conduct satisfy the long-held definition of manipulative conduct under Rule 10b-5. *See Masri*, 523 F. Supp. 2d at 365–66.

### 2.   Defendants' Manipulative Scheme Deceived Market Participants, Including Solus, By Subverting Fundamental Market Assumptions

Defendants are liable for manipulative conduct under Rule 10b-5 if such conduct causes damage to market participants who relied on "an assumption of an efficient market free of manipulation." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2007). As this Court has found, "the CDS market operates based on the market participants' ability to accurately assess risk, which such participants currently do ***based on the working assumption that Reference Entities will endeavor to avoid default whenever possible***." Mem. Op. 9 (emphasis added). Consistent with this assumption, Hovnanian made numerous public statements during 2016 and 2017 confirming that the company was committed to paying its debts in a timely fashion, and making no mention of the possibility that Hovnanian would engage in any type of engineered default. AC ¶¶ 44–45. Accordingly, market participants assess risk based on (i) the probability that a Reference Entity will be unable (not unwilling) to pay its debts when they come due, and (ii) the corresponding trading price in the secondary market of the Reference Entity's cheapest-to-deliver security. Hambrook Decl. ¶ 3.

At the same time that GSO was buying hundreds of millions of dollars of CDS protection referencing Hovnanian, it was actively working to subvert these fundamental risk assumptions by conspiring with Hovnanian to (a) engineer an artificial Credit Event and (b) create new debt securities designed to trade significantly below par, in order to manipulate the outcome of the Credit Event auction. *See supra* pp. 6–7. GSO therefore knew that the prices it was paying for

CDS protection did not accurately reflect the risk associated with those securities in light of Defendants' manipulative scheme.   Moreover, GSO knew that other participants in the CDS market had no ability to accurately assess that risk, because they had no way of knowing that GSO was presently conspiring with Hovnanian to trigger an artificial default.   Accordingly, market participants—including Solus—that relied on Hovnanian's public statements, as well as prevailing market assumptions regarding risk, were deceived by Defendants' conduct.

In response, Defendants argue that their conduct was not deceptive, because the key features of the exchange offer were disclosed to the market.   *See* GSO Br. 16; HOV Br. 13.   In support of this argument, Defendants cite a number of cases in which courts have dismissed 10b-5 claims in situations where the allegedly manipulative conduct was disclosed to investors.   *See* GSO Br. 16; HOV Br. 13.   This argument is meritless, because the cases Defendants rely upon all concerned disclosures in connection with equity or debt markets that gave investors the opportunity to avoid the harm that was subsequently complained of.[11]   That was simply not the case here.   By the time Defendants publicly announced the exchange offer on December 28, 2017—and even by the time rumors of the transaction began to circulate in mid-November 2017— Solus had already sold $246.5 million in CDS protection on Hovnanian, and the market price for CDS protection had subsequently skyrocketed, meaning Solus could not exit the position without sustaining a massive loss (as a function of the scheme implemented by Defendants).   *See supra*

---

[11]   *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) (holding that shareholders with right to vote on transaction were not defrauded by unfair transaction fully disclosed prior to vote); *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) (holding no market manipulation claim in auction-rate security market where investors were informed prior to purchase that the "manipulation" they complained of could occur); *In re Citigroup, Inc.*, 2011 WL 744745, at *6 (S.D.N.Y. Mar. 1, 2011) (Swain, J.) (same), *aff'd sub nom. Finn v. Barney*, 471 F. App'x 30 (2d Cir. 2012) (summary order)).   The portion of *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 241–42 (S.D.N.Y. 2006) that Hovnanian cites (HOV Br. 12) does not support its proposition.

pp. 7–9.  Defendants point to no case—nor is Solus aware of any—that says Section 10(b) liability can be avoided by disclosing a manipulative scheme after the trap has already been sprung.

### C.   Solus Adequately Alleges That Defendants Acted With Scienter

This is not a case in which Defendants claim to have engaged in the exchange offer for some legitimate commercial purpose unrelated to its impact on the market for Hovnanian CDS. Rather, as detailed below, Defendants have admitted that, from its very inception, the transaction was part of a broader scheme intended to benefit GSO's CDS position by both manufacturing a sham Credit Event under the CDS contracts and subsequently artificially increasing the amount of profit for CDS buyers, such as GSO, via the Rigged Bond.  *See supra* pp. 6–7.  Moreover, the Court has made numerous findings of fact confirming all of these points, most notably that the ***intent*** of this scheme was to manipulate recoveries on Hovnanian CDS to benefit GSO's CDS position.  *See supra* p. 8.  Accordingly, if Solus has adequately alleged that Defendants' scheme was "manipulative" (which it has, for the reasons explained above), then it necessarily follows that Solus has also satisfied the scienter pleading requirement, because Defendants have admitted both the key elements of the scheme and its intended purpose and effect.  *See SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111 (2d Cir. 1998) ("It is well-settled that knowledge of the proscribed activity is sufficient scienter under § 10(b)."); *Absolute Activist Master Value Fund, Ltd. v. Ficeto*, 2013 WL 1286170, at *6 (S.D.N.Y. Mar. 28, 2013) (allegations of deliberate manipulation "easily satisfy the standard for pleading scienter").

With respect to GSO, Ryan Mollett—a Senior Managing Director who was responsible for the Hovnanian transaction—testified that GSO came up with a scheme in early 2017 to buy CDS protection on Hovnanian and turn a profit on that position by offering Hovnanian below-market financing in exchange for its agreement to trigger a Credit Event.  Mollett Decl. ¶¶ 8–9.  Mollett further testified that a Credit Event would be the "optimal result from an economic standpoint" for

23

GSO, Hr'g Tr. 106:11–29, and that it was GSO's "hope and expectation" that the Rigged Bond would be the cheapest-to-deliver obligation in the ISDA auction. *Id.* 113:17–19.

With respect to Hovnanian, J. Larry Sorsby, the company's Chief Financial Officer, admitted that Hovnanian knew it was receiving off-market financing in exchange for taking actions that were intended to engineer a Credit Event and that Hovnanian knew a Credit Event would "have some value" to GSO. Hr'g Tr. 62:15–18. Sorsby also admitted that Sunrise Trail's purchase of the 8% Notes had "no business purpose outside of being a component of the refinancing transaction." *Id.* 48:11–14. Similarly, Hovnanian's counsel conceded that "there is nothing [about the engineered payment default] that is inherently beneficial to Hovnanian other than as part of the … overall financing package." Hr'g Tr. 22:14–20 (Jan. 15, 2018).

Based on this testimony, the Court made two findings of fact that are critical for scienter. *First*, the Court found that Sunrise Trail's purchase of $26 million of 8% Notes, and Hovnanian's agreement not to make a required May 1, 2018 interest payment on those notes, is "***specifically intended to trigger … a Credit Event with respect to CDS protection referenced to Hovnanian securities***." *See supra* p. 8 (quoting Mem. Op. 8) (emphasis added). *Second*, the Court found that the purpose of the Rigged Bond was to ***create "a bond trading well below par so as to maximize monetary recovery for GSO under a[] CDS failure to pay Credit Event***, by operation of the 'cheapest-to-deliver' rule." *See supra* p. 8 (quoting Mem Op. 8) (emphasis added).[12]

---

[12]   Defendants may argue that triggering a CDS Credit Event and issuing long-dated notes with a below-market coupon have legitimate commercial purposes separate and apart from generating an illicit windfall on GSO's CDS. *See, e.g.* Hr'g Tr. 51:1–16 (Jan. 25, 2018) (Sorsby); Sorsby Decl. ¶ 36 (Jan. 22, 2018), ECF No. 43. Where an open-market transaction may involve both manipulative and non-manipulative intent, scienter will be established where "*but for* the manipulative intent, the defendant would not have conducted the transaction." *Masri*, 523 F. Supp. 2d at 372. That standard is clearly satisfied here, because GSO's counsel has conceded that the exchange offer would not have occurred but for GSO's intent to generate a profit on its CDS position. Hr'g Tr. 24:2–21 (Jan. 15, 2018).

Notwithstanding their own admissions and this Court's findings of fact, Defendants argue that Solus has not adequately alleged scienter because its allegations regarding motive and opportunity are insufficient to infer scienter. *See* GSO Br. 17–18. But this misses the entire point of scienter, which is intended to address whether Defendants acted with intent to manipulate. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) ("[Scienter is] a mental state embracing intent to deceive, manipulate, or defraud" (quotations omitted)); *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (scienter adequately pleaded if plaintiff can establish "actual intent."). As explained above, courts frequently uphold allegations of scienter where there are sufficient allegations that the Defendants intended to engage in the manipulative conduct. Here, there is no serious dispute that Defendants intended to engage in the alleged conduct and intended to bring about the manipulative results.[13]

Moreover, Solus' allegations are sufficient even as to motive and opportunity because they demonstrate precisely why the Defendants intended to accomplish their manipulative scheme. Here, unlike in the cases cited by Defendants, Solus has alleged "concrete benefits" that will be realized from Defendants' manipulative conduct. For example, Solus has alleged that GSO will earn millions of dollars from the combination of the engineered default and Rigged Bond. AC ¶¶ 41–62. This type of benefit that flows directly from Defendants' wrongdoing is sufficient to allege a strong inference of scienter. *See, e.g.*, *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 645 (S.D.N.Y. 2012) (allegations of specific monetary benefit from structuring of manipulative deal sufficient to establish strong inference of scienter); *Dandong v. Pinnacle Performance Ltd.*, 2011 WL 5170293, at *12 (S.D.N.Y. Oct. 31, 2011) (same); *Absolute Activist*,

---

[13]   GSO argues that Solus has not attempted to allege conscious misbehavior or intentional misconduct. This is incorrect. *See, e.g.*, AC ¶¶ 2, 4, 8, 9, 12, 46, 50, 63–70, 75–83, 85–87.

2013 WL 1286170, at *6 (scienter adequately alleged where defendants will gain specifically from the alleged manipulation).[14]   Accordingly, Plaintiffs have adequately alleged scienter.

### D.   Solus Adequately Alleges Reliance

Defendants claim that Solus cannot adequately allege actual reliance "because market participants were familiar with transactions resembling the Refinancing," and the ISDA DC determined that these transactions gave rise to Credit Events.   GSO Br. 20.   This argument is meritless.

As a threshold matter, this is precisely the type of highly fact-based argument that is not appropriate for resolution at the motion to dismiss stage.  *See IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC*, 91 F. Supp. 3d 456, 476 (S.D.N.Y. 2015) ("[Reasonable reliance] is normally not to be decided on a motion to dismiss." (quotations omitted)); *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) ("The question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive.").

Even assuming it were appropriate to consider Defendants' argument at this stage (which it is not), it should be rejected for at least five reasons.

*First*, Defendants' argument—that the entire market knew CDS could and would be manipulated in this fashion—is belied by this Court's finding that the efficient functioning of the CDS market is premised on the assumption that "Reference Entities will endeavor to avoid default whenever possible."  *See supra* p. 5 (quoting Mem. Op. 9).

---

[14]    The cases cited by Defendants—which involve only general allegations that a defendant possessed motive because it earned money from the challenged conduct—are inapposite. *See, e.g.*, *In re JP Morgan Auction Rate Sec. (ARS) Mktg. Litig.*, 867 F. Supp. 2d 407 (S.D.N.Y. 2012); *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 529 (S.D.N.Y. 2012); *Engstrom v. Elan Corp., plc*, 2011 WL 4946434, at *9 (S.D.N.Y. Oct. 18, 2011).  In stark contrast, Defendants here are alleged to have established a specific financial position with the intent of profiting off that position through a fraudulent scheme that they then carried out.

*Second*, Defendants grossly overstate the alleged similarities between the transaction at issue in this case and the Codere and iHeart transactions.  Simply put, neither Codere nor iHeart remotely resembled the transaction at issue here—where GSO convinced a perfectly healthy company whose debt was trading at or above par to both trigger an engineered Credit Event *and* issue new debt for the explicit purpose of creating a new "cheapest-to-deliver" obligation that would artificially increase GSO's profit from its CDS.  Unlike Hovnanian, both Codere and iHeart were in severe financial distress and facing imminent risk of default when they triggered technical Credit Events.  Supp. Pickel Decl. ¶ 26 (Jan. 16, 2018), ECF No. 34.  Moreover, neither company issued debt specifically designed to create a "cheapest-to-deliver" obligation that would increase CDS recoveries.  Indeed, iHeart's technical default was triggered for reasons that were wholly unrelated to its CDS.  Merkel Decl. Ex. 6, ECF No. 84-6.  Accordingly, neither transaction put the market on notice that perfectly healthy Reference Entities could accept a payment to trigger a Credit Event.  The GSO-Hovnanian transaction is distinct from prior transactions in that it can be replicated with virtually any Reference Entity, and no CDS market participant can see it coming until it is too late.  *Id.*[15]  Indeed, Defendants' expert agreed that "any CFO who is out in the market looking for financ[ing] would be remiss not to be considering ... this type of a CDS triggered deal," Hr'g Tr. 233:11–18 (Jan. 25, 2018) (Selvaggio), and that "there are a lot of hedge funds in this town with $50 million to throw at a strategy like this."  *Id.* 235:5–9.

*Third*, Defendants overstate the significance of the determinations by the DC that the Codere and iHeart defaults triggered failure-to-pay Credit Events.  In neither case was the DC

---

[15]   The articles that Defendants point to that allegedly compared the GSO-Hovnanian transaction to the Codere and iHeart transactions (GSO Br. 20 n.21) came out on November 17 and December 22, 2017, *after* GSO established its $333 million short CDS position; *after* Solus established its $246.5 million long CDS position; and after the price of Hovnanian CDS had spiked due to market rumors.  They therefore have no bearing on reasonable reliance.

asked to consider whether the payment defaults breached the terms of the governing CDS contracts or otherwise violated the law.  Rather, the DC was asked to answer the very narrow question of whether the payment defaults satisfied the technical definition of a failure-to-pay Credit Event. Market participants cannot be deemed to have inferred from the answer to this question that the conduct engaged in by Defendants here was lawful, permissible, and to have been expected.

*Fourth*, Defendants' reliance on Section 11.1(b)(iii) of the 2014 Definitions is unavailing. That provision merely preserves the right of CDS counterparties who are creditors or contingent creditors of a Reference Entity to act in their best interest *vis-a-vis* that Reference Entity in normal commercial interactions, such as negotiations related to the restructuring or refinancing of debt. Supp. Pickel Decl. ¶¶ 21–24.  The interpretation urged by Defendants must be rejected because it would produce an absurd result.  As this Court observed, the CDS market requires market participants to assess risk based on the assumption that Reference Entities will endeavor to avoid payment defaults when possible.  If manufactured defaults—paid for by protection buyers—are permissible under Section 11.1(b)(iii), no protection seller would agree to such terms.  *See Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415 (1st Dep't 2010) ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.") (quotations omitted); *see also ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*, 95 A.D.3d 498, 503 (1st Dep't 2012)  ("It is a longstanding principle of New York law that a construction of a contract that would give one party an unfair and unreasonable advantage over the other, or that would place one party at the mercy of the other, should, if at all possible, be avoided.").  Moreover, Defendants' interpretation runs contrary to Section 29(a) of the Exchange Act, which prohibits the "enforcement of agreements to waive 'compliance' with the provisions of the [Exchange Act]."  *Harsco Corp. v. Segui*, 91 F.3d 337,

343 (2d Cir. 1996); *see* 15 U.S.C. § 78cc(a).[16]

*Finally*, Defendants' argument is tautological as it presupposes the legality of their conduct.  For example, the fact that there have been innumerable well-publicized instances of parties engaging in manipulative securities transactions—such as wash sales, tie-in agreements, front running, marking the close, and painting the tape—does not render future victims of such conduct unable to recover because they cannot prove reliance upon a market completely free of such activity.  Similarly, to the extent Defendants' conduct is otherwise violative of 10(b), it was reasonable for Solus to rely on the market for Hovnanian CDS being free of such illegal conduct.

### E.    Solus Adequately Alleges Legally Cognizable Damages

Defendants' argument that Solus has failed to plead legally cognizable damages, GSO Br. 21, HOV Br. 13–14, is unavailing because Solus seeks injunctive relief to stop Hovnanian from intentionally defaulting on its interest payment to Sunrise Trail, and to stop GSO from delivering the Rigged Bond and the 5% 2027 Notes into the Credit Event auction.  There is "well-established Second Circuit precedent holding that, in seeking injunctive relief under a § 10(b) claim, a plaintiff does not have to show damages in connection with the purchase or sale of any security." *Langner v. Brown*, 913 F. Supp. 260, 270 (S.D.N.Y. 1996) (citing *Mut. Shares Corp. v. Genesco, Inc.*, 384 F.2d 540 (2d Cir. 1967)).  Instead, "the plaintiff requesting injunctive relief must demonstrate 'that the continuation of past and present practices will in fact injure him.'" *Id.* (quoting *Fuchs v. Swanton Corp.*, 482 F. Supp. 83, 90 (S.D.N.Y. 1979)).[17]  That requirement is plainly met here.  As

---

[16]    *Good Hill Master Fund L.P. v. Deutsche Bank AG*, 146 A.D.3d 632 (1st Dep't 2017) stands for the unremarkable proposition that a CDS counterparty is permitted to disregard its CDS and act in its own commercial best interest when negotiating a transaction, ***not*** that a CDS counterparty is permitted to intentionally structure a transaction for the admitted purpose of triggering its CDS and artificially increasing its profits.

[17]    Solus is aware of one decision in this district that departs from the *Langner-Mutual Shares* rule that damages are not necessary to obtain injunctive relief under Section 10(b).  *See Cartica Mgmt., LLC v. Corpbanca S.A.*, 50 F. Supp. 3d 477 (S.D.N.Y. 2014).  In that case, Judge Castel concluded

GSO has admitted, it "expect[s]" that Hovnanian's failure to pay interest to Sunrise Trail will constitute a Credit Event and that the Rigged Bond will be the cheapest-to-deliver obligation in the subsequent Credit Event auction.  Hr'g Tr. 113:17–19 (Mollett).  This course of events will cause Solus to suffer a loss on its Hovnanian CDS position.  While the precise amount of that loss may not be known until after the auction is completed, it is disingenuous for Defendants to suggest that such loss is merely theoretical until their scheme comes to fruition.

## F.   Solus Adequately Alleges Control-Person Liability

Defendants argue that Solus' 20(a) claims fail because it has not alleged a predicate 10(b) violation or culpable participation by the Individual Defendants.  HOV Br. 14–16.  Defendants are wrong.  As explained above, Solus has alleged a predicate 10(b) violation.  *See supra* Arg. Sec. I.A–E.  With respect to culpable participation, Defendants misstate both the law and the facts. Culpable participation is not an element of Section 20(a).  *In re Parmalat Sec. Litig.*, 497 F. Supp. 2d 526, 532 n.42 (S.D.N.Y. 2007).  Moreover, even if culpable participation was an element, Solus easily meets the requirement here.   As explained above, Solus pleaded scienter against the Individual Defendants.  *See supra* Arg. Sec. I.C.  Additionally, Solus adequately alleges that the Individual Defendants were instrumental to the scheme by, among other things, personally negotiating the Rigged Bond and agreeing to default.  *See, e.g.*, AC ¶¶ 99–100.  These allegations

---

that the Second Circuit's holding in *Mutual Shares* did not survive the Supreme Court's decision in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), and ruled that the purchaser or seller rule in *Blue Chip Stamps* should apply equally to Rule 10b-5 injunctive relief claims.  *See Cartica*, 50 F. Supp. 3d at 488.  *Cartica* cannot be squared with the fact that *Blue Chip Stamps* merely adopted a rule already established in the Second Circuit by *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952), which predated *Mutual Shares*.  In other words, the Second Circuit adopted the injunctive relief exception to the purchaser or seller requirement at a time when it was already bound by what was, in effect, the *Blue Chip Stamps* rule.  The policy rationale in *Mutual Shares* for the injunctive relief exception—that "present stockholders" are "logical plaintiffs" to combat "a manipulative scheme which is still continuing," and "play an important role in enforcement of the Act in this way," *Mutual Shares*, 384 F.2d at 546–547—is equally applicable after *Blue Chip Stamps*.

are sufficient to establish actual intent for scienter and are therefore sufficient to establish culpable participation. *See In re Am. Int'l. Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534–35 (S.D.N.Y. 2010) (same allegations that satisfy scienter satisfy culpable participation).

## II.   THE AMENDED COMPLAINT STATES A CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Under New York law, a claim for tortious interference with prospective economic advantage lies where (1) a plaintiff has business relations with a third party; (2) defendants interfered with those business relations; (3) defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) defendants' acts injured the relationship. *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003). The Amended Complaint satisfies each of these elements.

### A.   Solus Adequately Alleges Business Relations With Third Parties

The Amended Complaint plainly alleges business relations between Solus and third-party CDS dealers. AC ¶¶ 121–22. No Defendant suggests otherwise. *See* GSO Br. 21–25; HOV Br. 16–18. Instead, Defendants contend that Solus' claim for tortious interference is an attempt "to fit a square peg into a round hole," because "Solus's theory does not conform with any claim cognizable under New York law." HOV Br. 16. This is incorrect.

New York law permits injured parties to seek redress for defendants' tortious conduct that frustrates a prospective contract right. *See NBT Bancorp v. Fleet/Norstar Fin. Grp.*, 87 N.Y.2d 614, 621 (1996). Defendants contend that recovery is limited to two narrow circumstances: either (1) where an existing contract is breached or (2) where "the plaintiff is close to entering into a contract and the defendant has prevented the contract from being consummated through illegitimate means." HOV Br. 17; GSO Br. 23. But New York law has never been so limited. For example, the New York Court of Appeals has long made clear that a plaintiff can recover for

31

tortious interference where a defendant, through wrongful means, caused a third party to terminate a contract pursuant to its terms. *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 192 (1980) ("[W]e are persuaded that interference with performance of voidable contracts should be treated the same as interference with contracts terminable at will for purposes of imposing liability in tort, and that both fall in the same category with interference with prospective contractual relations."). That is exactly what happened here. Through multiple improper means (*see infra* Arg. Sec. II.C), Defendants have sought to cause the early termination of Solus' CDS contracts with third-party dealers. Accordingly, New York law provides for Solus' recovery under a theory of tortious interference with prospective economic advantage.

### B. Solus Adequately Alleges That Defendants Knowingly Interfered With Solus' Third-Party Relationships And Caused Injury To Those Relationships

The Amended Complaint alleges that Defendants knew of Solus' CDS contracts with third parties and interfered with them. AC ¶¶ 41,123–26. Nevertheless, Defendants claim that "Solus fails to allege that [Defendants] directed any conduct towards Solus's 'third-party CDS dealers' in their capacity as Solus's dealers" and that, instead, any misconduct was directed at Solus alone. GSO Br. 22; *accord* HOV Br. 18. This argument ignores the basic realities of a dealer-intermediated market like the CDS market.

As this Court has already found, "CDS contracts are generally sold by dealers through a central clearing house." Mem. Op. 4. As a result, market participants understand that CDS create a chain of economic exposure, with a net long protection seller (in this case Solus) on one end, and a net short protection buyer (here, GSO) on the other, separated by one or more intermediating dealers. Hambrook Decl. ¶ 2. Market participants also understand that a Credit Event will trigger a series of payment obligations along the chain, with GSO demanding payment from its dealer counterparty, who will in turn demand payment from its counterparty, with a demand for payment

ultimately made to Solus.  Taking this market structure into account, there can be no serious dispute that Defendants' conduct was knowingly directed towards Solus' third-party CDS dealers.

The Amended Complaint further alleges that Defendants injured Solus' third-party relationships by causing the early termination of Hovnanian CDS.  AC ¶¶ 16, 71–74, 127–29.  Defendants' contention that none of Solus' "underlying business relationships are at risk" because paying out on the Hovnanian CDS is "a natural consequence of those contracts," GSO Br. 23, fundamentally misunderstands Solus' allegations.  There is nothing "natural" about a rigged failure-to-pay Credit Event involving a missed payment of $1.04 million by a financially healthy company that has nearly half a billion dollars of cash on its balance sheet.  AC ¶ 8.  Moreover, by engineering the Credit Event and the issuance of the Rigged Bond, Defendants have caused a premature end to Solus' contractual relationship with its third-party CDS dealers.

### C.   Solus Adequately Alleges Defendants Acted With Wrongful Purpose Or Improper Means

A wide array of conduct can be wrongful or improper, including "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure."  *NBT Bancorp*, 87 N.Y.2d at 624 (quoting *Guard-Life Corp.*, 50 N.Y.2d at 191).  Defendants' conduct as alleged in the Amended Complaint meets the wrongful purpose or improper means element in multiple ways.

*First*, Defendants' alleged violation of Rule 10b-5 is in and of itself sufficient to satisfy this element.  AC ¶¶ 103–20; *see Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003) ("It seems obvious that alleging violations of federal antitrust law and state statutory law should satisfy the pleading requirements for wrongful conduct.").

*Second*, in *Carvel Corp. v. Noonan*, the Court of Appeals held that economic pressure

constitutes wrongful conduct if it is "extreme and unfair." *Carvel*, 3 N.Y.3d 182, 192–93 (2004).[18]
The Amended Complaint alleges that Defendants applied extreme and unfair economic pressure
to the third-party CDS dealers.  AC ¶¶ 59–60, 96.  After devising its scheme, GSO amassed a
$333 million short position in Hovnanian CDS at extremely low prices, taking advantage of the
market's assumption that reference entities such as Hovnanian that were able to pay their debts
would do so.  *See supra* p. 7.  Once GSO locked in the CDS protection sellers (including the third-
party dealers), Defendants agreed to manufacture a Credit Event and to maximize GSO's windfall
by creating the Rigged Bond to deliver into the CDS auction.  AC ¶¶ 49–58.  This sort of forced,
commercially unreasonable transaction, *id.* ¶¶ 60, 96, amounts to extreme and unfair economic
pressure.  *See New Stadium LLC v. Greenpoint-Goldman Corp.*, 44 A.D.3d 449, 450 (1st Dep't
2007) (withholding consent to lease assignment to extort a $9 million consent fee was "sufficient
to plead a cause of action for tortious interference with business relations").

## III.   THE AMENDED COMPLAINT STATES A CLAIM FOR DECLARATORY JUDGMENT

### A.   Solus Adequately Alleges That Sunrise Trail Waived Its Right To Timely Interest Payments

Sunrise Trail waived its right to timely interest payments when it elected to purchase
$26 million in 8% Notes knowing full well that Hovnanian was contractually obligated to "not
make any interest payments [on those notes] prior to their stated maturity date" in 2019.  AC ¶¶ 56,
70, 134; Corkhill Decl. Ex. 2 § 4.18 (the "New Notes Indenture"); *see also Madison Ave.*

---

[18]   Defendants incorrectly suggest that their conduct "must amount to a crime or independent tort,"
or be "for the sole purpose of inflicting intentional harm" in order to satisfy the "wrongful purpose
or improper means" element.  GSO Br. 24 (quoting *Valley Lane Indus. Co. v. Victoria's Secret
Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 106 (2d Cir. 2012) (summary order)); *accord* HOV
Br. 18 (citing *PPX Enters. v. Audio Fidelity Enters.*, 818 F.2d 266, 269–70 (2d Cir. 1987)).  The
Second Circuit has since recognized that its "dicta" in *PPX* "limiting wrongful means to the
categories of 'criminal or fraudulent conduct,' would appear unduly narrow."  *Hannex Corp. v.
GMI, Inc.*, 140 F.3d 194, 206 & n.9 (2d Cir. 1998); *accord Scutti Enters.*, 322 F.3d at 216.

*Leasehold, LLC v. Madison Bentley Assocs. LLC*, 30 A.D.3d 1, 6 (1st Dep't 2006) ("Any provision of a contract is subject to waiver, particularly a provision requiring timely payment."). Affirmatively choosing to purchase debt securities with full knowledge that the issuer of those debt securities—the purchaser's own parent company—cannot and will not comply with its obligations to pay is a textbook example of "affirmative conduct" that "evince[s] an intent not to claim a purported advantage." *Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 85 N.Y.2d 232, 236 (1995). The Hovnanian Defendants' arguments to the contrary are meritless.[19]

Hovnanian is wrong in arguing that Solus fails to present a justiciable controversy concerning Sunrise Trail's waiver. HOV Br. 21–22. Rather, the Amended Complaint presents precisely the type of "substantial controversy" "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007); *see also Frederick Goldman, Inc. v. West,* 2007 WL 1989291, at *3 (S.D.N.Y. July 6, 2007) (Swain, J.) (recognizing that *MedImmune* "in effect lower[ed] the bar for a plaintiff to bring a declaratory judgment action"). Certain future events are neither disputed nor in doubt: Hovnanian will comply with the New Notes Indenture and fail to make an interest payment to Sunrise Trail on May 1, 2018 (31 days from today), and (absent a waiver) that payment failure will trigger an Event of Default with respect to all the 8% Notes on May 31, 2018 (62 days from today). The event of default is expected to trigger a Credit Event under Hovnanian CDS contracts, which will require Solus to make protection payments that could exceed $100 million. Solus will also be deprived of future premium payments on its Hovnanian CDS.

In addition to the obvious negative impact that it will have on Solus' CDS, an Event of

---

[19]  The waiver cases cited by the Hovnanian Defendants are inapposite, because they all deal with situations in which the party alleged to have waived had no knowledge of its counterparty's inability to perform at the time it entered into the contract. *See* HOV Br. 23.

Default will in turn reduce the value of the 8% Notes held by Solus, because other Noteholders will be able to "accelerate" the outstanding Notes (*i.e.*, declare them immediately due and payable), cutting off all future interest payments. *See* Waldman Decl. Ex. 2 § 5.01. This risk will cause the market value of the 8% Notes to drop. The impending harm to both Solus' CDS position and its 8% Notes position represents a "certainly impending future injury" to Solus that is sufficient to confer Article III standing to seek a declaratory judgment. *Marcavage v. City of N.Y.*, 689 F.3d 98, 103 (2d Cir. 2012) (quotation omitted).

The Hovnanian Defendants' argument that Sunrise Trail has not waived its rights is equally meritless. They contend that Sunrise Trail reserved its rights with respect to non-payment, pointing to the Confidential Offering Memorandum. HOV Br. at 23. But it was *Hovnanian*—not Sunrise Trail—that prepared the Confidential Offering Memorandum statement. That makes this case entirely unlike *Southold Sav. Bank v. Cutino*, 118 A.D.2d 555 (2d Dep't 1986), which the Hovnanian Defendants cite, because in *Southold* the allegedly waiving lender itself reserved its rights against the borrower. Here it is exactly the reverse: the borrower, Hovnanian (in a self-serving statement), stated the lender, Sunrise Trail, had not waived payment.

In fact, this statement reinforces why waiver is mandated here, because it highlights the stark reality that Sunrise Trail is a wholly owned subsidiary and mere instrumentality of Hovnanian, with no corporate voice or intent distinct from its parent. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) ("A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one."). Hovnanian cannot have it both ways, simultaneously intending not to pay its subsidiary *and* contending that its subsidiary has reserved its right to demand payment.

36

Unable to have their cake and eat it, too, the Hovnanian Defendants resort to an argument that Sunrise Trail's waiver is ineffective because it is not in writing.  HOV Br. 23.  But the 8% Notes Indenture's written waiver requirement that the Hovnanian Defendants invoke does not apply here.  Under that indenture, Notes held by Hovnanian "Affiliates" such as Sunrise Trail are "disregarded and deemed not to be outstanding" for waiver purposes.  Waldman Decl. Ex. 2 § 2.05(b).  But even if the "in writing" provisions did apply here, "New York law allows the parties to waive such a no-waiver provision by a subsequent course of conduct."  *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087, 1098 (S.D.N.Y. 1989); *see also Dice v. Inwood Hills Condo.,* 237 A.D.2d 403, 404 (2d Dep't 1997) ("[T]he existence of a nonwaiver clause does not in itself preclude waiver of a contract clause.").  *Travellers* is particularly instructive here.  Defendant TWA argued that it should be entitled to terminate a contract under a "key personnel" clause that was triggered by Travellers' sale to a third party.  The court ruled that TWA had waived its right to terminate—and the agreement's requirement that all waivers be in writing—by approving the Travellers sale knowing that it would result in a violation of the "key personnel" clause.  *Travellers*, 722 F. Supp. at 1098–99.  The facts here present an even more compelling case of waiver.  Even if it were an arm's-length purchaser, Sunrise Trail would have been aware that Hovnanian would become contractually forbidden to pay interest on the Notes; as a wholly owned Hovnanian subsidiary, there can be no doubt that, by purchasing its Notes with that knowledge, Sunrise Trail waived any right to complain of nonpayment.  For the foregoing reasons, the Hovnanian Defendants' motion to dismiss Count IV should be denied.

### B.    Solus Adequately Alleges That Hovnanian Has Breached The Indenture

Section 3.04(d) of the 8% Notes Indenture provides that K. Hovnanian may "acquire Notes by means other than a redemption … ***so long as such acquisition does not otherwise violate the terms of [the] Indenture***."  Waldman Decl. Ex. 2 § 3.04(d) (emphasis added).  K. Hovnanian

37

breached this provision by covenanting as part of the exchange offer not to pay interest on the 8% Notes held by Sunrise Trail in a timely fashion.  Pickhardt Decl. Ex. 11, at 12, ECF No. 7-11.  This covenant—which was subsequently included in the New Notes Indenture, *see* Corkhill Decl. Ex. 2 § 4.18—violated Section 4.01 of the 8% Notes Indenture, which requires K. Hovnanian to "pay … interest on the Notes on the dates and in the manner provided in the Notes and this Indenture." Waldman Decl. Ex. 2 § 4.01.  Solus therefore seeks a declaration that the terms of the exchange breached Section 3.04(d) of the 8% Notes Indenture.

The Hovnanian Defendants argue that Solus cannot seek a declaration that K. Hovnanian has breached the 8% Notes Indenture until it actually fails to pay interest to Sunrise Trail on May 1, 2018, and the 30 day grace period expires.  HOV Br. 24–25.  But this argument misses the point. Solus is not seeking a declaration that K. Hovnanian has anticipatorily breached Section 4.01. Rather, by covenanting not to comply with Section 4.01, Hovnanian has breached Section 3.04(d), which explicitly prohibits the acquisition of Notes in a manner that violates the 8% Notes Indenture.  There is nothing "anticipatory" about this breach.  K. Hovnanian has already completed the offending exchange offer and has accordingly already breached Section 3.04(d).[20]

The Hovnanian Defendants' alternative argument—that K. Hovnanian did not breach Section 3.04(d) because "[n]othing in the terms of the Exchange Offer … requires or obligates K. Hovnanian not to pay interest on Sunrise Trail's 8% Notes," (HOV Br. 25)—is equally meritless.  Settled rules of contract interpretation dictate that "[f]orm should not prevail over substance," *Penguin Grp. (USA) Inc. v. Time/Warner Retail Sales & Mktg. Servs., Inc.*, 115 A.D.3d 119, 121 (1st Dep't 2014) (quoting *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13

---

[20]   The cases cited by the Hovnanian defendants (HOV Br. 24-25) are inapposite, because none deal with a contract that expressly prohibits transactions that violate the contract's terms.

N.Y.3d 398, 404 (2009)), and that "separate agreements executed contemporaneously and that are part of a single transaction are to be read together," *Prod. Res. Grp., L.L.C. v. Martin Prof'l, A/S*, 907 F. Supp. 2d 401, 413 (S.D.N.Y. 2012) (citing *This Is Me, Inc. v. Taylor,* 157 F.3d 139, 143 (2d Cir. 1998)) (applying New York law).  There can be no serious dispute that the exchange offer and New Notes Indenture were part of a single transaction.  Indeed, the covenant not to pay interest in the New Notes Indenture was a precondition for GSO's willingness to participate in the exchange offer.  Accordingly, K. Hovnanian's inclusion of the failure to pay covenant in a contract that formed part of the exchange offer was a breach of Section 3.04(d).

### C.   The No-Action Clause In The Indenture Does Not Preclude Solus' Claims

The procedural requirements of the no-action clause in the 8% Notes Indenture apply to claims "for the appointment of a receiver or trustee or similar official, *or for any other remedy* [*t*]*hereunder*."  Waldman Decl. Ex. 2 § 5.06.  By its express terms, this clause does **not** apply to declaratory judgment claims, which seek a declaration of "the rights and other legal relations of any interested party," Declaratory Judgment Act, 28 U.S.C. § 2201(a); *see also Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F. Supp. 2d 376, 381 (S.D.N.Y. 2007), but do not seek any remedy under the 8% Notes Indenture itself.  Here, Solus is not seeking to obtain damages or other remedies *under the indenture*; rather, it seeks a declaration by the Court of the parties' respective rights and legal relations.  Accordingly, Solus' declaratory judgment claims in Counts IV and V are not precluded by the no-action clause in the 8% Notes Indenture.

This result is perfectly consistent with the rationale behind no-action clauses.  *See SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 934 F. Supp. 2d 516, 531 (E.D.N.Y. 2013), *aff'd*, 548 F. App'x 741 (2d Cir. 2014) (summary order).  In a different but analogous context, courts have held that the purpose of no-action clauses is not offended by declaratory judgment actions, finding that "a declaration is separate and apart from the merits of [the underlying contractual

dispute] and is a present dispute ripe for adjudication." *In re Spree.com Corp.*, 2002 WL 1586274, at *8 (Bankr. E.D. Pa. June 20, 2002) (considering applicability of no-action clause in insurance contract), *modified on other grounds*, 295 B.R. 762 (Bankr. E.D. Pa. 2003); *see also Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co. of Reading, Pa.*, 873 F.2d 229, 233 (9th Cir. 1989).[21]

The 8% Notes Indenture's no-action clause does not bar Count IV of the Amended Complaint for the additional, independent reason that Count IV is not a claim that arises "by virtue of or by availing of any provision of this Indenture," Waldman Decl. Ex. 2 § 5.06, as required for the no-action clause to apply. Rather, Count IV seeks a determination of the parties' rights and legal relations based on conduct that is exogenous to the 8% Notes Indenture. This conclusion is further supported by the no-action clause's procedural requirements, which state that to maintain a suit seeking remedies under the 8% Notes Indenture, a noteholder "previously shall have given to the Trustee written notice ***of default and of the continuance thereof***." Waldman Decl. Ex. 2 § 5.06 (emphasis added). Where, as in the case of Count IV, a declaration of default is not sought, the no-action clause is inapplicable according to its plain terms.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied in their entirety. Alternatively, Solus should be granted leave to re-plead.

---

[21] The cases cited by the Hovnanian Defendants, which stand only for the straightforward proposition that no-action clauses are "strictly construed" where they apply, do not compel a different conclusion. *Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992). Indeed, it is noteworthy that none of the cases cited by the Hovnanian Defendants involve stand-alone declaratory judgment claims. *See, e.g.*, *SC Note Acquisitions*, 934 F. Supp. 2d at 521 (breach of contract, breach of the covenant of good faith and fair dealing, and negligence); *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 178 (S.D.N.Y. 2011) (alleging "no less than nineteen claims for relief," but no declaratory judgment claims). In the only case the Hovnanian Defendants cite that features a declaratory judgment claim, *Waxman v. Cliffs Natural Resources Inc.*, the claim was dismissed as being wholly duplicative of the plaintiff's breach of contract and other claims, without any independent consideration of the applicability of the no-action clause to that claim. *Waxman*, 222 F. Supp. 3d 281, 296 (S.D.N.Y. 2016).

DATED:   New York, New York                QUINN EMANUEL URQUHART &
         March 30, 2018                          SULLIVAN, LLP


                                           By: _____
                                                Jonathan E. Pickhardt
                                                Daniel P. Cunningham
                                                Andrew S. Corkhill
                                                Ellison Ward Merkel

                                           51 Madison Avenue, 22nd Floor
                                           New York, New York  10010-1601
                                           (212) 849-7000

                                           -and-

                                           QUINN EMANUEL URQUHART &
                                                SULLIVAN, LLP

                                                Michael E. Liftik
                                                *pro hac vice*

                                           1300 I Street NW, Suite 900
                                           Washington, DC 20005
                                           (202) 538-8000

                                           *Attorneys for Plaintiff*